# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHIGAN WELFARE RIGHTS ORGANIZATION, NAACP, MAUREEN TAYLOR, NICOLE L. HILL, and TEASHA K. JONES, <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP; DONALD J. TRUMP FOR PRESIDENT, INC.; and REPUBLICAN NATIONAL COMMITTEE, <br><br> *Defendants.* | Civil Case No. 1:20-cv-03388-EGS |

## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF ON BEHALF OF DEFENDANTS DONALD J. TRUMP AND DONALD J. TRUMP FOR PRESIDENT, INC.

Jesse R. Binnall
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com
Counsel for DONALD J. TRUMP and
DONALD J. TRUMP FOR PRESIDENT, INC.

# Table of Contents

FACTUAL BACKGROUND .......................................................... 4

LAW AND ARGUMENT ........................................................... 11

I.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED. ............................................................................................11

   A.   *To survive a motion to dismiss, Plaintiffs must make factual allegations sufficient to show that they are entitled to relief.*.................................11

   B.   *Plaintiffs failed to state a claim under Section 11(b) because they do not plausibly plead allegations of "intimidation, threats, or coercion."*...................12

   C.   *Plaintiffs do not state an actionable §1985(3) conspiracy claim because they fail to adequately allege discriminatory purpose.*.................................13

   D.   *With respect to both claims, Plaintiffs fail to adequately allege an agency relationship between Trump supporters/volunteers and the Trump Defendants.* ...............................................................................................14

   E.   *Plaintiffs' claims against President Trump for monetary damages must be dismissed because he is absolutely immune from damages liability predicated on acts within the "outer perimeter" of his official responsibility*......................16

   F.   *All of the factual allegations Plaintiffs have made against President Trump and his Campaign involve conduct that is protected under the First Amendment of the United States Constitution.* .................................................17

   G.   *The injunctive and declaratory relief Plaintiffs seek are unconstitutional attempts at a prior restraint against speech.*......................................................22

i

II.   PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING THIS COURT'S
PERSONAL JURISDICTION OVER DEFENDANTS. ...........................................................23

III.   PLAINTIFFS DO NOT HAVE STANDING TO ASSERT A THIRD-PARTY CLAIM ON BEHALF
OF VOTERS IN STATES OTHER THAN MICHIGAN. ...........................................................25

    A.   *Plaintiffs Michigan Welfare Rights Organization and the NAACP do not
have standing.*.....................................................................................................25

    B.   *Individual Plaintiffs do not have standing to assert a third-party claim on
behalf of voters in other states.*............................................................................26

**CONCLUSION** .............................................................................................. 28

Without pleading any facts that edge their conclusory allegations across the plausibility line, Plaintiffs seek to use important civil rights statutes to improperly regulate constitutionally protected speech and to stymie President Trump's efforts to expose widespread voter integrity issues which operated to dilute the voices of voters in Michigan and throughout America. The Voting Rights Act prohibits "***intimidation, threats, or coercion***" directed at "any person for voting or attempting to vote" or at "any person for urging or aiding any person to vote or attempt to vote."[1] (emphasis added). In a similar vein, 42 U.S.C. §1985 prohibits racially motivated conspiracies aimed at depriving any person of the equal protection of the laws. Neither statute is a vehicle for squelching protected political speech.

This case is grounded in Plaintiffs' wholly unsupported assertion that ***political activities***—generated by a political candidate's exercise of his First Amendment rights to free speech and "to petition the Government for a redress of grievances"—is tantamount to "intimidation, threats, or coercion" forbidden by Section 11(b). Indeed,

---

[1] For ease of the Court's reference, 52 U.S.C. §10307(b), commonly known as Section 11(b) of the Voting Rights Act, provides: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42." The definition of "vote" or "voting" applicable to enforcement proceedings appears in 52 U.S.C. §10310(c)(1): "The terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election."

Plaintiffs seek nothing less than an injunction—or more specifically, a prior restraint—from this Court, to regulate the political speech and activities of a candidate for public office with whom they disagree. Plaintiffs broadly label the Defendants' alleged conduct—which amounts to several tweets, a press conference to report the findings of the Trump Campaign's voter fraud investigation, a telephone call with two Republican Wayne County canvassers *after* they caved to an avalanche of partisan Democratic political pressure and changed their votes to certify the county's election results, and a meeting in the White House with two Republican state legislators—as "intimidation" but fail to provide a factual basis for that characterization. If, as Plaintiffs insist, Section 11(b) proscribes Defendants' conduct, then the statute would be plainly unconstitutional.

Plaintiffs' interpretation of 42 U.S.C. §1985(3) suffers from similar constitutional infirmities. If §1985(3) bars politicians and their political campaigns from using ***political means*** to contest the highly disputed results of an election, then this statute is plainly unconstitutional.

