**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MICHIGAN WELFARE RIGHTS
ORGANIZATION, *et al.*,

        *Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*,

        *Defendants.*

Case No. 1:20-cv-03388-EGS

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Background ......................................................................................................................... 2

   I.   Conduct At Issue. ...................................................................................................... 2

   II.   Allegations Supporting An Inference Of Conspiracy Among Defendants. ................... 6

Argument ............................................................................................................................ 7

   I.   This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims. ............................ 7

     A.   Plaintiffs' Claims Are Live And Not Moot. ........................................................ 7

     B.   Plaintiffs Have Standing. .................................................................................. 9

   II.   This Court Has Personal Jurisdiction Over Defendants. ........................................... 12

   III.   Former President Trump Is Not Immune From Monetary Damages Because He Did Not Act In His Official Capacity When He Violated VRA § 11(b) And KKK Act § 1985(3). ...... 15

   IV.   Plaintiffs State A Claim Under VRA § 11(b). ......................................................... 16

     A.   VRA § 11(b)'s Implied Private Right of Action Is Well Established. ...................... 17

     B.   The FAC's Allegations of Intimidation Are Well Pleaded. ...................................... 20

     C.   The First Amendment Does Not Protect Defendants' Speech. ............................... 24

     D.   Plaintiffs Have Adequately Pleaded That Trump Campaign Volunteers, RNC Volunteers, And State Republican Parties Who Engaged In Relevant Conduct Were Defendants' Agents. ................................................................................................. 32

   V.   Plaintiffs State A Claim Under KKK Act § 1985(3). .................................................. 34

     A.   Plaintiffs Have Alleged Facts Showing A Civil Conspiracy. ..................................... 34

     B.   Plaintiffs Have Stated A Claim Under The Support Or Advocacy Clause. .............. 36

     C.   Plaintiffs Have Stated Claims Under The Deprivation And Hindrance Clauses. ...... 40

Conclusion ........................................................................................................................ 45

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Agostini v. Felton*,
    521 U.S. 203 (1997)..............................................................................................20

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)..............................................................................................19

\* *Allen v. State Board of Elections*,
    393 U.S. 544 (1969).................................................................................... 17-18, 20

*Am. Ass'n of Cosmetology Sch. v. Devos*,
    258 F. Supp. 3d 50 (D.D.C. 2017) ................................................................. 11-12

*Am. Libr. Ass'n v. FCC*,
    401 F.3d 489 (D.C. Cir. 2005) ...............................................................................11

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)................................................................................................9

*Atherton v. D.C. Off. of Mayor*,
    567 F.3d 672 (D.C. Cir. 2009) ...............................................................................37

*Azzam v. Rightway Dev. Inc.*,
    789 F. Supp. 2d 110 (D.D.C. 2011) .......................................................................33

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) .............................................................................15

*Barbour v. Merrill*,
    48 F.3d 1270 (D.C. Cir. 1995) ...............................................................................37

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................1

*Beul v. ASSE Int'l, Inc.*,
    233 F.3d 441 (7th Cir. 2000) .................................................................................32

*Blessing v. Cable News Network, Inc.*,
    No. 2:20-cv-0015, 2020 WL 7647530 (E.D. Ky. Dec. 23, 2020)...........................28

[*] Authorities upon which Plaintiffs chiefly rely are marked with an asterisk.

*Boling v. United States Parole Comm'n*,
   No. 17-5285, 2018 WL 6721354 (D.C. Cir. Dec. 19, 2018) ............................................. 37-38

*Bowie v. Maddox*,
   642 F.3d 1122 (D.C. Cir. 2011) ...................................................................................39

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969) ....................................................................................................28

*\* Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) .......................................................................................... 37-39, 41

*Burson v. Freeman*,
   504 U.S. 191 (1992) ....................................................................................................31

*Casanova v. Marathon Corp.*,
   477 F. Supp. 2d 98 (D.D.C. 2007) ..............................................................................33

*Chafin v. Chafin*,
   568 U.S. 165 (2013) ......................................................................................................8

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
   436 F. Supp. 3d 354 (D.D.C. 2020) ............................................................................32

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ........................................................................................................8

*Clinton v. Jones*,
   520 U.S. 681 (1997) ....................................................................................................15

*Cort v. Ash*,
   422 U.S. 66 (1975) ......................................................................................................19

*Council on Am.-Islamic Rel'ns Minn. v. Atlas Aegis, LLC*,
   No. 20 Civ. 2195, __ F. Supp. 3d __, 2020 WL 6336707 (D. Minn. Oct. 29,
   2020) ...........................................................................................................................17

*Daschle v. Thune*,
   slip op., No. 04 Civ. 4177 (D.S.D. Nov. 1, 2004), ECF No. 6 ....................................22

*Democratic Nat'l Comm. v. Republican Nat'l Committee*,
   No. 81 Civ. 3876, 2016 WL 6584915 (D.N.J. Nov. 5, 2016) .....................................33

*Dunn v. Blumstein*,
   405 U.S. 330 (1972) ......................................................................................................9

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   72 U.S. 749 (1985) ......................................................................................................27

*Erickson v. TD Bank,*
  No. 19-cv-13641, 2021 WL 118928 (D.N.J. Jan. 13, 2021)....................................14

*Federer v. Gephardt,*
  363 F.3d 754 (8th Cir. 2004) ...............................................................................38

*Friends of the Earth, Inc. v. Laidlaw (TOC), Inc.,*
  528 U.S. 167 (2000)........................................................................................8, 10

*Great American Federal Savings & Loan Ass'n v. Novotny,*
  442 U.S. 366 (1979) .............................................................................................39

*\* Griffin v. Breckenridge,*
  403 U.S. 88 (1971).........................................................................................38, 44

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983) ............................................................... 6, 31, 34-35

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982)..............................................................................................10

*Herbin v. Hoeffel,*
  No. 99-7244, 2000 WL 621304 (D.C. Cir. Apr. 6, 2000)......................................38

*Hoai v. Vo,*
  935 F.2d 308 (D.C. Cir. 1991) .............................................................................38

*Hobson v. Wilson,*
  737 F.2d 1 (D.C. Cir. 1984) ......................................................................35, 37, 40

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977)..............................................................................................11

*Jenkins v. Miller,*
  No. 2:12-CV-184, 2017 WL 4402431 (D. Vt. Sept. 29, 2017) ......................... 43-44

*Johnson v. Interstate Mgmt. Co.,*
  849 F.3d 1093 (D.C. Cir. 2017) ...........................................................................19

*United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan,*
  250 F. Supp. 330 (E.D. La. 1965)..................................................................... 21-22

*Keating v. Carey,*
  706 F.2d 377 (2d Cir. 1983).................................................................................42

*\* Kush v. Rutledge,*
  460 U.S. 719 (1983)..............................................................................................39

*LaRouche v. Fowler*,
    152 F.3d 974 (D.C. Cir. 1998) ............................................................................37

* *League of United Latin Am. Citizens v. Pub. Interest Legal Found.* ("*LULAC*"),
    No. 18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ............... 17, 21-23, 36-39, 44

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) .................................................................................................20

*Levy v. Currier*,
    587 A.2d 205 (D.C. 1991) ...................................................................................32

*Libertad v. Welch*,
    53 F.3d 428 (1st Cir. 1995) .................................................................................43

*Martin v. Malhoyt*,
    830 F.2d 237 (D.C. Cir. 1987) ............................................................................38

*McCord v. Bailey*,
    636 F.2d 606 (D.C. Cir. 1980) ............................................................................37

*Moore v. Ogilvie*,
    394 U.S. 814 (1969) ...............................................................................................9

* *Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996) ......................................................................................... 17-19

* *Nat'l Coal. on Black Civic Participation v. Wohl* ("*NCBCP I*"),
    No. 20 Civ. 8668, 2020 WL 6305325 (S.D.N.Y. Oct. 28, 2020) .............. 17, 20-22, 26-27, 36

*Nat'l Coal. on Black Civic Participation v. Wohl* ("*NCBCP II*"),
    No. 20 Civ. 8668, __ F. Supp. 3d __, 2021 WL 480818 (S.D.N.Y. Jan. 12,
    2021) ............................................................................................................... 34-36

*Norman v. Reed*,
    502 U.S. 279 (1992) ...............................................................................................9

*Nwanguma v. Trump*,
    903 F.3d 604 (6th Cir. 2018) ..............................................................................28

*Paynes v. Lee*,
    377 F.2d 61 (5th Cir. 1967) ............................................................................36, 40

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ..........................................................................10

*Prakash v. Am. Univ.*,
    727 F.2d 1174 (D.C. Cir. 1984) ..........................................................................14

*Reynolds v. Sims,*
 377 U.S. 533 (1964)................................................................................31, 36

*Rhodes v. Siver,*
 No. 19 Civ. 12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021)........................................17

*In re Rodriguez,*
 No. 05-5130, 2005 WL 3843612 (D.C. Cir. Oct. 14, 2005) ....................................................37

*New York ex rel. Spitzer v. Operation Rescue Nat'l,*
 273 F.3d 184 (2d Cir. 2001)...............................................................................31

*Spokeo, Inc. v. Robins,*
 136 S. Ct. 1540 (2016)..........................................................................................9

*St. Amant v. Thompson,*
 390 U.S. 727 (1968)........................................................................................26-27

*Texas v. Florida,*
 306 U.S. 398 (1939).............................................................................................14

*United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v.*
 *Scott,*
 463 U.S. 825 (1983).......................................................................................38, 43

*United States v. Bruce,*
 353 F.2d 474 (5th Cir. 1965) ...............................................................................21

*United States v. Clark,*
 249 F. Supp. 720 (S.D. Ala. 1965).....................................................................23-24

*United States v. May,*
 555 F. Supp. 1008 (E.D. Mich. 1983).................................................................31

*United States v. McLeod,*
 385 F.2d 734 (5th Cir. 1967) ...............................................................................21

*United States v. Or. State Med. Soc'y,*
 343 U.S. 326 (1952)..............................................................................................8

*United States v. Turner,*
 720 F.3d 411 (2d Cir. 2013)................................................................................26

*United States v. White,*
 769 F.2d 511 (8th Cir. 1985) ...............................................................................31

*Urquhart-Bradley v. Mobley,*
 964 F.3d 36 (D.C. Cir. 2020) ..............................................................................15

*Virginia v. Black,*
    538 U.S. 343 (2003).................................................................................26

*In re Vitamins Antitrust Litig.,*
    No. MISC 99-197, 2000 WL 1475705 (D.D.C. May 9, 2000).................................35

*Warth v. Seldin,*
    422 U.S. 490 (1974)............................................................................ 11-12

*Watts v. United States,*
    394 U.S. 705 (1969).................................................................................25

*White Coat Waste Proj. v. United States Dep't of Veterans Affairs,*
    404 F. Supp. 3d 87 (D.D.C. Aug. 29, 2019) ...........................................3, 5

*Wilson v. DNC Servs. Corp.,*
    417 F. Supp. 3d 86 (D.D.C. 2019)..........................................................38

*Wilson v. DNC Servs. Corp.,*
    831 F. App'x 513 (D.C. Cir. 2020)..........................................................38

*Xie v. Sklover & Co., LLC,*
    260 F. Supp. 3d 30 (D.D.C. 2017)..........................................................12

*Youming Jin v. Ministry of State Sec.,*
    335 F. Supp. 2d 72 (D.D.C. 2004) .................................................. 14, 34-35

*Zhang Jingrong v. Chinese Anti-Cult World All.,*
    287 F. Supp. 3d 290 (E.D.N.Y. 2018) ......................................................40

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017)............................................................................19

## United States Constitution

First Amendment ..................................................................1-3, 24-26, 28, 31, 42

Fourteenth Amendment ..........................................................................42

Fifteenth Amendment .................................................................... 17-18

## Statutes

* 42 U.S.C. § 1985(3) ...................................1, 8, 12, 15, 25, 27-28, 31, 33-34, 36-44

52 U.S.C. § 10101(b) ..........................................................................21

* 52 U.S.C. § 10307(b) ................................................ 1, 8-10, 15-25, 27-28, 30-31, 34, 36, 39, 42

52 U.S.C. § 10310(c)(1) ...................................................................................................20, 24

**Other Authorities**

Cong. Globe, 42d Cong., 1st Sess. 565, 567, col. 2 (1871) ...........................................42

H.R. Rep. No. 89-439 (1965).........................................................................................21

Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) ...................23

Restatement (Third) of Agency § 7.07(3)(b) (2006) ...................................................32

*Payment of Expenses Associated with Travel by the President and Vice President*
(Mar. 24, 1982), https://www.justice.gov/sites/default/files/olc/opinions/1982/
03/31/op-olc-v006-p0214_0.pdf ........................................................................................16

