**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MICHIGAN   WELFARE   RIGHTS
ORGANIZATION, *et al.*

            Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

            Defendants.

---

Civ. Action No. 20-3388 (EGS)

## MEMORANDUM OPINION

### I.   Introduction

Plaintiffs Michigan Welfare Rights Organization ("MWRO"),
the National Association for the Advancement of Colored People
("NAACP"), Maureen Taylor ("Ms. Taylor"), Nicole Hill ("Ms.
Hill"), and Teasha Jones ("Ms. Jones") (collectively
"Plaintiffs") bring this case against Defendants the Republican
National Committee ("RNC"), Donald J. Trump for President, Inc.
(the "Trump Campaign"), and Donald J. Trump ("former President
Trump") (collectively "Defendants"), alleging violations of the
Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux Klan
Act, 42 U.S.C. § 1985(3), based on conduct alleged to have
occurred throughout the country around the 2020 Presidential

Election. *See generally* Amended Complaint ("Am. Compl.") ECF No.
8.[1]

Pending before the Court are four motions. Defendants move
to transfer this case to the United States District Court for
the Eastern District of Michigan, on the basis of the
convenience of the parties and witnesses, and in the interest of
justice. *See* Def. RNC's Mem. in Supp. of its Mot. to Transfer
Venue Pursuant to 28 U.S.C. § 1404(A) ("Mot. to Transfer"), ECF
No. 21-1; Defs.' Donald J. Trump and Donald J. Trump for
President Incorporated's Notice of Joinder in Mot. to Transfer
Venue ("Trump Defs.' Mot. to Transfer"), ECF No. 22. Plaintiffs
oppose this motion. *See* Pls.' Resp. in Opp'n to Defs.' Mot. to
Transfer Venue ("Pls.' Transfer Opp'n"), ECF No. 23. In
addition, the RNC moves to dismiss this case for failure to
state a claim and lack of standing. *See* RNC's Mot. to Dismiss
Pls.' Amended Compl. ("RNC's MTD"), ECF No. 24. The Trump
Defendants move to dismiss for failure to state a claim, lack of
personal jurisdiction, and lack of standing. *See* Mem. in Supp.
of Mot. to Dismiss Amended Compl. For Decl. and Injunctive
Relief on Behalf of Defs. Donald J. Trump and Donald J. Trump
for President, Inc. ("Trump Defs.' MTD"), ECF No. 25-1.

---

[1] When citing electronic filings throughout this Opinion, the
Court cites to the ECF page number, not the page number of the
filed document.

2

Plaintiffs oppose both motions. *See* Pls.' Resp. in Opp'n to
Defs.' Mots. To Dismiss ("Pls.' MTD Opp'n"), ECF No. 35. On
March 31, 2022, Plaintiffs filed a Notice of Supplemental
Authority relevant to their 42 U.S.C. § 1985(3) claim. *See*
Notice of Supplemental Authority, ECF No. 46.

Upon consideration of the motions, responses, and the
replies thereto, the applicable law and regulations, the entire
record and the materials cited therein, the Court **DENIES**
Defendants' Motion to Transfer, ECF No. 21; **DENIES** the Trump
Defendants' Motion to Transfer, ECF No. 22; **GRANTS IN PART as to**
**Plaintiffs' 52 U.S.C. § 10307(b) claim AND HOLDS IN ABEYANCE IN**
**PART as to Plaintiffs' 42 U.S.C. § 1985(3) claim** the RNC's
Motion to Dismiss, ECF No. 24; and **GRANTS IN PART as to**
**Plaintiffs' 52 U.S.C. § 10307(b) claim AND HOLDS IN ABEYANCE IN**
**PART as to Plaintiffs' 42 U.S.C. § 1985(3) claim** the Trump
Defendants' Motion to Dismiss, ECF No. 25.

## II.  Factual and Procedural Background

Plaintiff MWRO is the Michigan state chapter of the
National Welfare Rights Union and is based in Detroit, Michigan.
*See* Am. Compl., ECF No. 8 ¶ 7. MWRO "conducts voter engagement
efforts targeted at low-income voters of color" and has members
"who reside in Detroit in Wayne County, Michigan, voted in the
November 2020 election, and cast a ballot for President." *Id.*
Plaintiffs Maureen Taylor, Nicole L. Hill, and Teasha K. Jones

reside in Detroit and cast their votes for President in the 2020
election. *Id.* ¶¶ 8-10. Plaintiff the NAACP is "the nation's
largest and oldest civil rights grassroots organization" and
"has over 220,000 members nationwide." *Id.* ¶ 12. It has "members
across the country who voted in the 2020 election and who plan
to vote in future elections, including in Michigan, Wisconsin,
Pennsylvania, Georgia, Arizona, and Nevada." *Id.*

Defendant Donald J. Trump was the forty-fifth President of
the United States. *Id.* ¶ 13. In November 2020, he was an
unsuccessful candidate for re-election to that office. *Id.* He is
domiciled in Florida, and asserts he was also domiciled there
when the events alleged in the Amended Complaint occurred. *See*
Trump Defs.' MTD, ECF No. 25-1 at 8. Donald J. Trump for
President, Inc. ("Trump Campaign"), is a Virginia corporation
with a principal place of business in New York and an office in
Virginia. *See id.* The RNC is a national political party with its
principal place of business at 310 First Street S.E., Washington
D.C. *See* Mot. to Transfer, ECF No. 21 at 7.

On November 20, 2020, Plaintiffs brought suit in this Court
against Defendants alleging: (1) Violation of Section 11(b) of
the Voting Rights Act ("VRA"), *see* 52 U.S.C. § 10307(b); and (2)
Conspiracy to Interfere with Civil Rights in Violation of 42

U.S.C. § 1985(3).[2] *See* Am. Compl.*,* ECF No. 8 ¶¶ 76-85. Plaintiffs assert that Defendants conspired to prevent the counting of legally cast ballots, *see id.* ¶¶ 20, 76-85; and that the objective of Defendants' conspiracy was to intimidate election officials, disenfranchise and overturn the will of voters, and ensure that then-President Trump remained President despite losing the 2020 presidential election, *see, e.g.*, *id.* ¶¶ 35-37. For the purposes of the Motions to Dismiss, the Court assumes the facts alleged in the complaint to be true and construes them in Plaintiffs' favor. *See Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir. 2015).

Plaintiffs argue that in furtherance of their conspiracy, Defendants engaged in private coercion of election officials; public intimidation of, and incitement of lawless action against, election officials; and, through their agents, physical violence, obstruction, and other intimidation—conduct unprotected by the First Amendment. *See* Pls.' MTD Opp'n, ECF No. 35 at 11. In support of this argument, Plaintiffs allege that Defendants' actions were carried out by agents under Defendants' control, including Trump Campaign and RNC volunteers and state

---

[2] The Court grants the Motions to Dismiss with respect to Plaintiffs' VRA claim, but holds in abeyance the Motions to Dismiss with respect to the 42 U.S.C. § 1985(3) claim. Accordingly, the Court does not consider the allegations as to the 42 U.S.C. § 1985(3) claim in the Factual and Procedural Background section of this opinion.

Republican parties. *Id.* ¶¶ 2, 22, 56, 61-66. Defendants and
their agents "recruit[ed] volunteers for election-related
activities," and, once the volunteers had "enlist[ed]," required
them "to participate in a training before engaging in certain
election-related activities." *Id.* ¶¶ 62-63. The trainings were
designed to prime volunteers to engage in inappropriate
behavior, including intimidation and coercion, at polling places
and recount sites. *Id.* ¶ 66. Plaintiffs seek declaratory and
injunctive relief, as well as monetary damages. *Id.* at 30-31.

Plaintiffs claim that Defendants' conduct violating the VRA
falls into three main categories: (1) private coercion and
intimidation of election officials (by the Trump Defendants);
(2) public intimidation targeting election officials, including
through false accusations and implications of criminality and
incitement of illegal activity by others (by all Defendants,
including in conspiracy with one another); and (3) physical
violence or obstruction of counting lawful votes by agents (by
all Defendants, including in conspiracy with one another). *See*
Pls.' MTD Opp'n, ECF No. 35 at 11. Allegations specific to each
category are discussed below.

## A. Allegations As To Private Coercion And Intimidation Of Election Officials

Plaintiffs contend that: (1) former President Trump made
personal phone calls to two Republican canvassers in Wayne

County, Michigan who agreed to certify Wayne County's election results, but who reversed course after receiving those calls and furnished affidavits to the Trump Campaign stating their opposition to certification, Am. Compl., ECF No. 8 ¶¶ 46-47; (2) former President Trump made phone calls to the Governor of Georgia and speaker of the Pennsylvania House of Representatives pressuring them to overturn election results, *id.* ¶¶ 50, 52-53; (3) former President Trump summoned the leaders of the Michigan State Senate and State House to the White House, where they participated in a meeting that included lawyers involved in former President Trump's efforts to overturn the election results, *id.* ¶ 48; and (4) Trump Campaign representatives "spent weeks" pressuring the Governor of Arizona "to echo President Trump's false claims about election fraud and cast doubt upon the State's results," *id.* ¶ 54.