This Court need not reach "the serious constitutional questions" raised by Plaintiffs' interpretation of the Voting Rights Act, however, because "courts, particularly in [Voting Rights Act] cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue[.]" *Simmons v. Galvin*, 575 F.3d 24, 42 (1st Cir. 2009) (citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197, 129 S. Ct. 2504, 2508, 174 L. Ed. 2d 140 (2009)). Applying this canon, the Court should find that the proscriptions of this statute do not encompass Defendants'

constitutionally protected behavior and, accordingly, that Plaintiffs have failed to state a claim for relief under Section 11(b).

Moreover, Plaintiffs' §1985(3) claim similarly fails because Plaintiffs do not plead any facts that, if true, would show that Defendants conspired against them because of class-based discriminatory animus. *Lattisaw v. District of Columbia*, 118 F.Supp.3d 142, 162 (D.D.C. 2015). The statute does not apply to all conspiratorial tortious interferences with the rights of others but only those motivated by some class-based, invidiously discriminatory animus. *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009). Plaintiffs allege nothing more than bare and conclusory allegations that do not even come close to edging this claim over the line from "possibility to plausibility of 'entitlement to relief.'" *Lattisaw*, 118 F.Supp.3d at 162 (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Plaintiffs further cannot establish that this Court is authorized to exercise jurisdiction over Defendants. Because neither President Trump nor his campaign are residents of the District of Columbia, Defendants are not subject to general jurisdiction here. Any effort to subject Defendants to this Court's specific jurisdiction based on their constitutionally protected activities offend the limits imposed on the District of Columbia by constitutional due process.

Additionally, as pled, principles of sovereign immunity bar Plaintiffs' claims for monetary damages against President Trump.  Finally, to the extent that Plaintiffs seek an injunction on behalf of voters "in any other state," Plaintiffs' requested

injunction is overbroad. Plaintiffs Maureen Taylor, Nicole L. Hill, and Teasha K. Jones are residents of Michigan and do not have standing to obtain relief on behalf of voters in other states. Additionally, Plaintiffs NAACP and Michigan Welfare Rights Organization cannot meet their respective burdens of proving they have standing to assert the instant claims.

## FACTUAL BACKGROUND

Plaintiffs Michigan Welfare Rights Organization, Maureen Taylor, Nicole L. Hill, Teasha K. Jones, and the NAACP filed the instant Amended Complaint seeking declaratory and injunctive relief as well as monetary damages under Section 11(b) of the Voting Rights Act and 42 U.S.C. §1985(3) and naming as Defendants (1) President Donald J. Trump, (2) his presidential campaign, Donald J. Trump for President, Inc. (the "Campaign"), and (3) the Republican National Committee (the "RNC"). Dkt. 8, pp. 27-29.

According to their Amended Complaint, Plaintiff Michigan Welfare Rights Organization is a group whose membership includes "Black members who reside in Detroit, Michigan, voted in the November 2020 Election, and cast a ballot for President." Dkt. 8, p. 3. The Amended Complaint alleges that the three individual Plaintiffs Taylor, Hill, and Jones are Black residents of Detroit Michigan, over the age of eighteen-years-old, who voted in the November 2020 election and casted a ballot for President. Dkt. 8, p. 4. The Amended Complaint further alleges that the NAACP is a "civil rights grassroots organization" with state and local chapters representing 48 states with "members across the country who voted in the 2020

election and who plan to vote in future elections, including in Michigan, Wisconsin, Pennsylvania, Georgia, Arizona, and Nevada." Dkt. 8, p. 4.

Donald J. Trump is the Forty-Fifth President of the United States. In November 2020, he was a candidate for re-election to that office. Dkt. 8, p. 5. He is domiciled in Florida, as he was when the events alleged in the Amended Complaint occurred. Donald J. Trump for President, Inc. (the "Campaign"), is a Virginia corporation with a principal place of business in New York and an office in Virginia. The RNC is a national political party which generally coordinates and promotes Republican candidates for elected office. Dkt. 8, p. 5.

Confronting voting irregularities so extensive that even Plaintiffs had to acknowledge such an instance in their Amended Complaint,[2] President Trump and his Campaign worked tirelessly to investigate and to expose widespread voter fraud in the aftermath of the November 3, 2020 election. From the beginning, President Trump pursued this investigation with one goal in mind: protecting the franchise of every American by ensuring that every legal vote is counted. In discharging the oath he took as President to "preserve, protect and defend the Constitution of the United States" to the best of his ability, President Trump boldly opposed those threatening to steal the 2020 election and to delegitimize the electoral safeguards enshrined in our Constitution. *See* U.S. Const. Art. II, §1, cl. 8.

---

[2] *See* Dkt. 8, p. 14 (dismissing "minor discrepancies" between the number of voters who signed into poll books and the number of ballots cast).

President Trump undertook this effort on behalf of all Americans. In an attempt to obstruct him and to derail the ongoing struggle for ballot integrity, Plaintiffs have filed the instant Amended Complaint explosively alleging that President Trump, his Campaign, and the RNC "engaged in a ***conspiracy***, executed through a coordinated effort, to disenfranchise voters by disrupting vote counting efforts, lodging groundless challenges during recounts, and attempting to block certification of election results through ***intimidation and coercion*** of election officials and volunteers," all in violation of Section 11(b) of the Voting Rights Act and 42 U.S.C. §1985(3). Dkt. 8, p. 7 (emphasis added). Factually, these allegations are clearly wrong and wildly offensive.