 Aaron Blake, *New Audio Reinforces Trump's Blatant Pressure Campaign to
Overturn the Election*, Wash. Post (Mar. 11, 2021), https://
www.washingtonpost.com/politics/2021/03/11/new-audio-reinforces-trumps-
blatant-pressure-campaign-overturn-election ...........................................................3

Amy Gardner & Paulina Firozi, *Here's the Full Transcript and Audio of the Call
Between Trump and Raffensperger*, Wash. Post (Jan. 5, 2021), https://
www.washingtonpost.com/politics/trump-raffensperger-call-transcript-
georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_
story.html ...................................................................................................................29

*Trump Supporters Storm U.S. Capitol, Clash With Police*, NPR.org (Jan. 6, 2021),
https:// www.npr.org/sections/congress-electoral-college-tally-live-updates/
2021/01/06/953616207/diehard-trump-supporters-gather-in-the-nations-
capital-to-protest-election-resul .........................................................................5, 29

Through their motions to dismiss, Defendants the Republican National Committee, Donald J. Trump for President, Inc., and former President Donald J. Trump[1] seek to validate their persistent effort to disenfranchise voters. Defendants contend that attempting to delay and stop vote counting in tightly contested states, pressuring state and local election officials not to certify election results, and baselessly challenging the validity of legally cast ballots is ordinary political speech protected by the First Amendment. That dangerous contention should be rejected. Read as a whole and with inferences in Plaintiffs' favor, Plaintiffs' Amended Complaint (Dkt. No. 8) ("FAC") alleges coercion and intimidation, which the First Amendment plainly does not protect and which is proscribed by Section 11(b) of the Voting Rights Act ("VRA"), 52 U.S.C. § 10307(b), and the Ku Klux Klan Act ("KKK Act"), 42 U.S.C. § 1985(3). By describing an organized campaign to undermine the election carried out by numerous actors over a period of weeks, the FAC also adequately alleges the agency and conspiratorial relationships between the various Defendants.

The Court should also reject Defendants' jurisdictional arguments. To begin, the fact that Defendants characterize these activities as acceptable political advocacy demonstrates precisely why this dispute is not moot; if Defendants believe these are legitimate activities, then there is, to say the least, a reasonable likelihood they will engage in similar conduct in future elections. By the same token, Plaintiffs have standing to assert these claims under well-established law. Finally, the Court should reject former President Trump's argument that he is immune from damages for activity far outside the scope of his role as President.

---

[1] The RNC's combined motion to dismiss and supporting memorandum (Dkt. No. 24) is denominated "RNC Mem." The Trump Defendants' memorandum in support of their motion to dismiss (Dkt. No. 25-1) is denominated "Trump Mem." The page numbers in citations to those memoranda are the page numbers supplied by the Court's ECF system.

## BACKGROUND

Plaintiffs allege that Defendants conspired to prevent the counting of legally cast ballots. (FAC ¶¶ 20, 76-85.) The objective of Defendants' conspiracy was to intimidate election officials, disenfranchise and overturn the will of voters, and ensure that then-President Trump stayed in power despite losing the 2020 presidential election. (*See, e.g.*, *id.* ¶¶ 35-37.) Plaintiffs allege that in furtherance of their conspiracy, Defendants engaged in private coercion of election officials; public intimidation of, and incitement of lawless action against, election officials; and, through their agents, physical violence, obstruction, and other intimidation—conduct far beyond the limits of any legitimate campaign activity and unprotected by the First Amendment.

Plaintiffs further allege that Defendants' actions were also carried out by agents under Defendants' control, including Trump Campaign and RNC volunteers and state Republican parties. (*Id.* ¶¶ 2, 22, 56, 61-66.) Defendants and their agents "recruit[ed] volunteers for election-related activities," and, once the volunteers had "enlist[ed]," Defendants required them "to participate in a training before engaging in certain election-related activities." (*Id.* ¶¶ 62-63.) The trainings, which Defendants prepared and provided to volunteers, were designed to prime volunteers to engage in inappropriate behavior, including intimidation and coercion, at polling places and recount sites. (*Id.* ¶ 66.)

## I.    Conduct At Issue.

Defendants' conduct falls into three main categories: (i) private coercion and intimidation of election officials (by the Trump Defendants); (ii) public intimidation targeting election officials, including through false accusations and implications of criminality and incitement of illegal activity by others (by all Defendants, including in conspiracy with one another); and (iii) physical violence or obstruction of counting lawful votes by agents (by all Defendants, including in conspiracy with one another). Allegations of each include:

*Private Coercion and Intimidation of Election Officials*: (i) former President Trump made personal phone calls to two Republican canvassers in Wayne County, Michigan who agreed to certify Wayne County's election results, but who reversed course after receiving those calls and furnished affidavits to the Trump Campaign stating their opposition to certification (*id.* ¶¶ 46-47); (ii) former President Trump made phone calls to the Governor of Georgia and speaker of the Pennsylvania House of Representatives pressuring them to overturn election results (*id.* ¶¶ 50, 52-53); (iii) former President Trump summoned the leaders of the Michigan State Senate and State House to the White House, where they participated in a meeting that included lawyers involved in former President Trump's efforts to overturn the election results (*id.* ¶ 48); and (iv) Trump Campaign representatives "spent weeks" pressuring the Governor of Arizona "to echo President Trump's false claims about election fraud and cast doubt upon the State's results" (*id.* ¶ 54). These allegations strongly support an inference that the Trump Defendants intimidated state and local officials during these private conversations—an inference confirmed by events occurring after the FAC was filed. These events show that former President Trump made further calls to the Georgia Secretary of State, Brad Raffensperger, and Secretary Raffensperger's lead investigator, during which former President Trump pressured these officials to change Georgia's election results (including by urging Secretary Raffensperger to illegally "find 11,780 votes," *i.e.*, one more vote than President-Elect Biden's post-recount margin of victory in the State).[2]

---

[2] *See* Aaron Blake, *New Audio Reinforces Trump's Blatant Pressure Campaign to Overturn the Election*, Wash. Post (Mar. 11, 2021), https://www.washingtonpost.com/politics/2021/03/11/new-audio-reinforces-trumps-blatant-pressure-campaign-overturn-election. Although Plaintiffs submit that the FAC's claims are amply pleaded, the Court is entitled to take judicial notice of reporting on these events. *See White Coat Waste Proj. v. United States Dep't of Veterans Affairs*, 404 F. Supp. 3d 87, 101 n.10 (D.D.C. Aug. 29, 2019) ("Taking judicial notice of the existence of news articles is entirely proper.") (alterations omitted). In the alternative, if the Court determines that the events described herein post-dating the First Amendment Complaint are significant to the

*Public Intimidation Causing Others to Target Election Officials*: (i) the RNC hosted a press conference at its Washington, D.C. headquarters, where former President Trump's personal lawyer, Rudolph Giuliani, falsely asserted that Wayne County's election results should not be certified due to "illegitimate ballots," and Trump Campaign lawyer Sidney Powell stated that the 2020 election had involved "the most unpatriotic acts I can even imagine," and that "American patriots are fed up with the corruption from the local level, to the highest level of our government" (an event that the RNC subsequently amplified by retweeting a portion of Powell's remarks using its official Twitter account) (FAC ¶¶ 38-40, 72); (ii) former President Trump publicly attacked Philadelphia City Commissioner Al Schmidt, falsely asserting that the Election in Philadelphia was characterized by "a mountain of corruption and dishonesty" (*id.* ¶ 24); (iii) former President Trump publicly branded Georgia's Secretary of State as "an enemy of the people," suggested the Georgia Secretary of State and Governor were implicated in "massive voter fraud in Georgia," and amplified a tweet from a supporter saying that they "will soon be going to jail" (*id.* ¶ 52); (iv) the RNC routinely used its official Twitter account (@GOP) to tweet links to the Trump Campaign's hotline for reporting purported election fraud and to repeat the false claim that "THE DEMOCRATS WILL TRY TO STEAL THIS ELECTION" (*id.* ¶ 71); (v) the Arizona Republican Party's official Twitter account issued multiple tweets encouraging supporters to "give [their] life for this fight" and "die for something" (*id.* ¶¶ 55, 60); (vi) the Chairperson of the Arizona Republican Party issued a tweet endorsing military intervention to "stop this coup" and overturn the election for former President Trump (*id.* ¶ 60); (viii) Defendants engaged in highly-militaristic marketing and recruitment efforts, including their designation of Trump Campaign volunteers as

---

adjudication of these motions, Plaintiffs respectfully request an opportunity to amend their Complaint to add these new facts.

an "Army for Trump," who would need to "enlist" and "fight" to overturn the election (*id.* ¶¶ 61-62, 66, 70). These allegations show that Defendants intimidated public election officials by: (a) falsely accusing them of corruption, and (b) inciting their supporters to engage in lawless activities. And the latter indeed came to pass—among other things, Defendants' supporters directed grave intimidation, including rape and death threats, at officials and judges connected to the election in various states (*id.* ¶¶ 32-34), and two weeks after the FAC was filed, stormed the U.S. Capitol on January 6, 2021 during Congress's certification of Electoral College votes, causing violent clashes and multiple deaths.[3]

*Baseless Challenges, Physical Violence, Obstruction, and Other Intimidation by Agents*: (i) "Trump Campaign observers encroached on physical spaces of vote tabulators to observe the count and made verbal comments pressuring vote tabulators" and "broke observation rules by frequently interrupting vote counters, sometimes with harassing comments and questions" (*id.* ¶ 28); (ii) "Trump Campaign observers also baselessly challenged" the validity of ballots for various reasons, "even though such challenges are clearly improper under Wisconsin law" (*id.* ¶ 29); and (iii) "[s]ome Trump Campaign observers went even further . . . by becoming physically aggressive with election volunteers," including "one Trump Campaign observer [who] had to be escorted from the [Milwaukee] recount site after pushing an election official" (*id.* ¶ 30). The FAC further shows that there is a plausible inference that, in undertaking these intimidating and obstructionist tactics, observers were acting as agents of the Trump Campaign and the RNC (which were closely coordinated throughout the 2020 election as described below). As the chairperson of

---

[3] Maria Peñaloza, *Trump Supporters Storm U.S. Capitol, Clash with Police*, NPR.org (Jan. 6, 2021), https://www.npr.org/sections/congress-electoral-college-tally-live-updates/2021/01/06/953616207/diehard-trump-supporters-gather-in-the-nations-capital-to-protest-election-resul. Again, the Court is entitled to take judicial notice of such reports. *See White Coat Waste Proj.*, 404 F. Supp. 3d at 101 n.10.

the Republican Party of Fond du Lac County, Wisconsin acknowledged, the "GOP strategy" in

Wisconsin post-election was "to disenfranchise people." (*Id.* ¶ 31.)

## II.   Allegations Supporting An Inference Of Conspiracy Among Defendants.

Furthermore, Plaintiffs' allegations give rise to a fair inference that Defendants' actions

were part of a conspiracy among them, such that conduct directly attributable to specific

Defendants is nonetheless attributable to all Defendants. *Halberstam v. Welch*, 705 F.2d 472, 481

(D.C. Cir. 1983). Evidence that Defendants supported and carried out their illegal activities

through joint efforts include allegations that:

- "After the 2016 Election, President Trump, the Trump Campaign, and the RNC merged their field and fundraising efforts together under the 'Trump Victory' banner, which resulted in a shared operational overhead, including office space and staff." (FAC ¶ 67.)[4]

- Defendants engaged in joint recruitment and training of election volunteers. (*Id.* ¶ 69.)

- Defendants shared Trump Victory fundraising proceeds, with the majority going directly to the RNC and state Republican parties. (*Id.* ¶ 68.)

- Through the Trump Victory enterprise, the RNC used training videos in multiple battleground states calculated to lead Trump supporters to interfere with the electoral process, *e.g.*, by encouraging volunteer poll watchers to wear "Official 'Poll Watcher'" badges, giving the false impression of being official state actors, whereby they engaged in intimidation and coercion at polls and recount sites. (*Id.* ¶¶ 63-66.)

- Defendants engaged in other joint conduct calculated to intimidate election officials and interfere with the electoral process, *e.g.*, by the RNC's hosting of a press conference at its Washington, D.C. headquarters in November 2020 at which former President Trump's personal lawyer and a Trump Campaign lawyer repeated baseless allegations of voter fraud and suggested that election officials were complicit in fraud and unpatriotic acts to steal the election. (*Id.* ¶¶ 38-40, 71.)