### B. Plaintiffs' Allegations as to Public Intimidation Causing Others to Target Election Officials

Plaintiffs state that: (1) the RNC hosted a press conference at its Washington, D.C. headquarters, where former President Trump's personal lawyer, Rudolph Giuliani, falsely asserted that Wayne County's election results should not be certified due to "illegitimate ballots," and Trump Campaign lawyer Sidney Powell stated that the 2020 election had involved "the most unpatriotic acts I can even imagine," and that

"American patriots are fed up with the corruption from the local
level, to the highest level of our government" (an event that
the RNC subsequently amplified by retweeting a portion of
Powell's remarks using its official Twitter account), Am.
Compl., ECF No. 8 ¶¶ 38-40, 72; (2) former President Trump
publicly attacked Philadelphia City Commissioner Al Schmidt,
falsely asserting that the Election in Philadelphia was
characterized by "a mountain of corruption and dishonesty," *id.*
¶ 24; (3) former President Trump publicly branded Georgia's
Secretary of State as "an enemy of the people," suggested the
Georgia Secretary of State and Governor were implicated in
"massive voter fraud in Georgia," and amplified a tweet from a
supporter saying that they "will soon be going to jail," *id.* ¶
52; (4) the RNC allegedly routinely used its official Twitter
account (@GOP) to tweet links to the Trump Campaign's hotline
for reporting purported election fraud and to repeat the false
claim that "THE DEMOCRATS WILL TRY TO STEAL THIS ELECTION" *id.* ¶
71; (5) the Arizona Republican Party's official Twitter account
issued multiple tweets encouraging supporters to "give [their]
life for this fight" and "die for something," *id.* ¶¶ 55, 60; (6)
the Chairperson of the Arizona Republican Party issued a tweet
endorsing military intervention to "stop this coup" and overturn
the election for former President Trump, *id.* ¶ 60; and (7)
Defendants engaged in highly militaristic marketing and

recruitment efforts, including their designation of Trump
Campaign volunteers as an "Army for Trump," who would need to
"enlist" and "fight" to overturn the election, *id.* ¶¶ 61- 62,
66, 70. Plaintiffs also state that Defendants' supporters
directed grave intimidation, including rape and death threats,
at officials and judges connected to the election in various
states. *Id.* ¶¶ 32-34.

### C. Allegations as to Baseless Challenges, Physical Violence, Obstruction, and Other Intimidation by Agents

Plaintiffs allege that (1) "Trump Campaign observers
encroached on physical spaces of vote tabulators to observe the
count and made verbal comments pressuring vote tabulators" and
"broke observation rules by frequently interrupting vote
counters, sometimes with harassing comments and questions," Am.
Compl. ECF No. 8 ¶ 28; (2) "Trump Campaign observers also
baselessly challenged" the validity of ballots for various
reasons, "even though such challenges are clearly improper under
Wisconsin law," *id.* ¶ 29; and (3) "[s]ome Trump Campaign
observers went even further . . . by becoming physically
aggressive with election volunteers," including "one Trump
Campaign observer [who] had to be escorted from the [Milwaukee]
recount site after pushing an election official," *id.* ¶ 30. The
Complaint also quotes the chairperson of the Republican Party of
Fond du Lac County, Wisconsin as acknowledging that the "GOP

strategy" in Wisconsin post-election was "to disenfranchise people." *Id.* ¶ 31.

On February 9, 2021 Defendants filed a Motion to Transfer Venue, arguing that the majority of the alleged events took place in Michigan. *See* Mot. to Transfer, ECF No. 21. The Trump Defendants joined in this motion. *See* Trump Defs.' Mot. to Transfer, ECF No. 22. On February 24, 2021, the RNC moved to dismiss the case for failure to state a claim and for lack of standing. *See* RNC's MTD, ECF No. 24. The Trump Defendants also moved to dismiss on the same day, bringing similar arguments for failure to state a claim and lack of standing, as well as arguments of executive immunity and lack of personal jurisdiction. *See* Trump Defs.' MTD, ECF No. 25. Plaintiffs have filed opposition to both sets of motions. *See* Pls.' Transfer Opp'n, ECF No. 23; Pls.' MTD Opp'n, ECF No. 35. Defendants have filed their replies. *See* RNC's Reply in Supp. of its Mot. to Transfer Venue ("Transfer Reply"), ECF No. 26; RNC Reply in Supp. of its Mot. to Dismiss ("RNC's MTD Reply"), ECF No. 37; Reply in Supp. of Trump Defs.' Mot. to Dismiss ("Trump Defs.' MTD Reply"), ECF No. 38. On March 31, 2022, Plaintiffs filed a Notice of Supplemental Authority relevant to their 42 U.S.C. § 1985(3) claim. *See* Plaintiffs' Notice of Supplemental Authority, ECF No. 46. Accordingly, the Court will hold in abeyance a decision on the merits of Plaintiffs' 42 U.S.C. § 1985(3) claim

pending completion of briefing on the Notice.[3] Otherwise, the
motions are ripe and ready for adjudication.

## III. Standard of Review

### A. Subject Matter Jurisdiction

Federal district courts are courts of limited jurisdiction
and "possess only that power conferred by [Article III of the]
Constitution and [by] statute." *Logan v. Dep't of Veterans
Affairs,* 357 F. Supp. 2d 149, 152 (D.D.C. 2004)
(*quoting Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S.
375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)). "There is
a presumption against federal court jurisdiction and the burden
is on the party asserting the jurisdiction, the plaintiff in
this case, to establish that the Court has subject matter
jurisdiction over the action." *Id.* at 153 (citing *McNutt v. Gen.
Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 182-83, 56 S. Ct.
780, 80 L. Ed. 1135 (1936)).

The requirement of "standing is an essential and unchanging
part of the case-or-controversy requirement of Article III."
*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130,
119 L. Ed. 2d 351 (1992). "[T]he defect of standing is a defect

---

[3] The Court addresses issues of subject matter and personal
jurisdiction in this Memorandum Opinion, since they are
preliminary to the merits of the 42 U.S.C. § 1985(3) claim,
unaffected by the supplemental authority and relevant for
Plaintiffs' VRA claim.

in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). There are three requirements for standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan*, 504 U.S. at 560–61 (citation omitted).

In assessing whether a complaint sufficiently alleges subject matter jurisdiction, the Court accepts as true the allegations of the complaint, *see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); and liberally construes the pleadings such that the plaintiff benefits from all inferences derived from the facts alleged, *Barr v. Clinton,* 370 F. 3d 1196, 1199 (D.C. Cir. 2004).

However, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 556 U.S. at 678 (citations, quotation marks and brackets omitted).

Consequently, "[a] claim invoking federal-question jurisdiction under 28 U.S.C. § 1331 ... may be dismissed for want of subject matter jurisdiction if it is not colorable, *i.e.,* if it is immaterial and made solely for the purpose of obtaining jurisdiction or it is wholly insubstantial and frivolous." *Arbaugh,* 546 U.S. 500, 513 n.10, 126 S. Ct. 1235 (2006) (citation omitted); *accord Tooley v. Napolitano,* 586 F.3d 1006, 1009 (D.C. Cir. 2009) (citation omitted).

### B. Rule 12(b)(2) Motion to Dismiss

Under Rule 12(b)(2), a defendant may move to dismiss an action when the court lacks personal jurisdiction. Fed. R. Civ. P. 12(b)(2). On such a motion, the plaintiff bears the burden of establishing a factual basis for the exercise of personal jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y.*, 894 F.2d 454, 456 (D.C. Cir. 1990). To meet this burden, the plaintiff must allege specific facts that connect each defendant with the forum. *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). The plaintiff cannot rely merely on conclusory allegations. *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). The court may consider, receive, and weigh affidavits and other relevant materials outside of the pleadings to assist it in determining the pertinent jurisdictional facts.

*U.S. v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000).

A "court's exercise of personal jurisdiction over nonresidents must satisfy both the Due Process Clause and D.C.'s long-arm statute." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 173 (D.D.C. 2018) (citation omitted). To satisfy due process requirements, "a plaintiff must demonstrate that there are 'minimum contacts between the defendant and the forum establishing that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Swecker v. Midland Power Coop.*, 253 F. Supp. 3d 274, 278 (D.D.C. 2017) (citation omitted). The court may exercise either general or specific personal jurisdiction. *The Urban Institute v. Fincon Services*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010).

"A court with general jurisdiction may hear *any* claim against that defendant." *Brystol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). For an individual, the "paradigm forum" for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846 (2011).

In contrast, "[s]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 122 (D.D.C. 2018) (quoting *Goodyear*, 562 U.S. at 919). "[S]pecific jurisdiction exists if a claim is related to or arises out of the non-resident defendant's contacts with the forum." *Molock*, 297 F. Supp. 3d at 122. A plaintiff must demonstrate "that specific jurisdiction comports with the forums long-arm statute, D.C. Code § 13-423(a), and does not violate due process." *Id.* (citing *FC Inv. Group LC v. IFX Markets Ltd.*, 529 F.3d 1087, 1094-65 (D.C. Cir. 2008)).