President Trump vigorously rejects the assertion that he sought to disenfranchise a single American or to prevent a single legal vote from being counted. In challenging the election results, President Trump intended to protect our electoral system from manipulation by bad actors seeking to subvert the People's will. The election challenges that Plaintiffs blithely dismiss were grounded in the affidavits of hundreds of everyday Americans who put their reputations, their livelihoods, and their personal safety on the line to speak out—under penalty of perjury—about the election fraud they observed. These individuals whose affidavits supported President Trump's claims testified at great personal expense, not in pursuit of any gain but in an effort to protect the voting rights of all Americans.

Notably, in seeking to expose the voter fraud that riddled the 2020 election, President Trump sought to accomplish the very aims that motivated Congress'

enactment of the Voting Rights Act as indicated by its legislative history. As noted by the Seventh Circuit:

> [Section 11(b)] originated as a section of the comprehensive Voting Rights Act of 1965. That act was designed "primarily to enforce the 15th amendment to the Constitution of the United States and [was] also designed to enforce the 14th amendment and article I, section 4 [of the Constitution]." H.R.Rep. No. 439, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2437. The House Judiciary Committee noted that "[t]he public record is replete with endless instances of vote frauds, including stuffing the ballot box, tombstone voting, multiple casting of votes by one individual in several precincts or districts, threats and coercion of voters, destruction or alteration of ballots, willful miscounting of votes, and buying votes." Id. at 2471. To meet the congressional purposes the members of the House Judiciary Committee deemed it imperative that the Act include methods for enforcing clean elections. "It is a cruel deception to give any man the elective franchise and then allow destruction of the effect of his vote through a multitude of corrupt practices.... [W]e are obligated to protect the integrity of the vote cast by any citizen."

*United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994). The very purpose of Section 11(b) is to fight voter disenfranchisement, specifically disenfranchisement that results from fraud. Indeed, as the enactors of the Voting Rights Act undoubtedly understood, every time a fraudulent vote is cast and counted, the choice of a legitimate voter is erased. President Trump's efforts to ensure the integrity of our voting system are consistent both with the letter and the spirit of this law. This action is premised on constitutionally untenable interpretations of Section 11(b) and §1985(3)—that is, that any ***political pressure*** President Trump and his Campaign generated by exercising their First Amendment rights amounted to a violation of the Voting Rights Act and a conspiracy undertaken "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *See* 42 U.S.C. §1985(3).

This is ludicrous—a transparent, tired, and undemocratic attempt to quell political dissent and chill political speech. The thrust of this lawsuit is clear—do not challenge the establishment's political machine or the media's chosen narrative. Those who do will pay dearly. Their motives will be impugned and they will be labeled racists.

In this vein, a cause of action under 42 U.S.C. §1985(3) expressly requires proof, among other things, that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268, 113 S. Ct. 753, 758, 122 L. Ed. 2d 34 (1993). In an apparent attempt to meet this burden, Plaintiffs generally allege that Defendants recount efforts focused on metropolitan areas with large Black populations. Dkt. 8, pp. 28-29. Specifically, Plaintiffs assert that, in Wisconsin, the Trump Campaign limited recount efforts to two counties in Wisconsin with the largest percentage of Black voters and that "[t]he Trump Campaign did not identify any neutral justification for targeting its recount request at only those two counties." Dkt. 8, p. 9. Plaintiffs make a similar assertion about Defendants' motivations in seeking a recount in Wayne County, where Detroit is located. Yet, they are silent about the long and embarrassing history of voter fraud in that city.[3]

---

[3]https://www.detroitnews.com/story/news/politics/2020/09/04/detroit-vote-count-problems-persist-15-years/5694743002/;
https://amp.detroitnews.com/story/news/politics/2020/08/21/michigan-election-officials-call-detroit-primary-voting-problems-alarming-appalling/3410790001/;
https://www.detroitnews.com/story/news/politics/2016/12/12/records-many-votes-detroits-precincts/95363314/.

The factual allegations Plaintiffs raise are of two kinds. First, Plaintiffs make various specific allegations involving purely political speech which fall squarely under the protection of the First Amendment:

(1)    A press conference at which Trump Campaign lawyers reported the findings of the Campaign's voter fraud investigation. Dkt. 1, pp. 5-6; Dkt. 8, p. 13.

(2)    Several tweets posted by President Trump, including a tweet asserting that "Voter Fraud in Detroit is rampant, and has been for many years!" and another reporting on the results of a vote of the Wayne County Board of Canvassers stating, "'Wow! Michigan refused to certify the election results! Having courage is a beautiful thing!'" Dkt. 1, pp. 5-6; Dkt. 8, pp. 14, 15.