- The RNC routinely endorsed false claims by the Trump Defendants suggesting elected officials were complicit in illegal conduct, *e.g.*, by using its official Twitter account (@GOP) to retweet material from the Trump Campaign's official account (@TeamTrump), including multiple links to the Trump Campaign's hotline for reporting

---

[4] Of course, Plaintiffs do not contend that all of Defendants fundraising or field activity is improper. The evidence of coordination is significant because it supports an inference that Defendants were also involved in coordinating the illegal activity described in the FAC, including through oversight and direction of their joint volunteers/agents.

purported election fraud when none was occurring; to issue original tweets repeating the claim that "THE DEMOCRATS WILL TRY TO STEAL THE ELECTION," (*id.* ¶ 71); and to retweet the Trump Campaign's remarks at the RNC's November 2020 press conference. (*id.* ¶¶ 38-40, 71).

- The RNC publicly amplified the Trump Defendants' false narrative that voters engaged in widespread fraudulent (and criminal) conduct, and that election officials who certified results would be complicit in that conduct. After the Wayne County Board of Canvassers initially deadlocked on certification, then-Michigan Republican Party Chairwoman Laura Cox made clear that the RNC and Trump Campaign were working together to promote that false narrative, stating: "I am proud that, due to the efforts of the Michigan Republican Party, the Republican National Committee and the Trump Campaign, enough evidence of irregularities and potential voter fraud was uncovered resulting in the Wayne County Board of Canvassers refusing to certify their election results." (*Id.* ¶ 44.) After county canvassers ultimately certified the results, Ms. Cox and RNC Chair Ronna McDaniel sent a letter to the State Board seeking to delay certification (premised on minor discrepancies that the Michigan Secretary of State confirmed "are common in Michigan and across the nation" and not indicative of fraud, such as "a voter being checked in at the right polling place but the wrong precinct, or a voter checking in but leaving with their ballot if the line was long"). (*Id.* ¶¶ 42, 49.)

- Further suggesting coordination between them, most of Defendants' conduct took place in close temporal proximity and was directed at ballot counting processes across the United States, including Washington, D.C. (*id.* ¶ 38), Wisconsin (*id.* ¶¶ 26-31), Arizona (*id.* ¶¶ 33, 54-55, 60, 68), Georgia (*id.* ¶¶ 32, 52, 63, 68-69), Pennsylvania (*id.* ¶¶ 53, 68), Nevada (*id.* ¶¶ 33, 68), and Michigan (¶¶ 44-49).

## ARGUMENT

### I.   This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims.

Defendants' subject matter jurisdiction arguments regarding mootness and standing should be rejected. The Court plainly has jurisdiction to award damages and to enjoin Defendants from engaging in similar misconduct in the future. Contrary to Defendants' claims (RNC Mem. at 13; Trump Mem. at 28), Plaintiffs' claims are not moot, Plaintiffs had a personal interest in the issues of this case when they filed their complaint, and the organizational Plaintiffs have organizational and/or representational standing.

### A.   Plaintiffs' Claims Are Live And Not Moot.

The RNC argues that Plaintiffs lack standing because the 2020 election is over and "[a]ny

claims asserting the need for injunctive relief concerning certification are thus moot." (RNC Mem. at 13.) This argument improperly conflates the separate inquiries as to mootness and standing.[5] *Friends of the Earth, Inc. v. Laidlaw (TOC), Inc.*, 528 U.S. 167, 189 (2000). Claims are moot only if "the issues presented are no longer 'live,'" rendering it "impossible for a court to grant any effectual relief." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citations omitted). The issues here are very much live.

Plaintiffs' claims for declaratory judgment and for damages under KKK Act § 1985(3) are plainly not moot. Plaintiffs also seek an injunction to prevent future voter intimidation given Defendants' pattern of past misconduct and indicia of continued misconduct. (*See* FAC ¶¶ 30, 75.) This is necessarily forward-looking relief. "All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). Thus, unlike the election cases that the RNC cites—where the requested relief was tied to a past election—the 2020 election's "'passage into history'" does not obviate Plaintiffs' entitlement to injunctive relief. (RNC Mem. at 13 (quoting *Virginians Against a Corrupt Congress v. Moran*, No. 92-5498, 1993 WL 260710 (D.C. Cir. June 29, 1993) (other citations omitted)).) The FAC alleges facts showing that there is significant likelihood of recurrence of Defendants' election-related misconduct. Not only is the RNC involved "in most elections for key offices," it also was only recently released from a 35-year consent decree prohibiting it from engaging in election intimidation behavior.

---

[5] The RNC's reliance on standing cases like *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) is misplaced. In *Lyons*, the Court held that the "plaintiff lacked initial standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat arising from the policy." *Laidlaw*, 528 U.S. at 190 (discussing *Lyons*, 461 U.S. at 105-110). By contrast, Plaintiffs were suffering from Defendants' violations of VRA § 11(b) and § 1985(3) at the time of suit (which means they have standing), and they also face an ongoing risk of harm (which means their claims for injunctive relief are not moot).

(FAC ¶ 75.) Likewise, former President Trump's "reported interest in campaigning for President in 2024" and his fundraising of "at least $207.5 million since the election, a significant amount of which has been directed to former President Trump's new political action committee, Save America PAC" (*id.*) show the risk of future misconduct. Indeed, the RNC does not even contend that the wrongful behavior will not be repeated but instead, incorrectly, defends it as permissible under VRA § 11(b). (*See, e.g.*, RNC Mem. at 14-23.) All of this creates a risk of future harms to Plaintiffs of the same sort that give them standing in the first place: future harms to their voting rights, future harms to their members' voting rights, and/or future drains on their resources. Also, if Defendants' mootness argument were accepted, it would be impossible for courts to take proactive steps to prevent interference with voting rights in future elections because such interference would be capable of repetition yet evade review. That cannot be, and is not, the law.[6]

## B. Plaintiffs Have Standing.

As a further attempt to avoid judicial review, Defendants next argue that Plaintiffs, including the organizational plaintiffs, lack standing to bring these claims. Article III standing requires that "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Where, as here, a case is at the pleading stage," a plaintiff need only "clearly allege facts demonstrating each element." *Id.* at 1547.

---

[6] *See*, *e.g.*, *Norman v. Reed*, 502 U.S. 279, 288 (1992) (applying exception to access to ballot challenge); *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.3 (1983) (applying exception to presidential candidate's challenge to Ohio's early filing deadline for independent candidates); *Dunn v. Blumstein*, 405 U.S. 330, 332 n.2 (1972) (applying exception to voter's challenge to durational residence requirements for voting); *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) (applying exception to challenge to number of signatures required on nominating petitions for new political parties).

Defendants' challenges to standing are unavailing. *First*, to the extent that the RNC's mootness argument also implicates standing issues, Plaintiffs have established standing with allegations showing they had a personal interest at the time they filed suit. *Laidlaw*, 528 U.S. at 189. *Second*, contrary to the Trump Defendants' cursory assertion that MWRO and NAACP lack standing to bring their VRA § 11(b) claim because they "cannot meet their burden of proving injury in fact" (Trump Mem. at 29), the FAC establishes injury, as well as the other prongs of organizational standing (NAACP) and representational standing (NAACP and MWRO).[7]

As to organizational standing, an organization, "like an individual plaintiff, [must] show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation omitted). The "key issue is whether [the plaintiff] has suffered a concrete and demonstrable injury to [its] activities." *Id.* at 1093 (citation omitted). The FAC more than adequately pleads such injury, alleging that Defendants' misconduct has forced NAACP "to divert resources to monitor Defendants' activities and disseminate public education materials" to address the conduct. (FAC ¶ 84.) As the Supreme Court has long held, "consequent drain on [an] organization's resources . . . constitutes far more than simply a setback to the organization's abstract social interests" and in such circumstances, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). There also can be no question that NAACP satisfies the causation and redressability prongs, as the alleged injuries are directly traceable to Defendants' conduct and the remedies sought would redress those harms. *PETA*, 797 F.3d at 1093.

---

[7] The Trump Defendants also argue that the individual Plaintiffs do not have standing to assert claims on behalf of individuals in other states. (Trump Mem. at 29-30.) This argument need not be considered as the individual Plaintiffs do not assert claims on behalf of anyone else.

In addition, both NAACP and MWRO have representational standing on behalf of their members, including NAACP members outside of Michigan. An organization has representational standing so long as "(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005) (citing, *inter alia*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 353 (1977)).

NAACP and MWRO satisfy each of these requirements. *First*, the FAC alleges that each has at least one member who would have standing on their own. (*See* FAC ¶ 7 ("MWRO has Black Members who reside in Detroit in Wayne County, Michigan, voted in the November 2020 election, and cast a ballot for President. Defendants have sought to prevent the complete counting and certification of validly cast ballots for President in Wayne County, and thereby sought to disenfranchise and disregard the lawfully cast votes of the members of MWRO."); *Id.* ¶ 12 ("The NAACP has members across the country who voted in the 2020 election and who plan to vote in future elections, including in Michigan, Wisconsin, Pennsylvania, Georgia, Arizona, and Nevada. Defendants have sought to prevent the complete counting and certification of validly cast ballots for President in Wayne County, and thereby sought to disenfranchise and disregard the lawfully cast votes of Plaintiff NAACP's members.").)

*Second*, the missions of these organizations include efforts to improve voting and other civic engagement (*see id.* ¶¶ 7, 11) such that their "interests at stake" in this case "are germane to [each] organization's purpose," *Hunt*, 432 U.S. at 343.

*Third*, NAACP and MWRO's claims do not require "individualized proof" from members. *Id.* at 344. Plaintiffs' declaratory and injunctive relief claims do not require individual participation

of the organizational Plaintiffs' members. *See Am. Ass'n of Cosmetology Sch. v. Devos*, 258 F. Supp. 3d 50, 68 (D.D.C. 2017) (citing *Warth v. Seldin*, 422 U.S. 490, 516 (1974)). And Plaintiffs' damages claim under KKK Act § 1985(3) (discussed below)—also brought on behalf of the individual Plaintiffs—for the dignitary harm of being subjected to a conspiracy to deprive or otherwise attack one's citizenship rights is "common to the entire membership[s]" of NAACP and MWRO and thus not "peculiar to the individual member concerned." *Warth*, 422 U.S. at 516.

## II.    **This Court Has Personal Jurisdiction Over Defendants.**

Only the Trump Defendants contest personal jurisdiction, and this Court should quickly reject their challenge. This Court has specific and general personal jurisdiction over them.

"Specific personal jurisdiction is present where (1) jurisdiction over the defendant is authorized by the forum's long-arm statute, here D.C. Code § 13–423; and (2) the exercise of that jurisdiction satisfies the federal requirement of constitutional due process." *Xie v. Sklover & Co., LLC*, 260 F. Supp. 3d 30, 39 (D.D.C. 2017) (cleaned up). The long-arm statute authorizes exerting personal jurisdiction over the Trump Defendants because, "act[ing] directly or by an agent," they committed many of the acts designed to disenfranchise Plaintiffs by intimidation, threat, and coercion as part of "transacting any business in the District of Columbia." D.C. Code Ann. § 13-423(a)(1), (b); *see also Xie*, 260 F. Supp. 3d at 39 (explaining that the "transacting any business" clause "is given an expansive interpretation that is coextensive with the due process clause") (cleaned up).

At all relevant times, former President Trump lived and worked in the District of Columbia. He thus made many, perhaps all, of the private and public statements that constituted or incited coercion, threats, and intimidation of state officials while physically present in the District of Columbia. Those statements include pressuring officials to overturn the election (FAC ¶¶ 47, 53) and publicly inciting threats against and intimidation of officials for following election law (*id.*

¶¶ 52, 54). Further, many of his and his agents' relevant acts occurred in the District of Columbia. Those acts include: meeting with officials at the White House to pressure them to disenfranchise Plaintiffs (*id.* ¶ 48); holding a press conference at RNC headquarters to propagate debunked election fraud claims and assertions of criminality by elected officials designed to intimidate and coerce officials and to incite intimidation, coercion, and violence targeting those officials (*id.* ¶¶ 38, 40); and meeting at the White House with individuals who advocated breaking election laws, seizing voting machines, and declaring martial law (*id.* ¶¶ 54-55, 59).

Plaintiffs have adequately alleged that the Trump Campaign was similarly involved in this systematic effort to disenfranchise Plaintiffs and other Black voters, including by its actions in the District of Columbia. For example, while in the District of Columbia, then-Trump Campaign lawyer Sidney Powell attempted, groundlessly, to justify that effort by invoking nonexistent "election fraud" and criminality by election officials, including Wayne County election officials. (*Id.* ¶¶ 40, 54.) During all times relevant to the FAC, the Trump Campaign worked closely with the District of Columbia-based RNC to encourage the disenfranchisement effort, including through financial ties established by their participation in the Trump Victory enterprise. (*Id.* ¶ 68.) Moreover, former President Trump was the candidate and the *de facto* leader of the Trump Campaign, and he lived and worked in the District of Columbia as he guided the Trump Campaign's effort to disenfranchise Plaintiffs.