### C. Transfer Pursuant to 28 U.S.C. § 1404(a)

28 U.S.C. § 1404(a) authorizes a court to transfer an action to any other district where it might have been brought "for the convenience of the parties and witnesses, in the interest of justice." The purpose of § 1404(a) "is to prevent the waste of time, energy, and money, and to protect litigants, witnesses, and the public from unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). District courts accordingly have discretion under § 1404(a) to transfer a case based on an "individualized case-by-case consideration of convenience and fairness." *Berry v. U.S. Dep't of Justice*, 49 F. Supp. 3d 71, 74 (D.D.C. 2014) (citing *Stewart*

*Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)); *see also Beall v. Edwards Lifesciences LLC*, 310 F. Supp. 3d 97, 102-103 (D.D.C. 2018) (Sullivan, J.); *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 45 (D.D.C. 2006). Section 1404(a) is meant to be a "judicial housekeeping measure" rather than a "forum-shopping instrument." *Van Dusen*, 376 U.S. at 636.

Defendants bear the "heavy burden of establishing that [P]laintiffs' choice of forum is inappropriate" such that this Court should transfer this case out of this District pursuant to 28 U.S.C. § 1404(a). *Jalloh v. Underwood*, 300 F. Supp. 3d 151, 155-56 (D.D.C. 2018) (citing *Thayer/Patric of Educ. Funding L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002)); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 127 (D.D.C. 2018); *see also Garcia v. Acosta*, 393 F. Supp. 3d 93, 108 (D.D.C. 2019); *Accurso v. Fed. Bureau of Prisons*, Case No. 17-CV-02626 (APM), 2018 WL 4964501, at *2 (D.D.C. Oct. 15, 2018). To satisfy this burden, defendants "must show that considerations of convenience and the interest of justice weigh in favor of transfer." *Jalloh*, 300 F. Supp. 3d at 155 (internal quotation marks and citations omitted).

To justify a transfer, defendants must make two showings. *Devaughn v. Inphonic, Inc.*, 403 F. Supp. 2d 68, 71 (D.D.C. 2005). First, they must establish that the plaintiff could have brought suit in the proposed transferee district. *Id.* at 71-72.

Pursuant to 28 U.S.C. § 1391(b), a suit may be brought in a judicial district: (1) where "any defendant resides, if all defendants are residents of the State in which the district is located"; (2) where "a substantial part of the events or omissions giving rise to the claim occurred"; or (3) if there is no judicial district where the case may be brought as provided by the first two categories, where "any defendant is subject to the court's personal jurisdiction." Second, defendants must demonstrate that considerations of convenience and the interests of justice weigh in favor of a transfer. *Devaughn*, 403 F. Supp. 2d at 71; *Berry*, 49 F. Supp. 3d at 75. To determine whether "considerations of convenience and the interests of justice weigh in favor of a transfer," courts consider several private-interest factors, including: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendant; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof." *Beall*, 310 F. Supp. 3d at 103. Courts also consider whether certain public- interest factors weigh in favor of transfer, including "(1) the transferee's familiarity with the governing laws, (2) the relative congestion of each court, and (3) the local interest in deciding local controversies at home." *Id.*

## IV.   Analysis

The RNC argues that this case should be transferred to the Eastern District of Michigan. *See* Mot. to Transfer, ECF No. 21 at 8. The RNC also moves to dismiss the case, arguing that Plaintiffs' VRA claim fails because: (1) there is no private right of action under § 11(b); (2) relief under the VRA is limited to injunctive relief, which Plaintiffs lack standing to seek; (3) Plaintiffs' VRA claim is moot, and (4) none of the conduct alleged amounts to a violation of the VRA. *See* RNC's MTD, ECF No. 24 at 9, 13.

The Trump Defendants reiterate the RNC's argument that Plaintiffs' VRA claim should be dismissed because the allegations do not amount to a violation of the VRA. *See* Trump Defs.' MTD, ECF No. 25-1 at 15, 20, 25. Like the RNC, the Trump Defendants challenge Plaintiffs' standing to bring the VRA claim. *See id.* at 28. In addition, the Trump Defendants argue that Plaintiffs cannot meet their burden of establishing the Court's personal jurisdiction over Defendants, *see id.* at 26.[4]

Since several arguments presented by the Trump Defendants and the RNC are overlapping, the Court considers all the

---

[4] At this time, the Court does not address any of Defendants' arguments on the merits of the 42 U.S.C. § 1985(3) claim. It also need not reach the issue of whether former President Trump is immune from monetary damages and whether Plaintiffs have alleged an agency relationship between Defendants and Trump Campaign Observers.

arguments together. "[A] federal court generally may not rule on
the merits of a case without first determining that it has
jurisdiction over the cause (subject-matter jurisdiction) and
the parties (personal jurisdiction)." *Sinochem Int'l Co. v.
Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 423, 127 S. Ct.
1184 (2007) (citation omitted). This includes determining
whether the Court has Article III standing before addressing the
merits of a case. *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169,
179 (D.C. Cir. 2012). However, there is no mandatory sequencing
of non-merits issues. *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S.
574, 584, 119 S.Ct. 1563 (1999); *see also Everlast World's
Boxing Headquarters Corp. v. Ringside, Inc*., 928 F. Supp. 2d
735, 741 (S.D.N.Y. 2013) (stating that "it is common to resolve
challenges to personal jurisdiction before
addressing motions to transfer venue") (citation omitted).

   Accordingly, the Court first considers whether: (1) it has
personal jurisdiction over the Trump Defendants and concludes
that it does; (2) Plaintiffs' VRA claim is moot and concludes
that it is not; and (3) Plaintiffs lack standing and concludes
that they do. Having resolved these preliminary questions, the
Court considers whether: (4) transfer to the Eastern District of
Michigan is appropriate and concludes that it is not. The Court
need not reach any remaining arguments while holding in abeyance

the Motions to Dismiss in regard to Plaintiffs' 42 U.S.C §
1985(3) claim.

### A. The Court Has Personal Jurisdiction Over the Trump Defendants

This Court is presented with an argument that is perhaps as
unprecedented as it is outlandish: the former President of this
country denying that he lived in and had minimum contacts with
the country's capital and the White House during his time as
President. Specifically, the Trump Defendants argue that this
Court lacks personal jurisdiction because "[n]either President
Trump nor the Campaign are subject to general jurisdiction in
the District of Columbia," and "[a]ny effort to subject
Defendants to this Court's specific jurisdiction based on their
constitutionally protected activities, including any action
President Trump has performed in discharging his duties as
President of the United States, cannot comport with the limits
imposed on the District of Columbia by federal due process."
Trump Defs.' MTD, ECF No. 25-1 at 28. Plaintiffs respond that
this Court has both specific and general jurisdiction because
"former President Trump was the candidate and the *de facto*
leader of the Trump Campaign, and he lived and worked in the
District of Columbia as he guided the Trump Campaign's effort to
disenfranchise Plaintiffs." Pls.' MTD Opp'n, ECF No. 35 at 22.
The Trump Defendants reply that former President Trump was

domiciled in Florida, and that "any constitutionally protected
acts alleged against the former President or his supposed agents
cannot be used to assert specific jurisdiction." Trump Defs.'
MTD Reply, ECF No. 38 at 9. The Court finds it has both general
and specific jurisdiction over former President Trump, and
specific jurisdiction over the Trump Campaign.[5]

For an individual, the "paradigm forum" for the exercise of
general jurisdiction is the individual's domicile; for a
corporation, it is where the corporation is incorporated or has
its primary place of business. *Goodyear*, 564 U.S. at 924.
"Residence in fact, coupled with the purpose to make the place
of residence one's home, are the essential elements of
domicile." *Texas v. Florida,* 306 U.S. 398, 424 (1939); *see also
Prakash v. Am. Univ.*, 727 F.2d 1174, 1180 (D.C. Cir. 1984). On
the other hand, to establish specific personal jurisdiction, the
defendant must have "minimum contacts" with D.C. *IMAPizza, LLC
v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018).
"Specific jurisdiction exists if a claim is related to or arises
out of the non-resident defendant's contacts with the forum."
*Molock*, 297 F. Supp. 3d at 122. A plaintiff must demonstrate
"that specific jurisdiction comports with the forums long-arm

---

[5] The Court need not reach the issue of general jurisdiction over
the Trump Campaign.

statute, D.C. Code § 13-423(a), and does not violate due process." *Id.* (citation omitted).

When responding to a motion to dismiss based on personal jurisdiction, without an evidentiary hearing, a plaintiff need only make a *prima facie* showing that the court has personal jurisdiction over the defendant. *Edmond v. U.S. Postal Service General Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991). To meet this burden, the plaintiff must allege specific facts that connect each defendant with the forum. *Second Amendment Found.*, 274 F.3d at 524. Any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane*, 894 F.2d at 456 (*citing Reuber v. United States*, 750 F.2d 1039, 1052 (D.C. Cir. 1984)).

Here, as Plaintiffs point out, former President Trump, then President of the United States of America, was living and working in the District of Columbia ("D.C."). *See* Pls.' MTD Opp'n, ECF No. 35 at 21. Although the Trump Defendants assert that former President Trump is domiciled in Florida, *see* Trump Defs.' MTD, ECF No. 25-1 at 27; as late as September 27, 2019, then-President Trump identified the White House as his legal residence. Florida Voter Registration Application, ECF No. 25-2 at 1. On October 28, 2019, he claimed Mar-A-Lago in Palm Beach, Florida, as his legal residence on a voter registration form, *see id.* at 2; but as the Trump Defendants themselves point out,

the State of Florida form permits claiming residence so long as a person "maintains a place of abode in that county which he or she recognizes and *intends to maintain* as his or her permanent home." § 222.17, Fl. Stat. (2020) (emphasis added). At the time former President Trump filled out the form, he may well have intended to move to Florida in the event he lost the election, but his intention to move to Florida does not establish domicile there. *See Erickson v. TD Bank*, No. 19-cv-13641, 2021 WL 118928, at *2 (D.N.J. Jan. 13, 2021) (holding that intent to move was not enough for domicile; Plaintiff must actually have done so).