(3)    A statement from Michigan Republican Party Chairwoman saying: "I am proud that, due to the efforts of the Michigan Republican Party, the Republican National Committee and the Trump Campaign, enough evidence of irregularities and potential voter fraud was uncovered resulting in the Wayne County Board of Canvassers refusing to certify their election results." Dkt. 1, pp. 7-8; Dkt. 8, p. 15.

(4)    President Trump's telephone call with two Republican members of the Wayne County Board of Canvassers *after* they succumbed to liberal pressure to certify the county's election results. Dkt. 1, pp. 6-8; Dkt. 8, pp. 14-16.

(5)    President Trump's meeting at the White House with two Republican state legislators from Michigan. Dkt. 1, pp. 8-9; Dkt. 8, pp. 16-17.

(6)    President Trump's alleged telephone calls with various political officials "pressuring [them] to somehow overturn the election result." Dkt. 8, pp. 18-19.

Undoubtedly aware of the constitutional problems raised by their reliance on purely political speech, Plaintiffs attempt to put some meat on the bones of this meritless lawsuit by raising several new and very vague factual allegations in their

Amended Complaint involving asserted conduct committed by "Trump Campaign observers":

> (1)    "Trump Campaign observers encroached on the physical spaces of vote tabulators to observe the count and made verbal comments pressuring vote tabulators." Dkt. 8, p. 10.

> (2)    "Some Trump Campaign observers engaged in other deliberate actions to delay the recount by separately challenging every single ballot at a particular recount table" and challenging "absentee ballots that tabulators folded in order to put them in envelopes" and "mail-in ballots where the official sticker had become unstuck." Dkt. 8, p. 10.

> (3)    Some Trump Campaign observers allegedly became physically aggressive with election volunteers with one observer having to be escorted from the recount site after pushing an election official. Dkt. 8, p. 10.

Similarly, Plaintiffs' Amended Complaint also contains several allegations involving unidentified, desultory "Trump supporters." Dkt. 8, pp. 11-12. Plaintiffs do not plead any facts that could give rise to any inference that an agency relationship existed between these unnamed individuals and President Trump and/or the Trump Campaign.

On November 20, 2020, Plaintiffs filed their Complaint. Dkt. 1. Defendants President Trump and the Trump Campaign (the "Trump Defendants," collectively) were served on November 30, 2020. Dkt. 4; Dkt. 5. Plaintiffs then filed an Amended Complaint on December 21, 2020. Dkt. 8. Thereafter, the Trump Defendants moved for—and were granted—an extension of time to file their answer. Dkt. 9. This motion to dismiss timely follows. *See* Fed. R. Civ. P. 12(a)(1)(A)(i).

10

## LAW AND ARGUMENT

**I.      Plaintiffs have failed to state a claim for which relief may be granted.**

### A. To survive a motion to dismiss, Plaintiffs must make factual allegations sufficient to show that they are entitled to relief.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly*, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility

11

and plausibility of 'entitlement to relief.'" *Id.* (*quoting Twombly*, 550 U.S. at 557). Although for the purposes of a motion to dismiss the court must take all of the factual allegations in the complaint as true, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 679.

### B. Plaintiffs failed to state a claim under Section 11(b) because they do not plausibly plead allegations of "intimidation, threats, or coercion."

Under the *Twombly* standard, a complaint that pleads facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Here, the Amended Complaint does not even approach the possibility standard that the *Twombly* Court deemed *insufficient* for a claim to survive a motion to dismiss. Indeed, *none of the factual allegations* Plaintiffs raise in their Amended Complaint are even consistent with the Trump Defendants liability under Section 11(b). The statute prohibits "***intimidation, threats, or coercion***" directed at "any person for voting or attempting to vote" or at "any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. 1307(b) (emphasis added). Yet, Plaintiffs provide no facts about President Trump or the Campaign's intimidation of any person; they make no allegations about threats of any kind; they provide no facts about coercion. Instead, Plaintiffs offer labels, conclusions, and naked assertions devoid of "further factual enhancement." *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

Certainly, Plaintiffs' Amended Complaint is peppered with the terms "intimidation," "threats," and "coercion." But, the sum total of Plaintiffs' allegations

against the Trump Defendants amount to tweets, a news conference, a meeting at the White House between the President of the United States and other public officials, and alleged telephone calls. The substance of the tweets is public record. The news conference was televised. Plaintiffs make no factual allegations about the contents of these alleged telephone calls or the substance of the White House meeting. Ultimately, Plaintiffs allege nothing more than a formulaic recitation of the elements of Section 11(b). Under *Twombly*, this "will not do." *Twombly,* 550 U.S. at 555. Even assuming all of the allegations are true, President Trump and his Campaign engaged in simple and straightforward political speech during an important political dispute. Viewing all of the facts in the light most favorable to Plaintiffs, this Amended Complaint simply does not show that Plaintiffs are entitled to relief based on any allegation they raise against President Trump or the Trump Campaign. *See* Fed. R. Civ. P. 8(a)(2). Accordingly, Plaintiffs' Section 11(b) claim against the Trump Defendants should be dismissed.