Despite all these facts, the Trump Defendants argue that they cannot be subject to specific jurisdiction "based on their constitutionally protected activities." (Trump Mem. at 27.) Through this argument, which fails on its own terms (as shown below), the Trump Defendants implicitly concede that they engaged in sufficient activity in the District of Columbia to warrant jurisdiction.

This Court also has general personal jurisdiction over the Trump Defendants. Former

President Trump claims that he was domiciled in Florida at the time of the events in question (Trump Mem. at 27), but he obviously resided in the District of Columbia. His intention to move later to Florida, a state where he previously had never permanently resided, does not establish domicile there. *Erickson v. TD Bank*, No. 19-cv-13641, 2021 WL 118928, at *2 (D.N.J. Jan. 13, 2021).[8] "Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile." *Texas v. Florida,* 306 U.S. 398, 424 (1939); *see also Prakash v. Am. Univ.*, 727 F.2d 1174, 1180 (D.C. Cir. 1984). The Trump Campaign asserts that its "principal place of business" is in New York and its "headquarters" is in Virginia. (Trump Mem. at 27.) But it offers no meaningful evidence about the nature or extent of the business transacted in either state. Indeed, no evidence could overcome the fact that, at all relevant times, former President Trump lived and worked in the District of Columbia. A candidate is the nerve center of any campaign, which makes the District of Columbia the nerve center of the Trump Campaign.

Plaintiffs have established this Court has both specific and personal jurisdiction over the Trump Defendants.[9] But even if not, Plaintiffs submit that they would be entitled to jurisdictional

---

[8] As late as September 27, 2019, President Trump identified the White House as his legal residence and indicated that he was then, or most recently had been, registered to vote in New York. (Dkt. No. 25-2 at 1.) On October 28, 2019, he claimed Mar-A-Lago (Palm Beach, Florida) as his legal residence (Dkt. No. 25-2 at 2), but at that time he was still President and his residence in fact remained the White House.

[9] This Court also has personal jurisdiction over the Trump Defendants based on conspiracy jurisdiction because Plaintiffs have alleged facts showing (1) a civil conspiracy; (2) Defendants' participation therein; (3) at least one overt act by a co-conspirator within the District of Columbia subject to the District of Columbia's long-arm statute in furtherance of the conspiracy; and (4) purposeful availment, including knowledge of the co-conspirator's act(s) in the forum. *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 78-80, 83 (D.D.C. 2004). As set forth in the Background section and analyzed below, Plaintiffs have alleged facts showing a civil conspiracy. Those same facts support conspiracy jurisdiction. Defendants' participation in the conspiracy is established by the allegations showing their individual and shared acts in furtherance of the

discovery. The D.C. Circuit has "held many times that, if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (cleaned up). Whether as part of standard fact discovery or jurisdictional discovery granted by this Court, Plaintiffs intend to seek information regarding the timing and content of communications and actions undertaken by Defendants in the District of Columbia to ascertain the scope of Defendants' conspiracy. Such information would allow Plaintiffs to supplement their jurisdictional allegations.

**III.  Former President Trump Is Not Immune From Monetary Damages Because He Did Not Act In His Official Capacity When He Violated VRA § 11(b) And KKK Act § 1985(3).**

Former President Trump asserts that he is immune from damages because he acted within the "outer perimeter" of his official responsibilities. (Trump Mem. at 19-20.) He fails to meet his "burden of establishing immunity." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1140-42 (D.C. Cir. 2015) (citing *Westfall v. Erwin*, 484 U.S. 292, 299 (1988) (discussing metropolitan transportation official's failure to establish scope of duties for purpose of evaluating absolute immunity)). Immunity does not protect acts that former President Trump undertook outside his official duties as President. *Clinton v. Jones*, 520 U.S. 681, 694-95 (1997) (citing *Nixon v. Fitzgerald*, 457 U.S. 731, 757, 759 (1982)) (finding that the President's "effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office [was] unsupported by precedent").

---

conspiracy. The requirement of a single act by any co-conspirator within the District of Columbia in furtherance of the conspiracy is satisfied by many such acts by every Defendant. Plaintiffs have alleged facts showing that each Defendant knew of at least some of the other Defendants' acts in the District of Columbia, particularly the public acts of intimidation, which Defendants often amplified on one another's behalf. (*E.g.*, FAC ¶¶ 52-53 & 52 n.56 (citing Tim Kephart, *Secy. of State Raffensperger Backs Aide as Trump Refuses to Back Down*, CBS 46 (Dec. 2, 2020); https://www.cbs46.com/news/secy-of-state-raffensperger-backs-aide-as-trump-refuses-toback-down/article_03a446bc-34a2-11eb-bf4f-e3771e83791c.html.).)

Plaintiffs plainly pursue claims against former President Trump for actions taken in his personal capacity as a *candidate*, not in his official capacity as President. (FAC ¶¶ 1, 13.) The Executive Branch has long recognized that political activity necessarily falls outside the scope of the President's official duties. *See*, *e.g., Payment of Expenses Associated with Travel by the President and Vice President*, Justice.Gov (Mar. 24, 1982), https://www.justice.gov/sites/default/ files/olc/opinions/1982/03/31/op-olc-v006-p0214_0.pdf at 216-17 (concluding that political activity falls outside the scope of the President's official duties and activities if its primary purpose involves the President's position as the leader of their party).

Former President Trump offers only the conclusory assertion that he was trying to prevent "election fraud" in order to "preserve, protect and defend the Constitution of the United States." (Trump Mem. at 8 (citing U.S. Const. Art. II, Section I, clause 8).) He does not even attempt to explain how intimidating and coercing election officials, or inciting intimidation and threats against election officials, could possibly constitute executive action in defense of the Constitution, particularly given that his actions targeted *only* officials in areas where he lost. Nor does he offer any reason to believe his efforts to expose "election fraud" were part of any executive effort. If this Court were to find that former President Trump's election interference fell within the "outer perimeter" of his executive duties, there would be no distinction between official and personal acts for purposes of the VRA or KKK Act, and the President would have absolute immunity for any activity undertaken in the course of a reelection campaign. It cannot be that a sitting President has greater latitude to interfere with voting rights than a non-incumbent candidate.

## IV.   Plaintiffs State A Claim Under VRA § 11(b).

VRA § 11(b) provides: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce

any person for urging or aiding any person to vote or attempt to vote." "Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote, regardless of race." *Nat'l Coal. on Black Civic Participation v. Wohl* ("*NCBCP I*"), No. 20 Civ. 8668, 2020 WL 6305325, at \*12 (S.D.N.Y. Oct. 28, 2020) (history omitted).

### A. VRA § 11(b)'s Implied Private Right of Action Is Well Established.

The RNC's contention that VRA § 11(b) is without a private right of action is meritless. (*See* RNC Mem. at 9-11.) "Consistent with Section 11(b)'s broad reach . . . private parties may sue to enforce Section 11(b)." *NCBCP I*, 2020 WL 6305325, at \*13; *see also*, *e.g.*, *Rhodes v. Siver*, No. 19 Civ. 12550, 2021 WL 912393, at \*1-2 (E.D. Mich. Mar. 10, 2021) ("Defendants contend that Section 11(b) affords no private right of action. That is incorrect.") (citation omitted); *Council on Am.-Islamic Rel'ns Minn. v. Atlas Aegis, LLC*, No. 20 Civ. 2195, __ F. Supp. 3d __, 2020 WL 6336707, at \*4 (D. Minn. Oct. 29,2020) (assuming private right of action); *League of United Latin Am. Citizens v. Pub. Interest Legal Found.* ("*LULAC*"), No. 18-cv-00423, 2018 WL 3848404, at \*3 (E.D. Va. Aug. 13, 2018) (same).

These cases follow from *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996), and *Allen v. State Board of Elections*, 393 U.S. 544, 555-57 (1969), in which the Supreme Court found private rights of action under other provisions of the VRA. *See Morse*, 517 U.S. at 231-32 (plurality opinion by Justice Stevens; majority of Justices holding that Section 10 provides an implied private right of action and acknowledging an implied private right of action in Section 2); *Allen*, 393 U.S. 544, 555-56 (1969) (holding that Section 5 provides an implied private right of action).

Tellingly, the RNC does not cite a single case—in this Court or any other—denying a private right of action under VRA § 11(b). (*See* RNC Mem. at 9-11.) Instead, it urges that Section 12 of the VRA (which gives the Attorney General power to enforce certain VRA sections,

including Section 11) be construed as the exclusive method for enforcing VRA § 11(b). (*See id.* (citing 52 U.S.C. § 10308).) But both *Allen* and *Morse* reject this argument and confirm that Section 12 does not preclude enforcement by private litigants.

In *Allen*, the Supreme Court found an implied private right of action to enforce Section 5 of the VRA, which, like VRA § 11(b), is silent about a private right of action and can be enforced by the Attorney General under Section 12. *Allen*, 393 U.S. at 555-56. In so holding, the Court explained that to interpret Section 12 as limiting the ability of private individuals to bring suit under the VRA would contradict Congress's intent to "make the guarantees of the Fifteenth Amendment finally a reality for all citizens." *Id.* at 556. The Court explained: "[t]he achievement of the [VRA's] laudable goal could be severely hampered [] if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. . . . It is consistent with the broad purpose of this Act to allow the individual citizen standing." *Id.* at 556-57.

Likewise, in *Morse*, the Supreme Court found an implied private right of action under Section 10 of the VRA. *See Morse*, 517 U.S. at 232. There, the Court explained that its finding of a private right of action in *Allen* was reinforced by subsequent amendments to the VRA, in which Congress amended Section 3 to allow suits under any section of the VRA not just by the Attorney General but also "'*an aggrieved person*'" and added Section 14(e) to provide for attorneys' fees to prevailing parties "'*other than the United States*.'" *Id.* at 233-34 (quoting 52 U.S.C. §§ 10302(a), 10310(e) (emphasis added)). Also acknowledging a private right of action under Section 2, the Court observed that "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language."

*Id.* at 232.[10] There is no basis for this Court to depart from this precedent as the RNC suggests. (RNC Mem. at 11.)

Unable to proffer any statutory authority or on-point case law, the RNC asserts that "separation-of-powers principles" now make the Supreme Court "cautious" about recognizing implied causes of action. (RNC Mem. at 10 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017)); *see id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).) Critically, however, *Morse* was decided in 1996—well *after* the advent of this new interpretive era. *Sandoval*, 532 U.S. at 286 (explaining that the prior approach was "abandoned" in *Cort v. Ash*, 422 U.S. 66 (1975)); *see Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017) (explaining that even after *Cort* and later cases declining to find implied rights of action, *Morse* "recognize[d] an implied cause of action under Section 10 of the Voting Rights Act").

Moreover, *Sandoval* and *Ziglar* recognize that statutory intent remains the guiding principle in the implied right of action analysis. *See Sandoval*, 532 U.S. at 286, 290 (explaining in Title VI context that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create" a private cause of action); *Ziglar*, 137 S. Ct. at 1855 (explaining in Section 1983 context that "[t]he determinative question is one of statutory intent"). *Sandoval* itself acknowledged an implied private right of action for claims brought under Section 601 of Title VI. 532 U.S. at 279, 289. And in *Morse* (as in *Allen*), the Court held that Congress's intent in enacting the VRA was to create a private right of action—rejecting the argument that the

---

[10] In *Morse*, Justice Stevens's plurality opinion, Justice Breyer's concurrence, and Justice Thomas's dissent all recognize that Section 3 establishes a private right of action to enforce the VRA. *See* 517 U.S. at 233; *see also id.* at 240 (Breyer, J., concurring) (recognizing that, through the amended Section 3, Congress gave "a private right of action to enforce § 10 [of the VRA], no less than it did to enforce §§ 2 and 5"); *id.* at 289 (Thomas, J., dissenting) ("As appellants accurately state, § 3 explicitly recognizes that private individuals can sue under the Act." (cleaned up)).)

lack of "express authorizing language" forecloses private litigants from enforcing their rights thereunder. *Morse*, 517 U.S. at 231-32; *see Allen*, 393 U.S. at 555-56.

Finally, to be clear, no case has "overrule[d]" the private rights of action identified in *Allen* and *Morse*. (*Contra* RNC Mem. at 11.) The Supreme Court repeatedly has instructed that even "if a precedent of this Court . . . appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (citation omitted). As indicated above, in the two decades since *Sandoval* and *Ziglar*, a multitude of lower courts have continued to find a private right of action under VRA § 11(b) and other sections of the VRA. The RNC's theory is inconsistent with Supreme Court precedent and should be rejected.