As former President Trump concedes, "[t]he White House was his duty station," Trump Defs.' MTD Reply, ECF No. 38 at 9; even if he "regularly went to his beloved home state of Florida," *id.* Former President Trump's argument against jurisdiction in D.C. essentially amounts to an assertion that he was not at home at his "duty station," even while being the highest elected official of this country seeking reelection to that office. Drawing all inferences in Plaintiffs' favor, as the Court must at this juncture, the Court is persuaded that former President Trump's residence *in fact* while President of the United States, regardless of any intention to relocate to Florida, was Washington D.C. *See* Trump Defs.' Reply, ECF No. 38 at 9 (acknowledging D.C. as former President Trump's "duty station," and stating that he only "regularly went" to Florida).

Accordingly, the Court concludes that former President Trump was subject to general jurisdiction in D.C. while serving out his term as President.

Moreover, and as Plaintiffs point out, it was from D.C. that former President Trump made "many, perhaps all, of the private and public statements that constituted or incited coercion, threats, and intimidation of state officials." Pls.' MTD Opp'n, ECF No. 35 at 21. Plaintiffs also allege that the Trump Campaign took actions within D.C. to disenfranchise Plaintiffs and other Black voters, *see id.* at 22 (citing Am. Compl., ECF No. 8 ¶¶ 38, 40, 54-55, 59); and further argue that "former President Trump was the candidate and the *de facto* leader of the Trump Campaign" and guided the Campaign's actions out of D.C., *id.* Drawing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs have made a *prima facie* showing that the court has specific personal jurisdiction over the Trump Defendants. *See Edmond*, 949 F.2d at 424.

The Trump Defendants counter that the Trump Campaign's activities in D.C. were "almost exclusively press conferences, social media posts, meetings with political supporters, and phone calls to election officials," and are "all protected by the First Amendment," such that "using them to subject the Trump Defendants to the jurisdiction of the Court offends traditional notions of fair play and substantial justice." Trump Defs.' MTD

24

Reply, ECF No. 9 38 at 9-10. However, at this juncture, the Court must draw all factual discrepancies as to the nature of the activities in favor of Plaintiffs. *See Crane*, 894 F.2d at 456.

More importantly, the Trump Defendants misunderstand the constitutional due process limitations on jurisdiction. Contrary to the Trump Defendants' assertion, the Court is unaware of, and the Trump Defendants do not point to, any authority that states that constitutionally-protected acts cannot give rise to personal jurisdiction. *See* Trump Defs.' MTD Reply, ECF No. 38 at 9. The question for the Court for the purposes of specific jurisdiction is not whether the acts in the forum state are constitutionally protected, but rather whether the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316 (citation and quotation marks omitted). Defendants present no argument contesting the extent of the contacts, and indeed, the Court would be highly skeptical of any argument that the President and his reelection campaign lacked contacts to D.C. in a case challenging their conduct during the reelection. The Court concludes that it has specific jurisdiction over the Trump Defendants.

**B. Plaintiffs' VRA Claim Is Not Moot**

The RNC argues that Plaintiffs' claims for injunctive
relief "became moot before the action commenced." RNC's MTD, ECF
No. 24 at 13 (citations and quotation marks omitted). Plaintiffs
respond that the RNC's argument "improperly conflates the
separate inquiries as to mootness and standing," and that "the
2020 election's passage into history does not obviate
Plaintiffs' entitlement to injunctive relief." Pls.' Opp'n, ECF
No. 35 at 17. The RNC replies that "any suggestion that the
election remains ongoing is unserious," and that "[the VRA]
claim is moot unless the alleged injury is capable of repetition
yet evading review." RNC Reply, ECF No. 37 at 13 (quoting
*Laidlaw, Inc.*, 528 U.S. at 190-91). The Court concludes that
Plaintiffs' claims regarding injunctive relief are not moot
because they are "capable of repetition yet evading review".[6]

"Simply stated, a case is moot when the issues presented
are no longer 'live' or the parties lack a legally cognizable
interest in the outcome." *Powell v. McCormack*, 395 U.S. 486,
496 (1969). A court may not proceed to hear an action if,
subsequent to its initiation, the dispute loses "its character
as a present, live controversy of the kind that must exist if
[the court is] to avoid advisory opinions on abstract

---

[6] Defendants do not suggest that Plaintiffs' claims for
declaratory relief are moot.

propositions of law." *Hall v. Beals*, 396 U.S. 45, 48 (1969) (*per curiam*). "Where the conduct has ceased for the time being but there is a demonstrated probability that it will recur, a real-life controversy between parties with a personal stake in the outcome continues to exist." *Honig v. Doe*, 484 U.S. 305, 341 (1988) (SCALIA, J., dissenting) (emphasis deleted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000).

As the RNC argues, although the certification of the election was pending in some States when this lawsuit was filed, the election has since been certified and a new administration has taken office. *See* RNC's MTD, ECF No. 24 at 13. Any claims asserting the need for injunctive relief concerning certification for the 2020 election are therefore necessarily moot. However, it does not follow that Plaintiffs' claims for forward looking relief, declaratory judgment and for damages under 42 U.S.C. § 1985(3) are moot. The RNC argues there is no likelihood of the repetition of the alleged conduct and cites to a series of cases involving relief for past elections where the claims were dismissed for mootness. *See Virginians Against a Corrupt Congress v. Moran*, 1993 WL 260710 (D.C. Cir. 1993) (granting a motion to dismiss for mootness because "[t]he passage into history of the 1992 election makes it impossible for this or any court to grant meaningful relief with respect to

that election"); *see also Keane v. Nat'l Democratic Party*, 475 F.2d 1287, 1288 (D.C. Cir. 1973); *Flynt v. Weinberger*, 762 F.2d 134, 135 (D.C. Cir. 1985). But these cases requested relief for a past election, whereas Plaintiffs here also seek an injunction to prevent future voter intimidation. *See* Am. Compl., ECF No. 8 ¶¶ 30, 75. The question, accordingly, is whether is whether the alleged injury is capable of repetition yet evading review. *Laidlaw, Inc.*, 528 U.S. at 190-91.

The RNC correctly points out that unlike the four cases cited in support by Plaintiffs, Plaintiffs' claim "is not a challenge to the constitutionality of a state law on the books." RNC's MTD Reply, ECF No. 37 at 15. The Court also agrees with the RNC that this case is more similar to *Herron*, where a candidate for Congress claimed that his opponent had violated the law by failing to make certain disclosures. *See Herron for Congress v. FEC*, 903 F. Supp. 2d 9, 14-15 (D.D.C. 2012). The election had been over for two years, but the candidate claimed to be "*considering* a run for office in the future." *Id.* at 14. The Court found the case to be moot, because mere "*consider*[*ation* of] a run for office in the future" is too speculative, and because even if the candidate were to run for office again, it was only a "theoretical possibility" that he would be subjected to the same action again. *Id.*

In the present case, however, Plaintiffs adequately allege "a demonstrable probability that [they] will be subjected to the *same action* again." *Id.* (quotation marks omitted). Plaintiffs allege that: (1) the RNC is involved "in most elections for key offices," and was only recently released from a 35-year consent decree prohibiting it from engaging in election intimidation behavior, *see* Am. Compl., ECF No. 8 ¶ 75; and (2) former President Trump is "reported[ly] interest[ed] in campaigning for President in 2024" and has raised "at least $207.5 million since the election, a significant amount of which has been directed to former President Trump's new political action committee, Save America PAC," *id.* The RNC does not deny these allegations. *See generally* RNC's MTD, ECF No. 24; RNC's MTD Reply, ECF No. 37. Plaintiffs have also alleged former President Trump's refusal to withdraw his many falsehoods regarding voter fraud or to stop intimidating officials in the face of evidence, reason and even requests from RNC officials. *See, e.g.*, Am. Compl., ECF No. 8 ¶¶ 51-55. Drawing all inferences in Plaintiffs' favor, it is therefore not just "speculation to assert ... that [Defendants themselves] will again be involved" in disenfranchising voters, including Plaintiffs, and intimidating and coercing election officials. RNC's MTD, ECF No. 24 at 14. The Court concludes that Plaintiffs have sufficiently pled a risk of future harm to voting rights involving the same actors as in this case.

## C. Plaintiffs Lack Standing to Bring this Case

The RNC argues that "[e]ven if § 11(b) had a private right
of action, Plaintiffs lack standing to bring such a claim."
RNC's MTD, ECF No. 24 at 11. The RNC adds that equitable relief
is the only relief available under the VRA, and Plaintiffs'
request for damages can therefore not apply even if they have
standing. *Id.* at 11-12. The Trump Defendants bring a narrower
standing challenge, arguing that "Plaintiffs do not have
standing to assert a third-party Voting Rights Act claim on
behalf of voters in a state other than Michigan." Trump Defs.'
MTD, ECF No. 25-1 at 28. The Court addresses each of these
arguments in turn, beginning with the threshold question of
whether § 11(b) offers a private right of action.