### C. Plaintiffs do not state an actionable §1985(3) conspiracy claim because they fail to adequately allege discriminatory purpose.

To state a cause of action under § 1985(3), a plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. 42 U.S.C. § 1985(3); *Pope v. Bond*, 641 F. Supp. 489, 498 (D.D.C. 1986). A plaintiff must show, *inter alia*, "some racial, or perhaps otherwise class-based,

invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68, 113 S. Ct. 753, 758, 122 L. Ed. 2d 34 (1993). Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. *Id.* at 271. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part <u>"because of,"</u> not merely <u>"in spite of,"</u> its adverse effects upon an identifiable group. *Id.* at 271-72 (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)) (emphasis added).

Here, Plaintiffs' claims of "invidious discrimination" amount to the assertion that the counties in which Defendants sought to conduct a recount were counties with large Black populations. If true, this allegation simply does not show that Defendants conspired against Plaintiffs ***because of***—rather than ***in spite of***—their status as Black Americans. This allegation is a bald assertion that does not meet the *Twombly* plausibility standard. *See In re Rodriguez*, No. 05-5130, 2005 WL 3843612, at *4 (D.C. Cir. Oct. 14, 2005). Indeed, it is a factual contention that is "merely consistent with" Defendant's liability. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. As such, it "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. Thus, Plaintiffs' §1985(3) claim against the Trump Defendants should be dismissed.

### D. With respect to both claims, Plaintiffs fail to adequately allege an agency relationship between Trump supporters/volunteers and the Trump Defendants.

To the extent that Plaintiffs seek to impose liability on President Trump and his Campaign for the alleged conduct of "Trump Campaign observers" and "Trump supporters," Plaintiffs have failed to allege facts that if true would substantiate the existence of an agency relationship between these unnamed individuals and either of the Trump Defendants. Although the Court accepts as true the well-pled allegations in Plaintiffs' Amended Complaint, *Ndoromo v. Barr*, No. CV 19-3781 (CKK), 2020 WL 5107546, at *1 (D.D.C. Aug. 31, 2020), pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555. In the instant case, Plaintiffs label these unidentified Trump Campaign volunteers and supporters as "agents," *see* Dkt. 8, p. 6, but they have failed to raise a plausible inference than an agency relationship existed between the Trump Campaign and these unnamed individuals.

In the District of Columbia, the determination of whether an agency relationship exists turns on several factors, including: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 110 (D.D.C. 2010). Of these factors, the "'determinative factor' is usually the ... right to control an employee in the performance of a task and in its result." *Id.*; *see also Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C.1985) (stating that the "determination of the existence of [an agency] relationship basically turns upon one of these factors: control."). Indeed, "[i]t is a fundamental principle of hornbook agency

law that an agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'" *Acosta Orellana*, 711 F. Supp. 2d. at 110; *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F.Supp.2d 107, 122 (D.D.C.2008) (quoting Restatement (Second) of Agency § 14 (1958)); *see also* Restatement (Third) of Agency § 1.01 (2006) (stating that an agency relationship is the "fiduciary relationship that arises when [a principal] manifests assent to [an agent] that the agent shall act on the principal's behalf and subject to the principal's control").

Plaintiffs' factual allegations are completely devoid of any suggestion that the Trump Campaign had control over its diffuse and myriad volunteers, much less the over seventy-four million Trump supporters in America. Because Plaintiffs fail to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," they have failed to state a claim for relief that can survive a motion to dismiss. *Iqbal*, 556 U.S. at 678; *Cumis Ins. Soc., Inc. v. Peters*, 983 F. Supp. 787, 796 (N.D. Ill. 1997) ("While the existence and extent of the agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss.").

### E. Plaintiffs' claims against President Trump for monetary damages must be dismissed because he is absolutely immune from damages liability predicated on acts within the "outer perimeter" of his official responsibility.

As a former President of the United States, President Trump is absolutely immune from damages liability predicated on acts within the "outer perimeter" of his

official responsibility. *Nixon v. Fitzgerald*, 457 U.S. 731, 756, 102 S. Ct. 2690, 2704, 73 L. Ed. 2d 349 (1982). When defending against common law tort suits, this privilege is absolute, meaning he has a complete defense entitling him to summary judgment, subject only to the requirement that his actions fall within the outer perimeter of his official duties. *Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987).

All of the conduct alleged falls within the outer perimeter of President Trump's official responsibilities as President. Those official responsibilities include "preserv[ing], protect[ing] and defend[ing] the Constitution of the United States." U.S. Const. Article II, Section I, clause 8. As pled, President Trump's efforts to expose voter fraud and to protect our voting system from manipulation encompass those duties. As such, this immunity bars Plaintiffs' action for damages against President Trump.

### F.  All of the factual allegations Plaintiffs have made against President Trump and his Campaign involve conduct that is protected under the First Amendment of the United States Constitution.