## B. The FAC's Allegations of Intimidation Are Well Pleaded.

Defendants do not argue that pressuring state and local election officials to disregard lawfully cast ballots, as alleged here (*see* FAC ¶¶ 7-12), is beyond the reach of VRA § 11(b). (*See* Trump Mem. at 15-16; RNC Mem. at 14-23.) Nor could they: as set forth above, VRA § 11(b) proscribes intimidation against anyone who is "voting," "attempting to vote," or "urging or aiding any person to vote or attempt to vote," 52 U.S.C. § 10307(b)—and the VRA expressly defines "voting" as including "having such ballot counted properly *and* included in the appropriate totals of votes cast," 52 U.S.C. § 10310(c)(1) (emphasis added).

Defendants contend only that the FAC fails to allege conduct that constitutes "intimidat[ion], threat[s], or coerc[ion]" under the statute. (*See* Trump Mem. at 15-16; RNC Mem. at 14-23.) This argument has no merit. The words "intimidate," "threaten," and "coerce" have broad meaning, particularly in the VRA, which Congress intended to be given "the broadest

20

possible scope." *Allen*, 393 U.S. at 567.[11] The FAC amply alleges that Defendants have deployed overt and indirect tactics to intimidate, threaten, or coerce state and local officials.

Although Plaintiffs have alleged physical violence and obstruction by Defendants' agents (*see* FAC ¶¶ 25, 27-30, 32-33), VRA § 11(b)'s reach is not limited to such conduct. As the Southern District of New York recently explained upon examining VRA § 11(b)'s history and application, other forms of conduct that "reasonably arouse fear in recipients" may be "subtler, but no less potent, forms of intimidation" in violation of this statute. *NCBCP I*, 2020 WL 6305325, at *20; *see also United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 353 (E.D. La. 1965) (stating that VRA § 11(b)'s predecessor statute Section 131(b) "may be extended against interference with any activity having a rational relationship with the federal political process").[12]

Accordingly, VRA § 11(b) also squarely proscribes threats of baseless prosecutions, false claims of voter fraud and criminality, and other coercive tactics like those at issue here. *See United States v. McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967) (applying Section 131(b) to "baseless arrests and prosecutions" at a voter registration drive); *United States v. Bruce*, 353 F.2d 474, 476-

---

[11] The ordinary meanings of "intimidate," "threaten," and "coerce" are expansive. *See Leocal v. Ashcroft*, 543 U.S. 1, 2 (2004) ("When interpreting a statute, words must be given their ordinary or natural meaning.") (cleaned up). As the court in *NCBCP I* explained:

To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." To "threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)."

2020 WL 6305325, at *13 (quoting Webster's Third New Int'l Dictionary (1966)).

[12] *Katzenbach* and certain other cases cited herein were brought under the Civil Rights Act of 1957, 52 U.S.C. § 10101(b) ("Section 131(b)")), which is VRA § 11(b)'s predecessor statute. Like VRA § 11(b), Section 131(b) prohibits "intimidat[ion]," "threat[s]," and "coerc[ion]" in connection with voting. 52 U.S.C. § 10101(b). VRA § 11(b) was enacted with the intent of expanding Section 131(b). *See* H.R. Rep. No. 89-439, at 30 (1965). Thus, VRA § 11(b) is interpreted *in pari materia* with Section 131(b), but more broadly.

77 (5th Cir. 1965) (economic pressure actionable voter intimidation under VRA § 11(b)'s predecessor statute); *LULAC*, 2018 WL 3848404, at *4 (denying motion to dismiss VRA § 11(b) claim for report falsely identifying individuals as being fraudulently registered to vote).

As detailed above, the FAC contains allegations of conduct by Defendants that is plainly violative of VRA § 11(b), such as Defendants' intimidation of election officials through false accusations of criminality and incitement of their supporters to engage in illegal conduct. For example, the FAC alleges numerous calls by former President Trump to the officials in various battleground states and even a meeting at the White House with Michigan's legislative leaders to pressure them against certification of President-Elect Biden's victory. (FAC ¶¶ 46, 48, 50, 52, 54.) The FAC also alleges numerous examples of Defendants' public coercion of election officials, including by falsely implicating them in criminal conduct, *e.g.*, by former President Trump suggesting that Georgia's Secretary of State and Governor were implicated in "massive voter fraud" and amplifying a tweet saying that they "will soon be going to jail." (*Id.* ¶ 52.) The FAC also includes allegations of incitement of lawless behavior against those involved in election certification, incitement which resulted in threatened and actual violence. (*Id.* ¶¶ 32-34.) Finally, the FAC alleges that Defendants' agents engaged in obstruction, including physical violence, at tabulation sites in an effort to disenfranchise voters. (*Id.* ¶¶ 28-30.)

The conduct described above—which "interferes with . . . activity" at the heart of "the federal political process," *Katzenbach*, 250 F. Supp. at 353—is actionable under VRA § 11(b), *see, e.g.*, *NCBCP I*, 2020 WL 6305325, at *16 ("Conduct that puts others 'in fear of harassment and interference with their right to vote' naturally includes egregious conduct, such as acts of violence.") (quoting *LULAC*, 2018 WL 3848404, at *4); *Daschle v. Thune*, slip op., No. 04 Civ. 4177 (D.S.D. Nov. 1, 2004), ECF No. 6 (granting temporary restraining order under VRA § 11(b)

against campaign members who followed Native Americans to polling places, stood closely behind them, and made harassing comments about Native Americans being prosecuted for voting illegally).

Taken together, these allegations present an extreme climate of pressure by Defendants on state and local officials involved in certifying election results. They support a plausible inference that Defendants engaged in conduct having the "inevitable effect of . . . discourag[ing], intimidat[ing], threaten[ing], and coerc[ing]" citizens seeking to vote, which violates VRA § 11(b). *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965); *see* Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) (testimony of Attorney General Nicholas Katzenbach that under VRA § 11(b), "defendants would be deemed to intend the natural consequences of their acts").

Notwithstanding the scope of these allegations and VRA § 11(b)'s reach, the RNC urges that the FAC should be dismissed because "statements about the illegality of voter fraud and warnings against illegal voting . . . do not rise to the proscribable level of intimidation, threats, or coercion." RNC Mem. at 17. But the allegations in the FAC are not limited to such statements, and, in any event, statements about purported voter fraud have been found actionable under VRA § 11(b). *See, e.g.*, *LULAC*, 2018 WL 3848404, at *4 (denying motion to dismiss VRA § 11(b) claim for report falsely identifying individuals as being fraudulently registered to vote).[13] The key

---

[13] Nor do any of RNC's cited cases immunize all claims of voter fraud as the RNC suggests. Instead, the VRA § 11(b) cases cited by the RNC all involved case-specific determinations. (*See* RNC Mem. at 17-18, 20 (citing *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (denying preliminary injunction, finding that plaintiffs had not demonstrated that Virginia statute requiring voters to sign statement of "Republican party affiliation" in order to vote for a Republican candidate in primary constituted intimidation)); *Pa. Democratic Party v. Republican Party of Pa.*, Civ. No. 16-5664, 2016 WL 6582659, at *7, *8 (E.D. Pa. Nov. 7, 2016) (denying preliminary injunction where, *inter alia*, "Plaintiff [had] not shown that any Defendant has

is whether a statement would have the "inevitable effect" of intimidating a voter or a state official responsible for counting or certifying votes. *Clark*, 249 F. Supp. at 728. As explained, the statements and other actions by the RNC described in the FAC, which include false suggestions that elected officials were complicit in criminal activity, raise more than a plausible inference of such inevitable effect. The RNC also strains to contend that "no statement was directed at voting" (RNC Mem. at 19); this contention again is false. The RNC ignores that the VRA expressly defines voting as including "having such ballot counted properly and included in the appropriate totals of votes cast," 52 U.S.C. § 10310(c)(1), and the FAC alleges numerous actions targeting this process (*see, e.g.*, FAC ¶¶ 49, 55, 60, 71).

For these reasons, the FAC more than adequately states a claim under VRA § 11(b) and Defendants' motions to dismiss this claim should be denied.

### C. The First Amendment Does Not Protect Defendants' Speech.

Defendants incorrectly argue that the actions challenged in this lawsuit are protected by the First Amendment because they are garden variety political speech. (RNC Mem. at 16-22; Trump Mem. at 20-25.) Plaintiffs have no interest in challenging protected speech. But they do have a

---

engaged or will engage in voter intimidation in this District" but noting that "had Plaintiff made any credible showing, . . . I would not hesitate to take immediate action"); *Arizona Democratic Party v. Arizona Republican Party*, Civ. No. 16-3752, 2016 WL 8669978, at *7, *10 (D. Ariz. Nov. 4, 2016) (denying preliminary injunction where "Plaintiff produced no evidence that [defendant's] actions will result in voter intimidation," contrasting case with another where "the court had before it concrete examples of voter intimidation by the defendants' supporters that had actually occurred," thereby "removing any air of speculation about likelihood of harm" and justifying an injunction); *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 463-64 (N.D.N.Y. 2006) (granting summary judgment on VRA § 11(b) claim in case not involving any statements concerning purported election fraud, ruling that defendants' actions in visiting plaintiffs at their homes and completing absentee ballots for them implicated conduct that "would fairly support a finding that [defendants] misinformed, defrauded, tricked, or deceived these individuals," but that plaintiffs had presented "no sufficient basis" of compulsion "as required to prove intimidation, threats, or coercion" under VRA § 11(b))).

profound interest in redressing and preventing any recurrence of Defendants' intimidation, threats, and incitement to lawlessness, including the obstructionist and sometimes violent conduct by Defendants' agents at vote counting sites. The First Amendment does not prevent Plaintiffs from doing so. Threats, intimidation, and coercion—the conduct prohibited by both the VRA § 11(b) and KKK Act § 1985(3)—fall outside the scope of the First Amendment.[14] Defendants cannot invoke the First Amendment to try to transform their unprotected conduct into protected conduct. Defendants are wrong that the First Amendment protects all intimidation, threats, and incitements to lawlessness unless they are made with an intent to commit an unlawful act of violence. (RNC Mem. at 17; Trump Mem. at 24-25.) As shown below, that contention is inconsistent with case law, which makes clear that nonviolent threats are not protected speech. Further, much of Defendants' conduct is also outside the scope of the First Amendment because their speech incited unlawful action, all of which was imminent, much of which actually occurred. Finally, the Trump Defendants' attempt to avail themselves of First Amendment protection by arguing that Plaintiffs' requested injunctive relief is an impermissible prior restraint fails because the conduct to be prevented is not protected speech and the requested relief is narrowly tailored to protect the government's interest in securing the right to vote.

      i.   *The First Amendment Does Not Protect Defendants' Alleged Threats.*

Defendants argue that their actions are protected by the First Amendment because they do not constitute "true threats," which the Supreme Court has held fall outside of First Amendment protection. *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). Whether speech

---

[14] The Trump Defendants also argue that Plaintiffs' interpretations of the VRA and the KKK Act offend the canon of constitutional avoidance by demanding an overbroad reading of those statutes. (Trump Mem. at 22-23.) This is false—as demonstrated in this Opposition, Plaintiffs have pleaded a complaint that alleges true threats and speech that incites imminent lawless action, neither of which, as applied to the VRA and the KKK Act, offends the Constitution.

constitutes a true threat depends on "whether an ordinary, reasonable recipient who is familiar with the context of the [speech] would interpret it as a threat of injury." *United States v. Turner*, 730 F.3d 411, 420 (2d Cir. 2013). Although Defendants contend that the true threats doctrine applies only to threats of violence, recent authority makes clear that true threats include threats of nonphysical and nonviolent harm. *NCBCP I,* 2020 WL 6305325, at *15-16. Actions that inspire fear of economic harm, legal repercussions, privacy violations, derogatory remarks, and even surveillance can constitute threats for purposes of a true threat inquiry. *Id.* at *17-18 (citations omitted). In *NCBCP I*, the court looked, in part, to the Supreme Court's decision in *Virginia v. Black*, noting that although the Supreme Court held that true threats "*encompass . . .* expression[s] of an intent to commit an act of unlawful violence to a particular individual or group of individuals," the Supreme Court did not indicate that *only* threats of unlawful violence constitute true threats. *Id.* at *15 (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)) (emphasis added). In *NCBCP I*, the court also recognized that "[t]he threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence," entirely consistent with the Supreme Court's rationale for holding that "true threats" fall outside the protection of the First Amendment. *Id.* (citing *Black*, 538 U.S. at 360). In *NCBCP I*, the threatened nonbodily harms arose from false but intimidating statements that voting by mail would result in creditors and/or government agencies acquiring voters' personal information to use when collecting debts, identifying voters for mandatory vaccination, and enforcing outstanding warrants. *Id.* at *18. Those threats created a climate of fear that made voters hesitate to vote by mail, *id.* at *20, much as Defendants' efforts here made officials fear the consequences of fulfilling their lawful duty to count votes in the 2020

election.[15]

As detailed above, the FAC alleges conduct by Defendants that fits squarely into the types of "threats" considered by *NCBCP I*. The FAC alleges, in part, that former President Trump engaged in private intimidation of election officials to pressure them against certifying President-Elect Biden's victory. (FAC ¶¶ 46, 48, 50, 52, 54.) The FAC also alleges that Defendants intimidated and threatened election officials by implicating them in criminal conduct, including, for example, by retweeting a message saying that Georgia's Secretary of State and Governor "will soon be going to jail." (*Id.* ¶ 52.) Defendants intimidated and threatened election officials seeking to fulfill their legal obligations by repeated false accusations of fraud, including accusations directed at Wayne County officials and others who certified the election results (*id.* ¶¶ 38-40, 72) and attacks on elections, like Philadelphia's, that former President Trump labeled "a mountain of corruption and dishonesty" (*id.* ¶ 24). These officials responsible for counting and certifying votes were thereby threatened with legal repercussions and harassment, which constitute true threats under *NCBCP I*, 2020 WL 6305325, at *17.