### 1. Section 11(b) of the VRA Creates a Private Right of Action

The RNC argues that "under the approach that this Court
applies today, § 11(b) plainly lacks a private right of action."
RNC's MTD, ECF No. 24 at 11. The RNC contends that "[§] 12 of
the Act, 52 U.S.C. § 10308, provides the exclusive methods for
enforcing § 11," and authorizes only the Attorney General, and
not a private party, to seek equitable relief. *Id.* at 9.
Plaintiffs respond that § 11(b) has a well-established implied
private right of action, citing cases in support, and cite *Allen
v. State Board of Elections*, 393 U.S. 544 (1969), and *Morse v.*

*Republican Party of Virginia*, 517 U.S. 186 (1996), as recognizing private rights of action for other provisions in the VRA. *See* Pls.' Opp'n, ECF No. 35 at 26-27. Plaintiffs point out that *Morse* was decided *after* the advent of the new interpretive era ushered in by *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). *Id.* at 28. Plaintiffs add that "statutory intent remains the guiding principle in the implied right of action analysis," and that "Congress's intent in enacting the VRA was to create a private right of action." *Id.* at 28-29. The RNC replies that *Allen* and *Morse* are part of a "bygone era," and that there is nothing in the text of § 11(b) or "the rest of the [VRA] statute that purports to create a private right of action for § 11(b)." RNC Reply, ECF No. 37 at 17. The Court concludes that precedent and direction from the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") and the Supreme Court support a finding of a private right of action.

Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), indisputably contains no express private right of action. Section 12 of the Act, 52 U.S.C. § 10308, provides that violations of certain sections of the Act can be criminally prosecuted, *id.* §§ 10308(a)-(c), and that the Attorney General can bring civil actions for injunctive relief against persons who have engaged in or are about to engage in the conduct that § 11 prohibits, *id.* § 10308(d). However, a series of subsequent

decisions found implied rights in other provisions of the VRA.
First, in *Allen*, the Supreme Court found an implied private
right of action to enforce § 5 of the VRA, which, like VRA §
11(b), is silent about a private right of action and can be
enforced by the Attorney General under § 12. *Allen*, 393 U.S. at
555-56. The Supreme Court explained that to interpret § 12 as
limiting the ability of private individuals to bring suit under
the VRA would contradict Congress's intent to "make the
guarantees of the Fifteenth Amendment finally a reality for all
citizens." *Id.* at 556. The Court reasoned that "[t]he
achievement of the [VRA's] laudable goal could be severely
hampered [] if each citizen were required to depend solely on
litigation instituted at the discretion of the Attorney General.
. . . It is consistent with the broad purpose of this Act to
allow the individual citizen standing." *Id.* at 556-57.

In the decades that followed, the Supreme Court grew
increasingly wary of creating implied rights of action. *See*
*Sandoval*, 532 U.S. at 286 (explaining that the prior approach
was "abandoned" in *Cort v. Ash*, 422 U.S. 66 (1975)).
Nevertheless, over two decades after *Cort* ushered in a new era,
in *Morse*, the Supreme Court found an implied private right of
action under § 10 of the VRA. *See Morse*, 517 U.S. at 232. The
Court stated that its finding of a private right of action in
*Allen* was reinforced by subsequent amendments to the VRA, in

which Congress amended § 3 (Proceeding to Enforce the Right to Vote) to allow suits under any section of the VRA not just by the Attorney General but also "'*an aggrieved person*'" and added § 14(e) to provide for attorneys' fees to prevailing parties "'*other than the United States*.'" *Id.* at 233-34 (quoting 52 U.S.C. §§ 10302(a), 10310(e) (emphasis added)). The Court further recognized a private right of action under § 2 and observed that "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language." *Id.* at 232.

After *Morse*, the Supreme Court continued on the path it adopted in *Cort. See Sandoval*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) ("[S]eparation-of-powers principles" now make the Supreme Court "cauti[ous]" about recognizing implied causes of action.") Thus, "[h]aving sworn off the habit of venturing beyond Congress's intent," *Sandoval*, 532 U.S. at 287; [t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create" a private cause of action, *id.* at 286, 290. *See also Ziglar*, 137 S. Ct. at 1855 (explaining in the context of § 1983 that "[t]he determinative question is one of statutory intent").

The D.C. Circuit has acknowledged that to "recognize an implied cause of action, we have to conclude that Congress intended to provide a cause of action even though Congress did not expressly say as much in the text of the statute," which is a high bar to clear." *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097-98 (D.C. Cir. 2017).

In the post-*Cort* and *Sandoval* era, persuasive authority across multiple districts has found congressional intent to create an implied right of action for § 11(b) specifically within the statutory text, meeting the "high bar" for implied causes of action. *See Nat'l Coal. on Black Civic Participation v. Wohl ("NCBCP I")*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020), *reconsideration denied*, No. 20 CIV. 8668 (VM), 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020) ("Defendants contend that Section 11(b) affords no private right of action. That is incorrect."); *see also Rhodes v. Siver*, No. 19 Civ. 12550, 2021 WL 912393, at *1-2 (E.D. Mich. Mar. 10, 2021 ("Consistent with Section 11(b)'s broad reach . . . private parties may sue to enforce Section 11(b).") (Citation omitted); *Council on Am.-Islamic Rel'ns Minn. v. Atlas Aegis, LLC*, No. 20 Civ. 2195, 2020 WL 6336707, at *4 (D. Minn. Oct. 29,2020) (assuming private right of action); *League of United Latin Am. Citizens v. Pub. Interest Legal Found.* ("*LULAC*"), No. 18-cv-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (same). Even under the

more demanding standard imposed by *Sandoval* and *Ziglar*, the Court is not aware of, and the RNC does not point to, a single case denying a private right of action under VRA § 11(b).

Contrary to the RNC's assertion, the present Supreme Court approach does not hold that "no private right of action can be implied." RNC's MTD, ECF No. 24 at 10. Rather, to find an implied right of action, the question for the Court, as the RNC itself acknowledges, is whether "the statute itself" "'displa[ys] an intent' to create 'a private remedy.'" *Ziglar*, 137 S. Ct. at 1856 (quoting *Sandoval*, 532 U.S. at 286-87). In *Morse*, the Supreme Court addressed precisely this question when discussing § 10 of the VRA, and found that Congress' intent in enacting the VRA, displayed in the statutory text, was to create a private right of action. *Morse*, 517 U.S. at 233. As the Court explained, although "[§] 3 originally provided for special procedures in any action brought under any statute to enforce the guarantees of the fifteenth amendment by the Attorney General . . . [i]n 1975, Congress amended that section to cover actions brought by the Attorney General *or an aggrieved person*." *Id.* Consequently, § 3 of the VRA, which applies to any "[p]roceeding to enforce the right to vote," now specifically covers "an aggrieved person institut[ing] a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C.A. § 10302. Since § 11(b) is,

35

like § 10, "by its terms, a statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments," *Morse*, 517 U.S. at 234; it meets the *Sandoval* test for an intent to create a private remedy. This intent is further evidenced in Congress' addition of § 14(e) to provide for attorneys' fees to prevailing parties "'*other than the United States*.'" *Id.* at 233-34 (quoting 52 U.S.C. § 10302(a)) (emphasis added).

It therefore cuts against the VRA's text to read § 12 of the VRA, which gives the Attorney General power to enforce various VRA sections, including § 11, as the exclusive method for enforcing VRA § 11(b). *See* 52 U.S.C. § 10308. This is particularly true because § 12 does not only reference § 11, it also references § 10, which the Court found in *Morse* to be enforceable by private action based on the statutory text. *See Morse*, 517 U.S. at 233. A markedly different finding for § 11(b) based on *the same statutory text* and valid Supreme Court precedent would be an unjustifiable deviation.

Moreover, the Supreme has explicitly stated that its new approach was ushered in by *Cort*, which predated *Morse. See Sandoval*, 532 U.S. at 286. Even if *Sandoval* signals a different approach than *Cort* (which the *Sandoval* Court itself recognized as the beginning of a new era, *see Sandoval*, 532 U.S. at 286) and the reasoning of this Court, as Plaintiffs point out, the Supreme Court has stated that "if a precedent of this Court . .

. appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (citation omitted). In this case, although the Court agrees with the RNC that the *Allen* "approach to implied rights of action has been overruled," *see* RNC's MTD, ECF No. 24 at 11; *Morse* still controls, and is supplemented by the *Sandoval* analysis herein. For these reasons, the Court concludes that § 11(b) creates a private right of action.

### 2. Plaintiffs Do Not Have Standing to Bring Their VRA § 11(b) Claim

Both the RNC and the Trump Defendants argue that Plaintiffs, including the organizational Plaintiffs, do not have standing to bring these claims because there is no injury in fact.[7] Plaintiffs respond that the Complaint "more than adequately pleads such injury." Pls.' Opp'n, ECF No. 35 at 19. The Court concludes that Plaintiffs do not have standing to bring their VRA claim.