For the Court to find that Plaintiffs' Amended Complaint states a claim, it would have to adopt an extraordinarily broad interpretation of Section 11(b) and of §1985(3) such that any effort by ***any person*** to exert ***political pressure*** on state and local election officials would constitute violations of these provisions. *Cf.* U.S. Const. Amend. 1 ("Congress shall make no law…abridging…the right of the people…to petition the Government for redress of grievances."). Such a broad definition would necessarily prohibit or chill garden-variety campaign activity and lobbying efforts.

However, Plaintiffs have cited no authority, however, to support such a boundless interpretation of the act.

The factual allegations Plaintiffs have raised against President Trump and his Campaign involve conduct that is squarely protected by the First Amendment of the United States Constitution. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." The hallmark of the protection of free speech is to allow "free trade in ideas"—even ideas that the overwhelming majority of people might find distasteful or discomforting. *Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 1547, 155 L. Ed. 2d 535 (2003). Thus, the First Amendment "ordinarily" denies "the power to prohibit dissemination of social, economic and political doctrine" even when politically unpopular. *Id.*

Indeed, the First Amendment generally prevents government from proscribing speech or even expressive conduct, because of disapproval of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305 (1992). Content-based regulations are presumptively invalid. *Id.* Further, "political speech is entitled to the fullest possible measure of constitutional protection." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 816, 104 S. Ct. 2118, 2134, 80 L. Ed. 2d 772 (1984). "[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps*, 562 U.S. 443, 451–52, 131 S. Ct. 1207, 1215, 179 L. Ed. 2d 172 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)). The First Amendment reflects "a profound national

commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder*, 562 U.S. at 452. That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.*

Given that Donald J. Trump was the President of the United States and, at all relevant times, a candidate for reelection to that office, it is difficult to imagine speech cloaked with more constitutional protection than the alleged expressive conduct—the tweets, press conference, and meeting with state legislators—that Plaintiffs seem to assert violates Section 11(b) and §1985(3). Turning district courts into the arbiters of campaign speech would be a particularly troubling precedent.

Moreover, the very election challenge Plaintiffs wish this Court to enjoin is independently authorized by other provisions of the Constitution, including the First Amendment right to petition the Government for redress of grievances and Article II, §1, cl. 2, which places the selection of presidential electors squarely in the hands of the state legislatures. *See* U.S. Const. Amend. 1 ("Congress shall make no law…abridging…the right of the people…to petition the Government for redress of grievances."); U.S. Const. Art. II, §1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors….").

Applying a broad interpretation of Section 11(b) and §1985(3) to proscribe such purely political activity would raise constitutional questions of the highest order. Indeed, Plaintiffs are inviting this Court to make such a broad and boundless

interpretation of these statutes that would require them to be struck down for running afoul of the vagueness and overbreadth doctrines. *See Hastings v. Judicial Conference of U.S.*, 829 F.2d 91, 105 (D.C. Cir. 1987) ("The overbreadth and vagueness doctrines are related but distinct. A vague law denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions; in contrast, a law that is overbroad may be perfectly clear but impermissibly purport to penalize protected First Amendment activity."). Simply put: Plaintiffs' broad reading of these historic statutes puts their enforceability and constitutionality at risk.

The Court need not take the bait. Indeed, the canon of constitutional avoidance counsels against interpreting a statute in such a way that would raise constitutional questions when there is some other ground upon which to dispose of the case. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205, 129 S. Ct. 2504, 2513, 174 L. Ed. 2d 140 (2009) (recognizing "[the] well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case"); *Delegates to Republican Nat. Convention v. Republican Nat. Comm.*, No. SACV 12-00927 DOC, 2012 WL 3239903, at *11-12 (C.D. Cal. Aug. 7, 2012);[4] *see also Simmons v. Galvin*, 575 F.3d 24, 42 (9th Cir. 2009) (acknowledging

---

[4] The *Delegates* court considered a presidential candidate's claim that the phrase "intimidate, threaten, or coerce" in the Voting Rights Act encompassed a state political party's conditioning of delegate status upon the putative delegate signing an affidavit promising to vote for a particular nominee. The court declined to adopt plaintiffs' broad proposed interpretation of these terms because such an

and applying "the principle that courts, particularly in [Voting Rights Act] cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue").

In this case, there are myriad ways to interpret these statutes that would not offend constitutional principles. *See e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 774, 114 S. Ct. 2516, 2529, 129 L. Ed. 2d 593 (1994) ("Absent evidence that the protesters' speech is independently proscribable (i.e., 'fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, this provision [banning all 'images observable' outside of an abortion clinic] cannot stand."); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388, 112 S. Ct. 2538, 2546, 120 L. Ed. 2d 305 (1992) (acknowledging that "threats of violence are outside the First Amendment"); *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 1548, 155 L. Ed. 2d 535 (2003) ("[T]he First Amendment also permits a State to ban a 'true threat.' 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.... Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a

---

interpretation could violate defendant's First Amendment right to exclude people from leadership positions in the party and "the Court need not reach 'the serious constitutional questions' raised if the Court were to adopt Plaintiffs' interpretation of the Voting Rights Act because 'courts, particularly in [Voting Rights Act] cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue."

speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.") (internal citations omitted).