---

[15] Defendants' false statements of rampant voter fraud fall outside the scope of the protections of the First Amendment for the additional reason that they were made with reckless disregard for their truth—particularly when used to coerce local officials to overturn the results of the election. Deliberate or recklessly false statements are presumed to be unprotected by the First Amendment. *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (holding that false statements are unprotected by First Amendment when published with malice). This is especially true where the speech causes harm. For example, falsely accusing someone of criminal activity or making false statements that relate to the person's professional conduct are unprotected speech. *See, e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755 (1985) (recovery for defamatory falsehoods, even when related to public concern, is permitted where a party proves actual malice); *St. Amant*, 390 U.S. at 728, 731 (malice established when speech made with doubt as to truth or reckless disregard for truth). Here, the false accusations of fraud directed at election officials are unprotected because they were made with reckless disregard for the truth and sought to affirmatively harm those individuals. Even Defendants' more general statements of fraud are unprotected for the additional reason that they were made with reckless disregard for the truth and were intended to undermine the outcome of the 2020 election by invalidating millions of lawfully cast ballots.

Defendants, through their agents, also engaged in obstruction, intimidation, and outright violence at recount sites in violation of VRA § 11(b) and KKK Act § 1985(3) with the objective of slowing and stopping counting efforts. Trump Campaign observers violated rules governing their behavior as observers, harassed and crowded vote tabulators, and became physically aggressive with election volunteers. (*Id.* ¶¶ 28-30.) These actions, much of which was not speech at all, are similarly not protected by the First Amendment.

    ii.   *The First Amendment Does Not Protect Defendants' Speech Because That Speech Was Meant To—And Did—Incite Imminent Lawlessness.*

The First Amendment does not protect Defendants' violations of VRA § 11(b) and KKK Act § 1985(3) for the independent reason that their speech was directed to inciting or producing imminent lawless action and did in fact incite such action. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also Nwanguma v. Trump*, 903 F.3d 604, 609-10 (6th Cir. 2018) (citing *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 246 (6th Cir. 2015)) (noting that speech is not protected where it implicitly or explicitly encouraged the use of lawless action, the speaker intends that his speech will result in lawless action, and lawless action is the likely result of the speech). When evaluating inciting speech, courts will look to its "content, form, and context" to assess "the circumstances of the speech, including what was said, where it was said, and how it was said." *Blessing v. Cable News Network, Inc.*, No. 2:20-cv-0015, 2020 WL 7647530, at *12 (E.D. Ky. Dec. 23, 2020) (quoting *Snyder v. Phelps*, 562 U.S. 443, 454 (2011)), *appeal docketed*, No. 21-5082 (6th Cir. Jan. 27, 2021). Context is especially important here, where the conspiracy relied not only on obvious threats, intimidation, and coercion but also on insidious forms of those transgressions that succeeded in combination with the obvious forms.

Defendants' speech falls outside the scope of First Amendment protection because it

publicly incited their supporters[16] to threaten, intimidate, coerce, or commit violence against public officials in order to prevent local officials from certifying election results.[17] Many supporters engaged in these actions as a direct result of Defendants' inciting speech. Defendants' aggressive campaign, particularly messaging that baselessly suggested there was rampant election fraud (FAC ¶¶ 21-25) and that election officials (who followed the law rather than obeying Defendants' demands) were complicit in that fraud (*e.g.*, *id.* ¶ 52), was intended to produce threats, intimidation, and coercion targeting such officials. It implicitly directed supporters and volunteers to challenge those officials in *any way* possible. In response to that incitement, Trump supporters paraded past the Georgia Secretary of State's home, with some directing sexually explicit threats at the Georgia Secretary of State's wife (*id.* ¶ 32), threatened a Georgia election technician with a noose (*id.*), threatened a Wisconsin Supreme Court Justice who ruled against former President Trump in an election-related case (*id.*), directed threats to the Arizona and Nevada Secretaries of

---

[16] Defendants wrongly suggest that they can only be responsible for their own acts or their agents' acts. (RNC Mem. at 22; Trump Mem. at 18-19.) Defendants misunderstand. Their speech that is proscribed by VRA § 11(b) and KKK Act § 1985(3) included unprotected speech that caused others, regardless of agency, to commit unlawful acts to prevent or attempt to prevent election officials from performing their duties.

[17] Defendants' conduct as pleaded in the FAC is sufficient to demonstrate that Defendants' conduct was unprotected speech. Additional conduct that took place following the filing of the FAC, however, further illustrates that Defendants' conduct was unprotected. Then-President Trump made a phone call to Georgia Secretary of State Raffensperger urging him to illegally "find 11,780 votes." Amy Gardner & Paulina Firozi, *Here's the Full Transcript and Audio of the Call Between Trump and Raffensperger*, Wash. Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/ trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644 d82356_story.html. This call to action was intended to produce imminent lawless action—namely the baseless reversal of election results—and was likely to produce such action. On January 6, 2021, shortly after the FAC was filed, then-President Trump hosted a rally at which he incited a deadly riot. His rhetoric was directed to producing imminent lawless action, and did produce lawless action, resulting in thousands of people storming the Capitol, violent clashes, and multiple deaths. Maria Peñaloza, *Trump Supporters Storm U.S. Capitol, Clash with Police*, NPR.org (Jan. 6, 2021), https://www.npr.org/sections/congress-electoral-college-tally-live-updates/2021/01/06/ 953616207/diehard-trump-supporters-gather-in-the-nations-capital-to-protest-election-resul. Former President Trump was then impeached for his role in the Capitol riots.

State as well as a Michigan official's family member (*id.* ¶ 33), and, armed with weapons, assembled outside of the Michigan Secretary of State's home at night (*id.*). In light of this incitement and the resulting threats, public officials, concerned that former President Trump's supporters would injure someone, called on former President Trump to condemn violence and rein in his supporters. (*Id.* ¶ 52 & n.46 (citing Kephart, *supra* n.9).) Former President Trump directly responded in a tweet where he linked to a video of the request from officials by continuing his aggressive—but baseless—campaign against purported voter fraud and asking what those officials were "afraid of." (*Id.* at ¶ 52.)

The RNC's argument that it is absolved from liability because none of the Trump Defendants' threats or incitement are attributable to it fails as well. (RNC Mem. at 22-23.) As an initial matter, the RNC engaged in speech that targeted election officials, suggesting they were complicit in voter fraud and speech in ways designed to incite imminent lawlessness. For example, the RNC hosted a press conference, and later retweeted remarks from the conference, at which a Trump Campaign representative declared that the 2020 election had involved one of "the most unpatriotic acts I can imagine." (FAC ¶¶ 38-40.) The RNC also publicly supported the false narrative that voters engaged in widespread fraudulent (and criminal) conduct in Wayne County. (*Id.* ¶ 44.) After Wayne County agreed to certify the results, the RNC communicated with the State Board looking to delay certification based on the false premise that minor discrepancies were evidence of widespread fraud. (*Id.* ¶¶ 42, 49.) Further, the RNC routinely used its Twitter account (@GOP) to reinforce the Trump Defendants' false claim that the election was stolen. (*Id.* ¶ 71.) The RNC, through the Arizona Republican Party, put pressure on Arizona officials not to certify election results (*id.* ¶ 55) and issued multiple tweets encouraging supporters to "give [their] life for this fight" and "die for something" (*id.* ¶¶ 55, 60), which contributed to former President

Trump's supporters threatening the Arizona Secretary of State with violence (*id.* ¶ 33).

Finally, as demonstrated below, Plaintiffs have alleged facts showing that the Trump Defendants and the RNC formed a conspiracy to deprive voters of the franchise in violation of VRA § 11(b) and KKK Act § 1985(3). Accordingly, the RNC is liable for the injuries the Trump Defendants caused, in addition to the injuries it caused by its own incitement. "[O]nce [a] conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy." *Halberstam*, 705 F.2d at 481.

    iii.   *Plaintiffs' Requested Injunctive Relief Does Not Constitute An Impermissible Prior Restraint.*

The Trump Defendants argue that injunctive relief would be an impermissible prior restraint. (Trump Mem. 25-26.) But the injunction Plaintiffs seek is not a prior restraint because the conduct prohibited by the injunction would not be constitutionally protected speech. *See, e.g.*, *United States v. White*, 769 F.2d 511, 516-17 (8th Cir. 1985) (injunction not impermissible prior restraint where commercial speech had been shown to be false or fraudulent and was likely to promote illegal activity and because speech was not protected by the First Amendment); *United States v. May*, 555 F. Supp. 1008, 1010 (E.D. Mich. 1983) (injunction valid, in part, because of adequate procedural safeguards). Moreover, Plaintiffs' request for injunctive relief prohibiting violations of the KKK Act and VRA will be subject to hearing and review by this Court, *May*, 555 F. Supp. at 1010, and is narrowly tailored to protect the government's significant interest in securing the right to vote. *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 210-11 (2d Cir. 2001) (portions of injunction not impermissible prior restraints where narrowly tailored to protect government interest); *see also Burson v. Freeman,* 504 U.S. 191, 199 (1992) (plurality opinion) (The "right to vote freely for the candidate of one's choice is of the essence of a democratic society.") (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

**D. Plaintiffs Have Adequately Pleaded That Trump Campaign Volunteers, RNC Volunteers, And State Republican Parties Who Engaged In Relevant Conduct Were Defendants' Agents.**

The Trump Campaign tries to escape responsibility for its volunteers' actions by arguing that the FAC is "completely devoid of any suggestion that the Trump Campaign had control over its diffuse and myriad volunteers" (Trump Mem. at 19), and the RNC similarly insists that it is not liable for the actions of its volunteers or members of state parties (RNC Mem. at 22-23).[18] Defendants are wrong. Plaintiffs have alleged facts supporting an inference that Defendants recruited, trained, and instructed Trump volunteers on poll monitoring, including vote counting, and that the RNC controls the state parties involved in those efforts; those allegations establish that the volunteers were Defendants' agents.[19]

As set forth in the Background section, the FAC alleges that Defendants and their agents recruited and trained volunteers who engaged in election-related activities. (FAC ¶¶ 62-63.) Defendants' highly militaristic recruitment efforts for their "Army for Trump" called for volunteers to "enlist" to "fight" for Trump. (*Id.* ¶¶ 61-62, 70.) The trainings prepared and provided by Defendants encouraged volunteers to think that they were called upon to prevent "deliberate attacks that could sway the overall results of the election." (*Id.* ¶¶ 62-63, 65.) These allegations create a plausible inference that the Trump Campaign observers who engaged in obstruction and physically intimidating conduct were acting under the direction and control of Defendants. *See,*

---

[18] Plaintiffs have alleged facts showing that any unlawful threats or violence committed by individuals who might not have been Defendants' agents were nonetheless committed as the result of Defendants' incitement. (*See, e.g.*, FAC ¶¶ 32-33.)

[19] The fact that the volunteers were unpaid does not prevent them from being agents. *Levy v. Currier*, 587 A.2d 205, 210 (D.C. 1991) (citing Restatement (Second) of Agency § 225 & cmt. a ("Consideration is not necessary to create the relation of principal and agent.")); *see also* Restatement (Third) of Agency § 7.07(3)(b) (2006) ("[T]he fact that work is performed gratuitously does not relieve a principal of liability."); *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 444 (7th Cir. 2000) (nonprofit corporation could be held liable for negligence of a volunteer).

*e.g.*, *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354, 357 (D.D.C. 2020) ("[A] court must . . . grant plaintiff the benefit of all inferences that can be derived from the facts alleged[.]") (citation omitted).