---

[7] The Trump Defendants also argue that the individual Plaintiffs do not have standing to assert claims on behalf of individuals in other states. Trump Defs.' MTD, ECF No. 25-1 at 29-30. The Court does not consider this argument since the individual Plaintiffs do not assert claims on behalf of anyone else.

As a threshold matter, the Court addresses the question of
the types of relief available under the VRA, a necessary step to
frame the Court's standing analysis. *See Town of Chester v.
Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (stating that
because "standing is not dispensed in gross," a plaintiff "must
demonstrate standing for each claim he seeks to press and for
each form of relief that is sought.") The RNC asserts that
"[e]quitable relief is the only relief available under the VRA."
RNC's MTD, ECF No. 24 at 11 (citing *Cook v. Randolph Cty., Ga.*,
573 F.3d 1143, 1155 (11th Cir. 2009); *Olagues v. Russoniello*,
770 F.2d 791, 804-05 (9th Cir. 1985); *Windy Boy v. Big Horn
County*, 647 F. Supp. 1002, 1023 (D. Mont. 1986); *Webber v.
White*, 422 F. Supp. 416, 426 (N.D. Tex. 1976)). Plaintiffs state
that their claims are "for declaratory judgment and for damages
under KKK Act § 1985(3)," as well as "an injunction to prevent
future voter intimidation given Defendants' pattern of past
misconduct and indicia of continued misconduct." Pls.' MTD
Opp'n, ECF No. 35 at 17. Plaintiffs do not claim to be seeking
damages under § 11(b), and do not respond to the RNC's arguments
for why damages are unavailable under that provision. *See
generally* Pls.' Opp'n, ECF No. 35. The Court therefore treats
the point as conceded. *See Int'l Union, United Gov't Sec.
Officers of Am. v. Clark*, 704 F. Supp. 2d 54, 60 (D.D.C. 2010)
("It is a long-established policy that when a party's opposition

to a motion fails to respond to arguments raised by the opposing party, a court may treat those unopposed arguments as conceded."). For the standing analysis, Plaintiffs' burden is to establish that they have standing to seek equitable relief under § 11(b).[8]

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" under Article III. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements." *Id*. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. An injury in fact must be "concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury-in-fact requirement is meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149,

---

[8] Declaratory and injunctive relief are equitable remedies. *Sierra Club v. U.S. Dep't of Transp.,* 245 F. Supp. 2d 1109, 1114 (D. Nev. 2003); *see also Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 328-29 (D.C. Cir. 2004) (analyzing injunctive and declaratory relief together when considering whether plaintiffs had standing).

158, 134 S. Ct. 2334, 189 (2014) (internal quotation marks and citation omitted).

Plaintiffs seeking injunctive or declaratory relief must "establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury is certainly impending.'" *Laidlaw, Inc.*, 528 U.S. at 190 (citation removed). In other words, "past wrongs" do not "themselves amount" to the kind of "real and immediate threat" of future injury "necessary to make out a case or controversy" for a claim seeking only equitable relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (citing *Rizzo v. Goode*, 423 U.S. 362, 372 (1976). Any threatened harm that is not both "real and immediate" is "too speculative" to support standing. *Lyons*, 461 U.S. at 103; *Laidlaw, Inc.*, 528 U.S. at 190.

Here, the RNC argues that "Plaintiffs failed to 'clearly ... allege' facts supporting a real and immediate threat of future harm." RNC's MTD, ECF No. 24 at 13 (citing *Spokeo*, 136 S. Ct. at 1547). Section 11(b) makes it illegal to attempt to "intimidate, threaten, or coerce ... any person for voting or attempting to vote." 52 U.S.C. § 10307(b). The RNC adds that even if Defendants' alleged past conduct violated § 11(b), there is no threat of imminent future harm. RNC's MTD, ECF No. 24 at 13. Plaintiffs do not specifically address any of Defendants'

standing arguments as to the imminence of future harm, a
requirement to show standing for equitable relief. *See* Pls.' MTD
Opp'n, ECF No. 35 at 18-21. Instead, Plaintiff state that "to
the extent that the RNC's mootness argument also implicates
standing issues, Plaintiffs have established standing with
allegations showing they had a personal interest at the time
they filed suit." *Id.* at 19. As the RNC rightly points out,
"Plaintiffs otherwise assume that the RNC 'improperly
conflate[d] ... mootness and standing' and frame the relevant
inquiry as one of mootness." RNC's MTD Reply, ECF No. 37 at 9
(citing Pls.' MTD Opp'n, ECF No. 35 at 8).

Plaintiffs argue that the MWRO and the NAACP have both
organizational and representational standing. ECF No. 35 at 19-
20. Plaintiffs allege that Defendants' misconduct has forced
NAACP "to divert resources to monitor Defendants' activities and
disseminate public education materials" to address the conduct.
Am. Compl., ECF No. 8 ¶ 84. They also allege that the NAACP has
members across the country who voted in the 2020 election and
who plan to vote in future elections." *Id.* ¶ 12. While these
representations suffice to establish injury, they fail to meet
the standard required for establishing standing to seek
injunctive or declaratory relief, namely "demonstrating that, if
unchecked by the litigation, the defendant's allegedly wrongful

behavior will likely occur or continue, and that the 'threatened injury is certainly impending.'" *Laidlaw, Inc*, 528 U.S. at 190.

Even if the points Plaintiffs make in their mootness arguments were repeated in their arguments for standing, Plaintiffs would not have demonstrated, as required when seeking injunctive relief premised on past harm, that they are "sufficiently likely to be *personally* subjected to the challenged conduct *again* in order to have standing." *Chang v. United States*, 738 F. Supp. 2d 83, 90 (D.D.C. 2010) (Sullivan, J.) (emphasis added). "[T]here are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Laidlaw, Inc.*, 528 U.S. at 170. This is one such case. The Court concludes that Plaintiffs lack standing to bring their VRA claim because they have failed to demonstrate that, "if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury is certainly impending.'" *Laidlaw, Inc*, 528 U.S. at 190 (citation omitted). The RNC and Trump Defendants' respective Motions to Dismiss, *see* ECF Nos. 24, 25; are hereby **GRANTED** with respect to the VRA claim. The Court consequently does not reach any of the VRA merits arguments. The Court next discusses Defendants' Motion to Transfer.

**D. Washington D.C. Is the Appropriate Forum for This Case**

28 U.S.C. § 1404(a) authorizes a court to transfer an action to any other district where it might have been brought "for the convenience of the parties and witnesses, in the interest of justice." Defendants move to transfer this case to the Eastern District of Michigan, arguing that transfer is warranted under 28 U.S.C. § 1404(a) because (1) "a substantial part of the alleged events or omissions giving rise to [Plaintiffs'] claims occurred in the Eastern District of Michigan," *see* Mot. to Transfer, ECF No. 21-1 at 12; (2) a large majority of witnesses are in the Eastern District of Michigan, *see id.* at 13; (3) Plaintiffs' choice of venue is not entitled to deference, *id.* at 15; (4) other private interest factors weigh in favor of transfer, *id.*; and (5) other private interest factors weigh in favor of transfer. The Court considers the threshold requirement of whether this case could have been brought in Michigan, then assesses the public and private interest factors.

**1. This Case Could Have Been Brought in The Eastern District of Michigan**

Defendants argue that venue is proper in Michigan because "a substantial part of the events or omissions giving rise to the claims occurred in Detroit, Michigan, which is situated in the Eastern District of Michigan," and therefore the first

43

requirement for transfer under 28 U.S.C. § 1404(a) is met. Mot.
to Transfer, ECF No. 21-1 at 12. Plaintiffs respond that
Defendants' "Motion to Transfer fundamentally misconstrues the
Amended Complaint as being almost entirely limited to
Defendants' efforts to interfere with vote certification in
Wayne County, Michigan." Pls.' Transfer Opp'n, ECF No. 23 at 9.
The Court agrees with Defendants that this case could have been
brought in Michigan.

On the one hand, in support of the claim that a substantial
part of the alleged events or omissions giving rise to
Plaintiffs' claims occurred in the Eastern District of Michigan,
Plaintiff MWRO is based in Detroit and has "members who reside
in Detroit in Wayne County, Michigan, voted in the November 2020
election, and cast a ballot for President." Am. Compl., ECF No.
8 ¶ 7. Plaintiffs allege that Defendants "have sought to prevent
the complete counting and certification of validly cast ballots
for President in Wayne County." *Id.* Plaintiffs Maureen Taylor,
Nicole L. Hill, and Teasha K. Jones reside and voted in Detroit,
and Plaintiffs allege that Defendants "sought to disenfranchise
and disregard the lawfully cast votes" of these Plaintiffs. *Id.*
¶¶ 8-10. Further, Plaintiffs make several allegations relating
to the actions and omissions of Michigan officials purportedly
giving rise to Plaintiffs' claims. *See, e.g.*, *id.* ¶¶ 33, 35, 37,
41- 49. Plaintiffs also make allegations related to Defendants'

intimidation of the Michigan State Board of Canvassers. *Id*. ¶ 49.

On the other hand, Plaintiffs argue that Defendants' efforts "were developed in and directed from the District of Columbia." Pls.' Transfer Opp'n, ECF No. 23 at 10. Former President Trump resided in D.C. and made key phone calls, invitations, and media statements in D.C, including hosting significant press conferences and meetings. *See, e.g.*, Am. Compl., ECF No. 8, ¶¶ 38, 48, 23. The RNC is headquartered in D.C. and hosted the Trump Campaign's November 19, 2020, press conference in D.C. *Id.* ¶ 72.