Ultimately, the Voting Rights Act and §1985(3) cannot punish that which is protected by the Constitution. Plaintiffs do not allege any acts that would be proscribable under a constitutionally permissible interpretations of these statutes. Accordingly, they have failed to state a claim and this Court should dismiss their Amended Complaint.

### G. The injunctive and declaratory relief Plaintiffs seek are unconstitutional attempts at a prior restraint against speech.

Prior restraints "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Court orders that proscriptively forbid speech activities are classic examples of prior restraints. *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771, 125 L. Ed. 2d 441 (1993). They are presumed to be constitutionally invalid and the government's burden of justifying such a restraint is heavy. *New York Times v. United States*, 403 U.S. 713, 714 (1971) (the *Pentagon Papers* case). Indeed, any prior restraint on expression comes to this Court with a "heavy presumption" against its constitutional validity. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 1578, 29 L. Ed. 2d 1 (1971). Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling governmental interests. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163,

135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015); *see also Edwards v. District of Columbia*, 765 F.Supp.2d 3, 14 (D.D.C. 2011).

No conceivable issue of public concern could justify the issuance of a prior restraint against a candidate for any public office, and certainly not when the office being sought is that of President of the United States; Plaintiffs have certainly not pled one here. If a prior restraint was not appropriate to stop the dissemination of classified information found in the *Pentagon Papers,* it is certainly not appropriate here.[5] The request for any prospective relief must be dismissed, with prejudice.

## II.   Plaintiffs cannot meet their burden of establishing this Court's personal jurisdiction over Defendants.

When personal jurisdiction is challenged, the plaintiff must demonstrate that each defendant is subject to personal jurisdiction in the forum. *Alkanani v. Aegis Def.*

---

[5] Plaintiffs pepper their Amended Complaint with the repeated and false legal conclusion that President Trump's claims of election fraud are wrong. It's as if they hope that by repeating the same falsehoods time and again they can wish them into existence. Such assertions are legally irrelevant, however, in determining whether a prior restraint is appropriate. Indeed, the United Supreme Court has repeatedly held that a prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights without regard to the truth or validity of the publication. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418, 91 S. Ct. 1575, 1577, 29 L. Ed. 2d 1 (1971) ("It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication."); *Near v. Minnesota*, 283 U.S. 697, 721, 51 S.Ct. 625, 633, 75 L.Ed. 1357 (1931) ("The recognition of authority to impose previous restraint upon publication in order to protect the community against the circulation of charges of misconduct, and especially of official misconduct, necessarily would carry with it the admission of the authority of the censor against which the constitutional barrier was erected. The preliminary freedom, by virtue of the very reason for its existence, does not depend, as this court has said, on proof of truth.").

*Servs., LLC*, 976 F. Supp. 2d 13, 22 (D.D.C. 2014). The plaintiff bears the burden of establishing a factual basis for the Court's exercise of personal jurisdiction over the defendant, and to meet that burden, the plaintiff must allege specific facts connecting [the] defendant with the forum. *Id.* The primary focus of our personal jurisdiction inquiry is the defendant's relationship to the forum State. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1779, 198 L. Ed. 2d 395 (2017).

For an individual, the "paradigm forum" for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846, 2853–54, 180 L. Ed. 2d 796 (2011). Neither President Trump nor the Campaign are subject to general jurisdiction in the District of Columbia. President Trump is domiciled in Florida. Exhibits 1 and 2. The Campaign is a Virginia corporation with a principal place of business in New York and a headquarters in Virginia. Exhibits 3 and 4.

Any effort to subject Defendants to this Court's specific jurisdiction based on their constitutionally protected activities, including any action President Trump has performed in discharging his duties as President of the United States, cannot comport with the limits imposed on the District of Columbia by federal due process. *See Bristol-Myers Squibb Co.*, 137 S. Ct. at 1779, 198 L. Ed. 2d 395 (2017) ("Because [a] state court's assertion of jurisdiction exposes defendants to the State's coercive power, it is subject to review for compatibility with the Fourteenth Amendment's Due

Process Clause, which limits the power of a state court to render a valid personal judgment against a nonresident defendant.") (internal citations omitted); *Goodyear*, 564 U.S. at 918; *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (assertion of jurisdiction over out-of-state defendant must comply with "'traditional notions of fair play and substantial justice'").

Accordingly, this Court should dismiss Plaintiffs' Amended Complaint against both the President and the Campaign for lack of personal jurisdiction.

### III.    Plaintiffs do not have standing to assert a third-party claim on behalf of voters in states other than Michigan.