Further, as the RNC concedes, it is "responsible for statements or actions by members of state parties" if "they were acting under the direction, and as agents, of the RNC." (RNC Mem. at 22.) The FAC pleads such a relationship: alleging, *inter alia*, that the RNC "oversees" the state Republican parties (FAC ¶¶ 2, 56), and that pursuant to the RNC's organizational structure, its members include the heads of each state's Republican Party (*id.* ¶ 49 (citing "The Rules of the Republican Party")). This is sufficient to establish a plausible inference of control.[20]

The FAC alleges that Defendants controlled their volunteers' efforts to undermine and then challenge the election results. (*Id.* ¶ 22.) Volunteers and state parties were carrying out a plan based on Defendants' direction. (*Id.*) This is sufficient to support a plausible inference that the volunteers were agents "acting under [Defendants'] direction or control." *Azzam v. Rightway Dev. Inc.*, 789 F. Supp. 2d 110, 115 (D.D.C. 2011) (holding that the complaint adequately alleged principal "directed" its agent to perform tortious conduct). Any protestation to the contrary by Defendants involves issues of fact not appropriately addressed at the pleading stage. *See Casanova v. Marathon Corp.*, 477 F. Supp. 2d 98, 103 (D.D.C. 2007) (issues of material fact precluded

---

[20] The RNC's citation to *Democratic Nat'l Comm. v. Republican Nat'l Committee* only confirms that the RNC has long acknowledged that state Republican parties can act as agents of the RNC. (RNC Mem. at 22.) This case concerned the parties' 1982 Consent Decree, which provided that it was binding only on the RNC, the New Jersey Republican Party, and the RNC's "agents, servants, and employees, *whether acting directly or indirectly through other party committees*." No. 81 Civ. 3876, 2016 WL 6584915, at *15 (D. N. J. Nov. 5, 2016) (emphasis added). The court was tasked with interpreting whether at-issue activities of state Republican party chairs fell within this agency relationship; based on lack of evidence, the court found that they did not. *Id.* at *16 ("The Court finds that the DNC has not demonstrated that [the state party chairs] were acting in their roles as RNC members.").

determination level of control, if any, between parties at summary judgment stage).

**V.    Plaintiffs State A Claim Under KKK Act § 1985(3).**

KKK Act § 1985(3) prohibits conspiring for any one of three reasons: (1) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" (the "Deprivation Clause"); (2) "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws" (the "*Hindrance Clause*"); *or* (3) "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy" (the "*Support or Advocacy Clause*"). 42 U.S.C. § 1985(3).

Here, the FAC adequately alleges both a conspiracy and all three types of prohibited underlying conduct. Indeed, given that the violations of all three clauses involve the right to vote, alleging a conspiracy to violate § 1985(3) also constitutes alleging a conspiracy to violate VRA § 11(b). *See Nat'l Coal. on Black Civic Participation v. Wohl* ("*NCBCP II*"), No. 20 Civ. 8668, __ F. Supp. 3d __, 2021 WL 480818, at *7 (S.D.N.Y. Jan. 12, 2021) (noting that conduct constituting intimidation under VRA § 11(b) also constitutes intimidation under § 1985(3)), *appeal docketed*, No. 21-232 (2d Cir. Feb. 8, 2021).

**A.   Plaintiffs Have Alleged Facts Showing A Civil Conspiracy.**

Plaintiffs allege facts showing a civil conspiracy: (i) an agreement between two or more persons; (ii) to participate in an unlawful act or in a lawful act in an unlawful manner; and (iii) an injury caused by an unlawful overt act performed by one of the parties to the agreement

(iv) pursuant to, and in furtherance of, the common scheme. *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 78-79 (D.D.C. 2004).[21] In particular, the FAC satisfies the first two elements by alleging, in addition to joint recruitment, fundraising, and training efforts (FAC ¶¶ 62-65), close operational and messaging ties among Defendants (*e.g.*, *id.*, ¶¶ 40, 65, 67-69, 71), including multiple instances in which Defendants, directly and through their agents, acted in concert to threaten, intimidate, or coerce election officials with the shared goal of disenfranchising Plaintiffs (*e.g.*, *id.*, ¶¶ 20, 22-30, 32-35, 38-40, 63-66, 71). Many of those concerted disenfranchisement efforts took place all over the nation but in a compressed time period, illustrating the close coordination among Defendants. (*Id.* ¶¶ 26-32, 33, 38, 44-49, 52-55, 60, 63, 68-69.)[22] Thus, the Court should swiftly reject the RNC's contention that even if the FAC adequately alleges a conspiracy, it does not allege a conspiracy to deprive anyone of a right. (RNC Mem. at 24.)

The Court should also reject the RNC's argument that Plaintiffs fail to allege the remaining two elements—an injury caused by Defendant's conspiratorial acts—because "Defendants' actions were unsuccessful." (*Id.* at 29 (quoting FAC ¶ 1).) *First*, neither statute requires that Defendants achieved their ultimate goal. *NCBCP II*, 2021 WL 480818, at *10. *Second*, although Defendants did not overturn the result of the 2020 presidential election, they did injure Plaintiffs while trying to do so. NAACP had to expend resources trying to counteract the harms inflicted on

---

[21] "[A]s the D.C. Circuit has recognized, 'in most cases the court will have to infer a conspiracy from indirect evidence'" that suggests the conspirators are pursuing the same goal and are in contact with one another in that pursuit. *Youming Jin*, 335 F. Supp. 2d at 82 (quoting *Halberstam*, 705 F.2d at 481). Thus, a plaintiff may adequately allege conspiracy based "primarily on inference, press reports, and circumstantial evidence." *In re Vitamins Antitrust Litig.*, No. MISC 99-197, 2000 WL 1475705, at *10 (D.D.C. May 9, 2000).

[22] "An express agreement among all conspirators is not necessary." *Hobson v. Wilson,* 737 F.2d 1, 51-52 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord'n Unit*, 507 U.S. 163 (1993). Provided that conspirators share "the general conspiratorial objective . . . they need not know all the details of the plan . . . or possess the same motives." *Id.*

its members by Defendants' actions. (FAC ¶ 83.) Moreover, Plaintiffs have also alleged facts showing that Defendants intimidated, threatened, and coerced state officials in an effort to prevent Plaintiffs' (and their members') votes from being properly counted and that this effort undermined those individuals' voting rights. (*Id.* ¶ 80.) Such harms, including the dignitary harm to Black voters who were targeted for disenfranchisement and the false narrative of voter fraud, are profound injuries. "It is 'as equally unquestionable that the right to have one's vote counted is as open to protection [. . .] as the right to put a ballot in a box.'" *Reynolds*, 377 U.S. at 554-55 (citation omitted). Creating "fear of harassment and interference" among voters or those counting and certifying their votes causes a cognizable harm under both VRA § 11(b) and KKK Act § 1985(3), even where the votes are ultimately cast and counted. *LULAC*, 2018 WL 3848404, at *1; *NCBCP II*, 2021 WL 480818, at *5, *10.

## B. Plaintiffs Have Stated A Claim Under The Support Or Advocacy Clause.

The same intimidation, threats, and coercion of election officials that violated VRA § 11(b) also violated the Support or Advocacy Clause of § 1985(3) by aiming "to prevent by force, intimidation, or threat" Plaintiffs from giving their "support or advocacy in a legal manner" in a federal election. 42 U.S.C. § 1985(3).

Defendants argue that Plaintiffs' § 1985(3) claim should be dismissed entirely because (1) the FAC does not adequately allege any "discriminatory purpose" (Trump Mem. at 16-17; *see* RNC Mem. at 26) and (2) § 1985(3) does not create substantive rights and Plaintiffs have not alleged that Defendants violated some separate right. (RNC Mem. at 23-24). Those arguments are incorrect. *First,* as shown below in Plaintiffs' arguments regarding the Deprivation and Hindrance Clauses, Plaintiffs *do* allege both discriminatory purpose and violations of separate rights, including their rights under VRA § 11(b) and the Equal Protection Clause. *Second*, Plaintiffs do not need to allege discriminatory purpose or identify a separate right in order to state a claim under

§ 1985(3). The Support or Advocacy Clause does not require race- or class-based discrimination and creates its own freestanding cause of action. *LULAC*, 2018 WL 3848404, at *5-*6; *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967); *NCBCP I*, 2020 WL 6305325, at *21 n.30, *22.

Defendants disregard § 1985(3)'s plain language and structure, both of which sharply differentiate among the three clauses. On one hand, the Deprivation and Hindrance Clauses explicitly invoke "the equal protection of the laws." 42 U.S.C. § 1985(3). On the other hand, the Support or Advocacy Clause does not. That distinction is reinforced by the two separate forms of conspiracy set out by the statute: one in which "two or more persons . . . conspire or go in disguise on the highway or on the premises of another" (Deprivation and Hindrance Clauses) and another in which "two or more persons conspire to prevent by force, intimidation, or threat" any citizen's support or advocacy in connection with a federal election (Support or Advocacy Clause). *Id.* Although some decisions addressing § 1985(3), including some D.C. Circuit decisions, have been misread as stating that equal protection analysis applies to the Support or Advocacy Clause, that is because those decisions either address claims that are "focus[ed] on the clauses related to equal protection" or simply "do not explicitly distinguish between different portions of Section 1985(3)." *LULAC*, 2018 WL 3848404, at *5.[23]

---

[23] In *Hobson*, the D.C. Circuit said that "the statute" requires that a plaintiff prove that the defendants conspired to deprive someone of the equal protection of the laws or of equal privileges and immunities, that "the rights protected by section 1985(3) exist independently of the section and only to the extent that the Constitution creates them," and that there must be class-based animus. 737 F.2d at 14-16. However, the Court did so *only* in terms of the Deprivation Clause, without addressing the Hindrance and Support or Advocacy Clauses in its recitation of the relevant statutory text. *Id.* at 14. Thus, the court's analysis applies—and was intended to apply—only to the Deprivation Clause. Such analysis combined with deceptively broad language is common in cases focused on equal protection claims, and such cases often cite *Hobson*, *Griffin*, or *Bray*, all of which analyzed only the Deprivation Clause. *See, e.g.*, *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009); *In re Rodriguez*, No. 05-5130, 2005 WL 3843612, at *4 (D.C. Cir. Oct. 14, 2005) (per curiam); *LaRouche v. Fowler*, 152 F.3d 974, 987 n.14 (D.C. Cir. 1998); *Barbour v.*

Those key distinctions between the Support or Advocacy Clause and the other two clauses of § 1985(3) lead to the conclusion that the court reached in *LULAC*: the Support or Advocacy Clause, "unlike the equal protection part of Section 1985(3)[,] does not require allegations of a race or class-based, invidiously discriminatory animus or violation of a separate substantive right." *LULAC*, 2018 WL 3848404, at *6. Supreme Court decisions regarding § 1985(3) support that conclusion. As the court noted in *LULAC*, the Supreme Court generally has been careful to mark the limits of its analysis regarding the requirements of invidious discrimination and the violation of a separate statute or constitutional right and has not applied those requirements to the Support or Advocacy Clause.[24] The *LULAC* court observed that the Supreme Court's analysis in *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971), which announced the animus requirement, involved only

---

*Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995); *McCord v. Bailey*, 636 F.2d 606, 613 (D.C. Cir. 1980). Some cases addressing § 1985(3) without addressing the Support or Advocacy Clause similarly recite the standard for equal protection claims. *See*, *e.g.*, *Boling v. United States Parole Comm'n*, No. 17-5285, 2018 WL 6721354, at *1 (D.C. Cir. Dec. 19, 2018) (per curiam), *cert. denied*, 140 S. Ct. 268 (2019); *Herbin v. Hoeffel*, No. 99-7244, 2000 WL 621304, at *1 (D.C. Cir. Apr. 6, 2000) (per curiam); *Hoai v. Vo*, 935 F.2d 308, 314 (D.C. Cir. 1991) (presuming plaintiff's § 1985 claim brought under § 1985(3)); *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987). Plaintiffs have found no case in which the D.C. Circuit applied the equal protection standard to a Support or Advocacy Clause claim. Indeed, in a recent decision regarding a claim involving the Support or Advocacy Clause, although the district court recited the equal protection standard, *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 96 (D.D.C. 2019), the D.C. Circuit did not and disposed of the case on other grounds, *Wilson v. DNC Servs. Corp.*, 831 F. App'x 513, 515-16 (D.C. Cir. 2020) (per curiam).