The Court agrees with Defendants that few of the allegations cited by Plaintiffs were *specifically* "pled as occurring in Washington, D.C., and a good number of the paragraphs in the Amended Complaint cited by Plaintiffs contain allegations that occurred elsewhere." Defs.' Transfer Reply, ECF No. 26 at 8. Nonetheless, the Court notes that the allegations establish Michigan as one of just several states where Plaintiffs were injured. While Michigan may be referenced more than other states; Arizona, Nevada, Georgia, Wisconsin, and Pennsylvania are all cited. *See generally* Am. Compl., ECF No. 8.

The RNC also overly emphasizes the importance of Michigan and downplays the role of other states in the Complaint. *See generally* Mot. to Transfer, ECF No. 21. For instance, the RNC

references Plaintiffs' allegation that "fundraising dollars were directed to the Michigan Republican Party and that one Defendant [the RNC] produced and distributed training materials in Michigan," citing to the Amended Complaint. *See* Defs.' Transfer Reply, ECF No. 26 at 9. The more accurate statement, however, is that "the RNC [] produced and distributed similar training videos for volunteers in Wisconsin, Michigan, and other battleground states." Am. Compl., ECF No. 8 ¶ 64. Similarly, the allegation as to fundraising details the fundraising amount going to *every battleground state*, not just Michigan. *Id.* ¶ 68. Further, Plaintiffs' claim that Defendants "encouraged volunteers and supporters to engage in conduct intended to and that did result in intimidation, harassment, and coercion of election officials" spans not just Detroit but "major metropolitan areas with large Black populations," including Milwaukee. *Id.* ¶ 78.

However, the question for the Court at this juncture is not whether Michigan is the *best* venue for this case, but simply whether its role is substantial enough that the case could have been brought there. The Court agrees with Defendants that "a substantial part of the events or omissions giving rise to the claims" occurred in Detroit, Michigan, and this case could have been brought there. *See* 28 U.S.C. § 1391(b)(2).

2. **Private Interest Factors Weigh in Favor of This Court**

   a. **Convenience Factors Weigh in Favor of D.C.**

Convenience factors include the convenience of the parties, convenience of the witnesses, and the ease of access to sources of proof. *Aracely*, 319 F. Supp. 3d at 128-30. With regard to the convenience of the witnesses, the Court considers "the availability of compulsory process to command the attendance of unwilling witnesses, and the cost of obtaining the attendance of willing witnesses." *Hunter v. Washington Metro. Area Transit Auth.*, No. CV 09-697 (EGS), 2009 WL 10693204, at *3 (D.D.C. Aug. 4, 2009) (Sullivan, J.). Courts have transferred actions when the majority of witnesses live near the transferee forum, or when the witnesses may not be subject to the subpoena power of the transferor court. *Pyrocap Int'l Corp. v. Ford Motor Co.,* 259 F. Supp. 2d 92, 98 (D.D.C. 2003) (quoting *Claasen v. Brown*, No. 94-1018, 1996 WL 79490, at *6 (D.D.C. Feb. 16, 1996)). Persuasive authority has held that "[t]he most critical factor to examine under 28 U.S.C. § 1404(a) is the convenience of the witnesses." *Id.* at 97 (quoting *Chung v. Chrysler Corp.*, 903 F. Supp. 160, 164 (D.D.C. 1995)).

Defendants argue that "almost all the material witnesses in this case, including many of the Plaintiffs, are located in [the Eastern District of Michigan]," and "transferring this matter to

the Eastern District of Michigan would substantially reduce the costs to obtain the attendance of willing witnesses." Mot. to Transfer, ECF No. 21-1 at 13-14. Plaintiffs respond that they "have identified that there are likely multiple RNC officials and representatives of the other Defendants in this District, and that there are likely officials and other individuals in other states who will serve as material witnesses." Pls.' Transfer Opp'n, ECF No. 23 at 18. Plaintiffs add that the "individual Plaintiffs have limited relevant evidence. The key facts in this case involve the conspiracy to disenfranchise voters or discount votes, which involves activities about which the individual Plaintiffs have no relevant testimony." *Id.* at 15-16. The RNC replies that "it has identified the location of numerous potential witnesses and relevant evidence in its Motion based on a fair reading of Plaintiffs' Amended Complaint, and none of these witnesses or evidence is located in Washington, D.C." Defs.' Transfer Reply, ECF No. 26 at 14. For the reasons explained below, the Court concludes that convenience factors weigh in favor of Plaintiffs.

In support of their convenience argument against transfer, Plaintiffs cite three cases in which courts decided against transfer because plaintiffs challenged policies developed in Washington, D.C. by national policymakers located there. *See Aracely*, 319 F. Supp. 3d at 127 (finding convenience factors

were balanced because witnesses were in Texas, California and
D.C., but noting that "the government officials who allegedly
established, developed, and promoted the policy at the heart of
[the] case, and the documents related thereto, [would] likely be
found, if at all, in the District of Columbia."); *Accurso*, 2018
WL 4964501, at *2 (finding convenience weighed against transfer
to where plaintiff was incarcerated in Texas because the
plaintiff's challenge to a BOP policy likely would require
significant testimony and evidence from D.C.-based BOP
officials); *Garcia*, 393 F. Supp. 3d at 108-09 (holding in a case
challenging workers wage based on Department of Labor policy
that the inconvenience defendants suffered because witnesses and
evidence could be found in Chicago was outweighed by the fact
that plaintiffs challenged the applications of a national
policy, and the senior officials who crafted the policy and
documents related to the policy were presumably located in
D.C.). Defendants distinguish these cases by emphasizing that
"Plaintiffs in this case, by contrast, have not sued a single
government entity, and instead challenge discretionary
statements and actions by private actors that allegedly occurred
in a number of states and impacted Plaintiffs' and their
members' voting rights." Defs.' Transfer Reply, ECF No. 26 at
12. The Complaint does, however, allege that Defendants' efforts
were "closely coordinated" and "systematic," suggesting an

49

approach akin to a nationwide policy. *See* Am. Compl., ECF No. 8 ¶¶ 2, 20. This case is not about one-off events in Michigan, but an allegedly nationwide approach adopted by former President Trump and the RNC, both of whom happened to operate out of D.C. *Cf. Garcia*, 393 F. Supp. 3d at 109.

Defendants deny that there are *any* witnesses they have identified in D.C., *see* Defs.' Transfer Reply, ECF No. 26 at 14; and argue that "many of the critical witnesses in this case reside within the subpoena power of the Eastern District of Michigan." Mot. to Transfer, ECF No. 21-1 at 14. The Court cannot agree, given the centrality of D.C. as then-President Trump's place of work, and the location of the RNC's headquarters, as well as the Complaint's references to key events occurring in D.C. *See* Am. Compl., ECF No. 8 ¶¶ 38, 48, 23, 72. In addition, the RNC's "identification" of potential witnesses, *see* Mot. to Transfer*,* ECF No. 21 at 7-8 leaves out the fact that NAACP members are spread across the country. *See* Am. Compl., ECF No. 8 ¶ 12. The potential witness list asserts that the "majority of RNC staff responsible for the day-to-day field operations of the RNC in Michigan during the period preceding and following the 2020 General Election live in or near Michigan," Mot. to Transfer, ECF No. 21 at 8; but ignores that Michigan is *one of many states* in which Plaintiffs challenge Defendants' conduct.

Defendants present no argument for why Michigan is a more convenient or cost-effective forum for "State Election Officials," the "RNC State and Regional Staff," the "Trump Campaign State Staff", and the "RNC and Trump Campaign State Volunteers" who are located not just in Michigan but "throughout the country in various other states." *Id.* Given the scope of Plaintiffs' allegations in D.C. and other states nationwide, it is not persuasive that Defendants' "relevant state and regional staff and volunteers reside in Michigan or nearby states and [they] have made clear that the relevant state and local election officials also reside in Michigan." Defs.' Transfer Reply, ECF No. 26 at 14. As discussed *supra*, this case is about a nationwide approach allegedly adopted by Defendants.

As Plaintiffs point out, "there will be documents and key witnesses located at the RNC's headquarters in the District of Columbia that are material to Plaintiffs' case." Pls.' Transfer Opp'n, ECF No. 23 at 18. "[M]aterial witnesses and evidence concerning the RNC's own campaign policies, communications among Defendants, and other communications about 2020 election cycle activities are presumably accessible from the RNC's headquarters in the District of Columbia." *Id.* at 15. Defendants' rebuttal to this, *see* Defs.' Transfer Reply, ECF No. 26 at 14; falls short for the same reason as its witness argument: an unsupported assertion that "based on a fair reading of Plaintiffs' Amended

Complaint," they believe "none of these witnesses or evidence is located in Washington, D.C." Mot. to Transfer, ECF No. 21-1 at 14. The Court cannot agree that the RNC's reading is actually "fair," since the RNC does not deny that its campaign policies, key leaders, or campaign materials are located primarily in D.C.