Plaintiffs seek an injunction from this Court requiring Defendants, among other things, to "[s]ecure approval from this Court prior to engaging in any activities related to recounts, certifications, or similar post-election activities" and to train volunteers using only training materials approved by this Court. Dkt. 8., p. 30. Plaintiffs do not have standing to assert a third-party Voting Rights Act claim on behalf of voters in a state other than Michigan.

#### A.  Plaintiffs Michigan Welfare Rights Organization and the NAACP do not have standing.

The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Where the plaintiff's standing is challenged, the court "must assume that [the plaintiff] states a valid legal claim." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 37 (D.D.C. 2018). In such cases, the plaintiff bears the burden of "show[ing] a substantial probability that [he or she has] been injured, that

the defendant caused [his or her] injury, and that the court could redress that injury."
*Id.* Each element [of standing] must be supported in the same way as any other
matter on which the plaintiff bears the burden of proof, i.e., with the manner and
degree of evidence required at the successive stages of the litigation. *Arpaio*, 797 F.3d
at 19. While the court accepts well-pleaded factual allegations as true and draw all
reasonable inferences from those allegations in the plaintiff's favor, threadbare
recitals of the elements of standing, supported by mere conclusory statements, do not
suffice. *Id.* The court does not assume the truth of legal conclusions, nor does it "accept
inferences that are unsupported by the facts set out in the complaint." *Id.* To survive
a motion to dismiss, a complaint must contain sufficient factual matter, accepted as
true, to state a claim of standing that is plausible on its face. *Id.*

In the instant case, both Michigan Welfare Rights Organization and the
NAACP cannot meet their burden of proving injury in fact. *See Elec. Privacy Info.
Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C.
Cir. 2017) ("Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71
L.Ed.2d 214 (1982), an organization may establish Article III standing if it can show
that the defendant's actions cause a concrete and demonstrable injury to the
organization's activities that is more than simply a setback to the organization's
abstract social interests.") (internal quotation marks omitted).

### B. Individual Plaintiffs do not have standing to assert a third-party claim on behalf of voters in other states.

Generally, a party must assert his own legal rights and interests and cannot
rest his claim to relief on the legal rights or interests of third parties. *Kowalski v.*

*Tesmer*, 543 U.S. 125, 129, 125 S. Ct. 564, 567, 160 L. Ed. 2d 519 (2004). Although the United States Supreme Court has recognized that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another, it has limited this exception by requiring that a party seeking third-party standing make two additional showings. *Id.* at 129-30. A party that satisfies the requirements of Article III standing may seek to enforce the legal rights of a third party where: (1) the party has a "close" relationship with the possessor of the right; and (2) there is a "hindrance" to the possessor's ability to protect its own interests. *Kumar v. Frisco Indep. Sch. Dist.*, 443 F. Supp. 3d 771, 781 (E.D. Tex. 2020) (*citing Kowalski*, 543 U.S. at 130.

Here, the individual Plaintiffs have not demonstrated a "close relationship" with voters in other states. Indeed, under Article II of the U.S. Constitution, the President is elected by Presidential Electors from each state who are appointed "in such Manner as the Legislature thereof may direct." U.S. Const. Art. II, §1, cl. 2. A voter in Michigan has no relationship whatsoever to a voter in another state because the right to vote for Presidential Electors in each state is prescribed by each state's respective legislatures, who are free to select Presidential Electors in any manner—including direct election of the Electors by the members of the state legislature—that does not violate the provisions the Constitution.

Moreover, there exists no hindrance to the ability of voters in other states to protect their own interests. Consequently, Plaintiffs do not have standing to seek relief on behalf of voters "in any other state."

27

<u>CONCLUSION</u>

Plaintiffs have failed to state a cause of action to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Viewing all factual allegations in the light most favorable to the Plaintiffs, their Amended Complaint does not state a cause of action under Section 11(b) of the Voting Rights Act or §1985(3) and important First Amendment considerations foreclose Plaintiffs' claims. Moreover, Plaintiffs cannot bear their burden of establishing that this Court's assertion of its personal jurisdiction over the President of the United States and his presidential Campaign is compatible with federal due process. Finally, Plaintiffs do not have standing to seek relief on behalf of voters "in any other state" because they cannot prove a "close relationship" to these third-party voters and cannot show any hindrance to the ability of these voters to protect their own rights. For these reasons, and the reasons raised by the Republican National Committee in its motion and brief, this Amended Complaint should be dismissed.

Dated: February 24, 2021                              Respectfully submitted,

                                         _/s/ Jesse R. Binnall_____
                                        Jesse R. Binnall (VA022)
                                        Harvey & Binnall, PLLC
                                        717 King Street, Suite 300
                                        Alexandria, VA 22314
                                        Tel: (703) 888-1943
                                        Fax: (703) 888-1930
                                        jbinnall@harveybinnall.com
                                        *Attorney for Donald J. Trump and*
                                        *Donald J. Trump for President, Inc.*

28

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February24, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record.

Dated: February 24, 2021

<u>/s/ Jesse R. Binnall</u>
Jesse R. Binnall
*Counsel for Donald J. Trump and*
*Donald J. Trump for President, Inc.*