[24] Authorities that Defendants rely upon recognize those limitations. For example, *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 827 (1983), explicitly restricts its analysis to the Deprivation Clause: "This case concerns the scope of the cause of action made available by 42 U.S.C. § 1985(3) (Supp. 1981) to those injured by conspiracies formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" (See RNC Mem. at 25 (citing *Carpenters*).) Similarly, another case cited by the RNC makes clear that "plaintiffs are not required to show class-based animus as part of a support and advocacy claim." (RNC Mem. at 24 (citing *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004).)

equal protection analysis under the Deprivation Clause and thus did not apply to the Support or Advocacy Clause. 2018 WL 3848404, at *5; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993) (stating that *Griffin*'s analysis applies to "the first clause of § 1985(3)"). The court in *LULAC* further noted that the Supreme Court declined to extend *Griffin*'s reasoning beyond the first clause of § 1985(3) because "there is no suggestion" that reasoning should apply to "any other portion of § 1985." *LULAC*, 2018 WL 3848404, at *5 (quoting *Kush v. Rutledge*, 460 U.S. 719, 726 (1983));[25] *see also Bowie v. Maddox*, 642 F.3d 1122, 1129 & n.3 (D.C. Cir. 2011) (reversing dismissal of claim under first clause of § 1985(2) for "[l]ack of invidious motive" because "that clause 'contain[s] no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws.'" (quoting *Kush*, 460 U.S. at 725)).

Based on the correct legal standard, the court in *LULAC* held that the defendants' alleged conduct, which implied that the individual plaintiffs and the organizational plaintiff's members were voting illegally and also included personally identifying information regarding the individual plaintiffs, violated both VRA § 11(b) and the Support or Advocacy Clause and that the plaintiffs' alleged injuries satisfied those statutes' requirements. *LULAC*, 2018 WL 3848404, at *1, *4, *6. The plaintiffs' cognizable injuries included "the detrimental impact [on the individual plaintiffs] of adverse publicity, intimidation, embarrassment, and fear of harassment associated with their participation in the electoral process" and, for the organizational plaintiff, having to divert "time and resources to combat the false narrative that Latinos who vote are doing so illegally." rather

---

[25] The Supreme Court's reminder of the limited applicability of its equal protection analysis in *Kush* came several years *after* it decided *Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979). The RNC claims that *Novotny* applies more broadly than *Kush* allows. (RNC Mem. at 23.) But the plaintiff in *Novotny* alleged he had been deprived of "equal protection of and equal privileges and immunities under the laws," a claim available only under the Deprivation Clause, and the Supreme Court's § 1985(3) analysis applied only to "the facts alleged in Novotny's complaint." 442 U.S. at 369-70.

than being able to devote those resources to its ordinary activities. *Id.* at \*4, \*6.

Similarly, here, Plaintiffs have alleged facts showing that Defendants used intimidation and incitement in an effort to prevent them from supporting a political candidate and to otherwise disenfranchise them. Plaintiffs have further alleged that Defendants' conduct harmed them, whether in the form of injury to their property (NAACP) or in the form of debasing their right to have their votes counted in an environment free from force, intimidation, or threat (all Plaintiffs or their members). *Paynes*, 377 F.2d at 63.

For the foregoing reasons, a violation of the Support or Advocacy Clause does require either a showing of class-based discrimination or violation of a separate right, and Plaintiffs have pleaded facts that establish a violation thereof.

### C.  Plaintiffs Have Stated Claims Under The Deprivation And Hindrance Clauses.

Plaintiffs also state claims under both the Deprivation Clause and the Hindrance Clause. Claims under the Deprivation Clause require showing: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Hobson v. Wilson,* 737 F.2d 1, 14 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord'n Unit*, 507 U.S. 163 (1993). For the purposes of this Opposition only, Plaintiffs assume that the same standard applies to the Hindrance Clause.[26]

As established above, Plaintiffs allege facts showing that Defendants conspired for the purpose of directly and indirectly depriving them of their right to vote (Deprivation Clause) and

---

[26] "Although the Supreme Court has interpreted [ ] the 'Deprivation Clause[ ]' of § 1985(3), it has never construed the Hindrance Clause[.]" *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 300 (E.D.N.Y. 2018) (citation omitted) (first two alterations in original).

"for the purpose of preventing or hindering the constituted authorities of [multiple states] from giving or securing" them their right to vote (Hindrance Clause) and that Defendants acted in furtherance of that conspiracy. 42 U.S.C. § 1985(3). Specifically, Plaintiffs have alleged facts showing the existence of a conspiracy to use intimidation, threats, and coercion to obstruct the counting and certification of votes by state and local election officials. Finally, Plaintiffs have alleged facts showing that they were injured in their property, by the debasement of their rights, or both. As also shown above, Defendants' arguments to the contrary fail. Their remaining arguments are equally unavailing.

i. *Plaintiffs Have Alleged Class-Based Discrimination.*

Defendants argue that Plaintiffs have failed to allege that there is "some racial, or perhaps otherwise class-based invidiously discriminatory animus" underlying the conspiracy. (Trump Mem. at 11 (citing *Bray*, 506 U.S. at 268); RNC Mem. at 26.) Not so. Plaintiffs have alleged facts indicating that Defendants targeted their efforts at heavily Black areas without a plausible, non-discriminatory reason for doing so and consistent with long-standing discriminatory myths that votes from heavily Black communities are more likely to be fraudulent. (FAC ¶¶ 3-4, 17, 20, 26, 43, 73-75, 78, 83.) Plaintiffs have provided specific examples of the targeted areas, including Detroit, Philadelphia, Atlanta, Milwaukee, and Madison. (*E.g.*, *id.* ¶¶ 3, 20, 26, 43, 78.) Plaintiffs have further identified instances in which Defendants challenged the vote in heavily Black areas but not in any other areas. (*Id.* ¶¶ 26, 42.) That includes noting that Defendants targeted Detroit (*e.g.*, *id.* ¶¶ 24, 38, 39) even though a judge had found their claims "not credible" (*id.* ¶ 38) and even though at least one majority-white city in the same county as Detroit had inconsistencies more significant than the minor, routine inconsistencies in Detroit (*id.* ¶¶ 42-43). On a motion to dismiss, this Court may not credit Defendants' assertions that they were trying to protect ballot integrity or election integrity. (Trump Mem. at 9; RNC Mem. at 20.) Plaintiffs have more than met

their burden to allege facts that push their claims over the dividing line "between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Separately, Plaintiffs have alleged invidious discrimination on the grounds that Defendants targeted areas that went against former President Trump in the 2020 election. Political affiliation can be a protected class under § 1985(3). *Keating v. Carey*, 706 F.2d 377, 386-88 (2d Cir. 1983). The plain language of the KKK Act does not specify a need for invidious racial motive. Nor does the KKK Act's history support such a requirement. "The Congress of 1871 . . . did not view the Klan solely as a racist organization to oppress blacks but as a political organization intent on establishing Democratic hegemony in the South.'" *Id.* at 387. The KKK Act's Senate floor sponsor made that broader scope clear when he explained to the Senate that the Act would apply to "a conspiracy formed against [a] man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter[.]" Cong. Globe, 42d Cong., 1st Sess. 565, 567, col. 2 (1871).

    ii.   *Plaintiffs Have Alleged State Action Where Required.*

The RNC also suggests that any claims relying on the First Amendment or the Fourteenth Amendment should be dismissed because Defendants are not state actors. (RNC Mem. at 24.) This argument is unavailing.

*First*, as the RNC acknowledges (*id.*), any state action requirement that might be applicable to certain constitutional rights underlying claims brought under the Deprivation Clause or the Hindrance Cause is irrelevant to Plaintiffs' § 1985(3) claims to the extent that they rely on violations of VRA § 11(b). As established above, Defendants' violations of VRA § 11(b) provide a sufficient basis to support Plaintiffs' § 1985(3) claims. Plaintiffs have no need to allege a violation of any other law, privilege, or immunity.

*Second*, beyond VRA § 11(b), Plaintiffs also allege facts supporting violations of

fundamental citizenship rights, including the Equal Protection Clause of the Fourteenth Amendment. As to this claim, Plaintiffs have alleged sufficient facts to support state action. In *Carpenters*, the Supreme Court held that the state action requirement is satisfied where either "the state is involved in the conspiracy or . . . the aim of the conspiracy is to influence the activity of the State." 463 U.S. at 826. "When private individuals conspire for the purpose of arresting or impeding the State's power to protect or secure equal protection of the laws to a group of citizens, . . . [i]t seems clear to us that such a conspiracy is precisely the type that the *Carpenters* Court was referring to." *Libertad v. Welch*, 53 F.3d 428, 450 (1st Cir. 1995). "When the State's conduct is thus arrogated, state action is clearly implicated, and rights protected only against official infringement are likewise implicated." *Id.*

As set forth above, Plaintiffs have alleged that the aim of Defendants' conspiracy was to influence the activity of the state. They allege facts showing that Defendants violated the Deprivation Clause by seeking, "directly or indirectly," 42 U.S.C. § 1985(3), to influence the activity of election officials in order to deprive Plaintiffs of their right to vote, either by invalidating their votes or by debasing their right to vote. Similarly, they allege that Defendants and their agents violated the Hindrance Cause because Defendants' actions had the purpose of hindering the constituted authorities of multiple states as they counted, recounted, and certified Plaintiffs' votes and the votes of other Black citizens.

The RNC's argument that "state action" must come from state actors (RNC Mem. at 24) would render the Deprivation Clause and the Hindrance Clause nullities and absurdities. Under the RNC's interpretation, the KKK Act would not bar members *of the KKK* from conspiring to disenfranchise voters unless those KKK members also happened to be state actors. Not only does *Carpenter* flatly contradict this, so do the language and logic of the statute, particularly as to the

43

Hindrance Clause. "[H]indering a state effort to provide equal protection itself clearly implicates state action." *Jenkins v. Miller*, No. 2:12-CV-184, 2017 WL 4402431, at *15 (D. Vt. Sept. 29, 2017). This is why in *Griffin*, the Supreme Court noted that the Hindrance Clause explicitly deals with the form of state action entailed in "interference with State officials." 403 U.S. at 99 & n.7. Indeed, to require state action to be undertaken *by* state actors in order to violate the Hindrance Clause would "undercut the hindrance clause altogether" because there is almost no situation in which a state would be involved in hindering its *own* efforts to secure the equal protection of citizens' rights. *Jenkins*, 2017 WL 4402431, at *1.

*Third*, to be clear, the state action requirement does not apply to Plaintiffs' Support or Advocacy Clause claim. *See LULAC*, 2018 WL 3848404, at *5-6. That clause does not refer to other laws, privileges, or immunities that might, or might not, require state action to infringe, so Plaintiffs need show only a violation of the statutory right of action created by that clause to enforce the right to vote for, or to otherwise support or advocate for, a candidate for federal office. 42 U.S.C. § 1985(3).

iii.   *Plaintiffs Have Alleged That Defendants' Violations Of § 1985(3) Harmed Them.*

Defendants' last ground for dismissal is the RNC's assertion that Defendants' violations of § 1985(3) did not proximately cause Plaintiffs any injury. (RNC Mem. at 27-28.) As a threshold matter, it is far from clear whether proximate causation analysis is the right analysis for § 1985(3), particularly given that the Deprivation Clause expressly proscribes "indirect[]" as well as "direct[]" means of depriving plaintiffs of their rights, privileges, and immunities. More importantly, the RNC's purported proximate causation argument is not about causation. Instead, it is an assertion that Plaintiffs suffered no injury cognizable under § 1985(3). As already established, the fact that Defendants' efforts to overturn the 2020 presidential election were unsuccessful simply does not mean that those efforts left Plaintiffs unharmed.

Plaintiffs have sufficiently alleged facts showing that Defendants violated all three clauses of § 1985(3), so this Court should deny their motions to dismiss.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss.

Dated: April 7, 2021

Respectfully submitted,

/s/ Jason M. Bradford
Jason M. Bradford (D.D.C Bar No. IL0073)

Samuel Spital (D.D.C Bar No. SS4839)
Janai S. Nelson (*pro hac vice*)
Monique N. Lin-Luse (*pro hac vice*)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
(212) 965-2200

Jason M. Bradford (D.D.C Bar No. IL0073)
William L. Von Hoene (D.D.C Bar No. IL0077)
Jonathan A. Enfield (D.D.C Bar No. IL0074)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350

Stephen L. Ascher*
JENNER & BLOCK LLP
919 3rd Avenue
New York, NY 10022
(212) 891-1600

*Counsel for Plaintiffs*

*Application for pro hac vice admission pending*

**CERTIFICATE OF SERVICE**

I certify that on April 7, 2021, I electronically filed the foregoing Plaintiffs' Response in Opposition to Defendants' Motions to Dismiss and the accompanying proposed order with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record.

Dated: April 7, 2021                    /s/ Jason M. Bradford
                                        Jason M. Bradford
                                        Attorney for Plaintiffs