The Court agrees with Plaintiffs that "individual Plaintiffs have limited relevant evidence. The key facts in this case involve the conspiracy to disenfranchise voters or discount votes, which involves activities about which the individual Plaintiffs have no relevant testimony." Pls.' Transfer Opp'n, ECF No. 23 at 16. The Court is also cognizant that Defendants have not indicated that any of the witnesses are unlikely to appear voluntarily. *See Hunter*, 2009 WL 10693204 at *3 (noting that neither of the parties had argued that any of the witnesses were unavailable or unwilling to testify). This is particularly true of Plaintiffs, who are subject to the Court's jurisdiction. Based on the nature of Plaintiffs' allegations, the Court concludes that convenience factors weigh in favor of Plaintiffs' chosen forum.

### b. Key Claims Arose in D.C., Not Michigan

Claims "arise" under 28 U.S.C. § 1404(a) in the location "where most of the significant events giving rise to the claims occurred." *Treppel v. Reason*, 793 F. Supp. 2d 429, 436-37 (D.D.C. 2011) (citations omitted). Plaintiffs argue that

"[w]hile some events alleged in the Amended Complaint necessarily took place outside of the District of Columbia, including the conduct that took place in Michigan and the many other localities across the country targeted by Defendants' disenfranchisement efforts, Plaintiffs have alleged that those efforts were developed in and directed from the District of Columbia." Pls.' Transfer Opp'n, ECF No. 23 at 10. Defendants reply that "Plaintiffs allege for the first time in their Opposition that there was some type of systemic or coordinated effort by Defendants emanating from a COVID-shuttered 2020 Washington," and this allegation therefore carries little weight. Defs.' Transfer Reply, ECF No. 26 at 14. The Court disagrees.

Although Plaintiffs do not explicitly allege that D.C. was the operational center of the conspiracy in their Complaint, *see generally* Am. Compl., ECF No. 8; they do allege a "systematic" and "closely coordinated" effort by Defendants who they assert are based in D.C., as well as the occurrence of several key events in D.C., *see id.* ¶ 2 (asserting the RNC closely coordinated with the Trump Campaign, notably through the "Trump Victory" project, a joint endeavor of the RNC and the Trump Campaign); *id.* ¶ 20 (alleging that Defendants' "systematic efforts – violations of the VRA and the Ku Klux Klan Act – have largely been directed at major metropolitan areas with large

Black voter populations); *id.* ¶¶ 38, 72 (describing a press
conference at the RNC's headquarters in D.C. where Mr. Giuliani
discussed Defendants' strategy to disenfranchise voters in
Michigan); *id.* ¶ 48 (noting that then-President Trump summoned
Michigan legislators to the White House to discuss Michigan).
Like in *Garcia*, even if potential witnesses are located
elsewhere (or here, spread across the country), the
inconvenience to Defendants is outweighed by the fact that
Plaintiffs challenged the applications of a "systematic" and
"coordinated" effort across the nation, and the senior officials
who crafted the policy and documents related to the policy were
located in D.C. while hosting key calls, events, conferences,
and meetings. *See Garcia*, 393 F. Supp. 3d at 109.

The Court is not persuaded by Defendants' citations to
*Bergmann v. United States Department of Transportation*, 710 F.
Supp. 2d 65, 73 (D.D.C. 2010), and *Hi Tech Pharmaceuticals, Inc.
v. Federal Trade Commission*. 6 F. Supp. 3d 95, 100 (D.D.C.
2013). Unlike those cases, for the reasons discussed above, the
instant action has far more connections to D.C., and far less to
the proposed transferee forum. *Cf. Bergmann*, 710 F. Supp. 2d 72-
73 (granting transfer where "the only real connection [the]
lawsuit has to the District of Columbia is that a federal agency
headquartered here . . . is charged with generally regulating
and overseeing the [administrative] process" and almost all of

the challenged acts occurred in the transferee forum); *Hi Tech*, 6 F. Supp. 3d at 99–100 (granting transfer where the only connection to the District of Columbia was the location of defendant Federal Trade Commission's headquarters and all claims arose from an enforcement action in the transferee forum). The Court concludes that D.C. is "where most of the significant events giving rise to the claims occurred." *Treppel*, 793 F. Supp. 2d at 436–37.

### c. Plaintiffs' Choice of Forum Deserves Deference

A plaintiff's choice of forum is ordinarily given significant deference. *Aracely*, 319 F. Supp. 3d at 128 (citations omitted). "Substantially less deference is warranted, however, when a plaintiff chooses a forum other than his home forum." *Bergmann*, 710 F. Supp. 2d at 71-72. The deference due to Plaintiffs' choice is also weakened when "most of the relevant events giving rise to [their] claims occurred elsewhere." *Beall*, 310 F. Supp. 3d at 103 (citing *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 80 (D.D.C. 2009)). For Plaintiffs' choice of forum to deserve deference, there needs to be a "substantial connection" to their chosen venue. *Dean v. Eli Lilly & Co.*, 515 F. Supp. 2d 18, 21 (D.D.C. 2007).

Defendants argue that "the deference accorded to Plaintiffs' choice here is substantially reduced by the fact

that Plaintiffs do not reside in Washington, D.C. and lack any apparent connection to that venue." Mot. to Transfer, ECF No. 21-1 at 15. Plaintiffs respond that Plaintiff NAACP does have members who reside in D.C., and more importantly, Plaintiffs' choice of forum is entitled to substantial weight because D.C. has meaningful ties to this controversy. Pls.' Transfer Opp'n, ECF No. 23 at 18. The Court agrees with Plaintiffs.

The Court has already discussed, *see supra*, that key events giving rise to this case happened in D.C., where Defendants were located. Defendants' reliance on *Dean*, 515 F. Supp. 2d at 21, is therefore misplaced, and Plaintiffs' choice of forum is granted deference given this case's ties to D.C. The Court is also unpersuaded by *Beall*, 310 F. Supp. 3d at 97. Defendants may assert that as in *Beall*, they have strong ties to the proposed transferee forum that should overcome Plaintiffs' preference, *see* Defs.' Transfer Reply, ECF No. 26 at 16; but the fact remains that *unlike* in *Beall*, the present forum is where Defendants themselves are headquartered. *See Beall*, 210 F. Supp. 3d at 99. As Plaintiffs point out, the RNC is headquartered in D.C.; the former President lived in D.C. and engaged in the activities giving rise to this case from D.C.; and several of Defendants' actions, including press conferences, rallies, and meetings with and calls to state officials, occurred in D.C. *See* Pls.' Transfer Opp'n, ECF No. 23 at 20.

### 3. **Public Interest Factors Weigh in Favor of D.C.**

Courts also consider whether certain public interest factors weigh in favor of transfer, including "(1) the transferee's familiarity with the governing laws, (2) the relative congestion of each court, and (3) the local interest in deciding local controversies at home." *Beall*, 310 F. Supp. 3d at 103. Regarding the first factor, "[b]ecause all federal courts are presumed to be equally familiar with the law governing statutory claims," *id.* at 106; this factor does not weigh either for or against transfer to the Eastern District of Michigan. As to the second factor, Defendants argue that this Court has not yet familiarized itself with the underlying merits of the case because the case is "in its earliest stages." Mot. to Transfer, ECF No. 21-1 at 17 (citation omitted). This argument does not clearly address the relative congestion of each Court, and therefore, as Plaintiffs point out, "does not weigh in favor of transfer, nor do the publicly reported caseloads of the districts." Pls.' Transfer Opp'n, ECF No. 23 at 21 (citing U.S. Courts, Table C—U.S. District Courts, Civil Statistical Tables for the Federal Judiciary (June 30, 2020), https://www.uscourts.gov/statistics/ table/c/statistical-tables-federal-judiciary/2020/06/30 (noting that the District of Columbia and the Eastern District of Michigan have roughly

equivalent numbers of civil cases pending)). Finally, the third factor weighs against transfer because, as the Court has already established, key events took place in D.C. where the RNC is headquartered and former President Trump was working. Contrary to Defendants' assertion, it is not the case that a "clear majority of the operative events took place in the transferee venue." Mot. to Transfer, ECF No. 21-1 at 17. The Court concludes that public interest factors weight in favor of the present forum. Combining the Court's analysis on the public and private interest factors, the Court concludes that the relevant factors weigh in favor of keeping the case in D.C. The RNC's Motion to Transfer, ECF No. 21; and the Trump Defendants' Motion to Transfer, ECF No. 22; are therefore **DENIED**.

## V.    Conclusion

For the foregoing reasons, the RNC's Motion to Transfer, ECF No. 21, is **DENIED**; the Trump Defendants' Motion to Transfer, ECF No. 22, is **DENIED**; the RNC's Motion to Dismiss, ECF No. 24, is **GRANTED IN PART as to Plaintiffs' 52 U.S.C. § 10307(b) claim AND HELD IN ABEYANCE IN PART as to Plaintiff's 42 U.S.C. § 1985(3) claim**; and the Trump Defendants' Motion to Dismiss, ECF No. 25, is **GRANTED IN PART as to Plaintiffs' 52 U.S.C. § 10307(b) claim AND HELD IN ABEYANCE IN PART as to Plaintiffs' 42 U.S.C. § 1985(3) claim**. An appropriate Order accompanying this Memorandum Opinion was issued on March 31, 2022.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**April 1, 2022**