IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHIGAN WELFARE RIGHTS
ORGANIZATION, *et al.*

          *Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*

          *Defendants.*

Civil Case No. 1:20-cv-03388-EGS

MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................II

TABLE OF AUTHORITIES .........................................................................III

BACKGROUND 2

ARGUMENT     9

     I.     Plaintiffs' claims are precluded by constitutional principles..............9

          a.    The First Amendment bars Plaintiffs' claims...............................9

          b.    Plaintiffs' claims require this court to consider a political question.....................................................................................13

          c.    Plaintiffs seek an impermissible remedy....................................15

     II.    Plaintiffs have failed to state a claim for which relief may be granted. ......................................................................................16

          a.    Plaintiffs failed to state a claim under Section 11(b) because they do not plausibly plead allegations of "intimidation, threats, or coercion."...................................................................17

          b.    Plaintiffs do not state an actionable § 1985(3) conspiracy claim because they fail to adequately allege discriminatory purpose. ...............................................................................................18

          c.    With respect to both claims, Plaintiffs fail to adequately allege an agency relationship between Trump supporters/volunteers and the Trump Defendants. ..........................................................20

          d.    Plaintiffs have failed to adequately allege that the VRA or 42 U.S.C. § 1985(3) apply to the President of the United States....22

     III.   Plaintiffs do not have standing to assert a third-party claim on behalf of voters in states other than Michigan.............................25

          a.    Plaintiffs Michigan Welfare Rights Organization and the NAACP do not have standing. ...................................................25

          b.    Individual Plaintiffs do not have standing to assert a third-party claim on behalf of voters in other states. ......................26

CONCLUSION .........................................................................................27

CERTIFICATE OF SERVICE.....................................................................29

# TABLE OF AUTHORITIES

### Cases

*Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 110 (D.D.C. 2010) ............... 21

*Alexander v. United States*, 509 U.S. 544, 550 (1993) ................................................. 15

*Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) ............................................... 25, 26

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ......................................... 16, 17, 18, 20, 22

*Baker v. Carr*, 369 U.S. 186, 217 (1962) ...................................................................... 13

*Bancoult v. McNamara*, 455 F.3d 427, 432 (D.C. Cir. 2006) ..................................... 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ............................... 16, 17, 18, 20

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993) ....................... 6

*Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 122 (D.D.C.2008) ........ 21

*Cumis Ins. Soc., Inc. v. Peters*, 983 F. Supp. 787, 796 (N.D. Ill. 1997) ...................... 22

*Delegates to Republican Nat. Convention v. Republican Nat. Comm.*, No. SACV 12-
00927 DOC, 2012 WL 3239903, at *11-12 (C.D. Cal. Aug. 7, 2012) ....................... 12

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985) 10

*Edwards v. District of Columbia*, 765 F. Supp. 2d 3, 14 (D.D.C. 2011) ..................... 16

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878
F.3d 371, 378 (D.C. Cir. 2017) ................................................................................ 26

*Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C.1985) .............................................. 21

*Hastings v. Judicial Conference of U.S.*, 829 F.2d 91, 105 (D.C. Cir. 1987) .............. 11

*In re Rodriguez*, No. 05-5130, 2005 WL 3843612, at *4 (D.C. Cir. Oct. 14, 2005) .... 20

*Japan Whaling Ass'n. v. Am. Cetacean Soc.,* 478 U.S. 221, 230 (1986) .............. 13, 14

*Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ...................................................... 26, 27

*Kumar v. Frisco Indep. Sch. Dist.*, 443 F. Supp. 3d 771, 781 (E.D. Tex. 2020) ......... 27

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 774 (1994) .............................. 12

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) ......................................................................................... 10

*Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 37 (D.D.C. 2018) ..................... 25

*Ndoromo v. Barr*, No. CV 19-3781 (CKK), 2020 WL 5107546, at *1 (D.D.C. Aug. 31, 2020) ......................................................................................... 20

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ................................................. 15

*New York Times v. United States*, 403 U.S. 713, 714 (1971) ...................................... 15

*Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) .............. 12

*Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ...................................... 15

*R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 382 (1992) ....................................... 10

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992) ....................................... 12

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) .......................................... 16

*Simmons v. Galvin*, 575 F.3d 24, 42 (9th Cir. 2009) ................................................... 12

*Snyder v. Phelps,* 562 U.S. 443, 451–52 (2011) .......................................................... 10

*United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994) ............................................... 5

*Virginia v. Black*, 538 U.S. 343, 358 (2003) ......................................................... 10, 12

Other Authorities

Craig Mauger, *Michigan election officials call Detroit's primary voting problems 'appalling,' 'alarming'*, THE DETROIT NEWS (Aug. 21, 2020), https://www.detroitnews.com/story/news/politics/2020/08/21/michigan-election-officials-call-detroit-primary-voting-problems-alarming-appalling/3410790001/. ..6

Joel Kurth and Jonathan Oosting, *Records: Too many votes in 37% of Detroit's precincts*, THE DETROIT NEWS (Dec. 12, 2016), https://www.detroitnews.com/story/news/politics/2016/12/12/records-many-votes-detroits-precincts/95363314/........................................................................6

**Rules**

Fed. R. Civ. P. 8(a)(2)....................................................................19

**Treatises**

Restatement (Second) of Agency § 14 (1958).............................................21

Restatement (Third) of Agency § 1.01 (2006)............................................21

**Regulations**

42 U.S.C. § 1985(3) ...................................................................5, 19

52 U.S.C. § 1307(b) .....................................................................18

**U.S. Constitution**

U.S. Const. amend. I....................................................................10

U.S. Const. art. II, § 1, cl. 8 ...........................................................9

U.S. Const. art. II, § 1, cl. 2 .......................................................12, 26

Plaintiffs seek to use important civil rights statutes to improperly restrict constitutionally protected speech and stymie President Trump's, and future Republican candidates', efforts to ensure safe and secure elections. This case is grounded in Plaintiffs' wholly unsupported assertion that political activities—generated by a political candidate's exercise of his First Amendment rights to free speech and efforts "to petition the Government for a redress of grievances"—are forbidden by Section 11(b) and 42 U.S.C. § 1985(3). Indeed, Plaintiffs seek nothing less than a prior restraint from this Court to restrict the political speech and activities of a *current* presidential candidate and all future Republican candidates for public office with whom they disagree.

Plaintiffs broadly label Defendants' alleged conduct—tweets; public statements, including a press conference to report the findings of the Trump Campaign's voter fraud investigation; and telephone calls and meetings with local elected officials—as intimidation, but Plaintiffs fail to provide a factual basis for their characterization.

As pled, Plaintiffs present a political question to this Court, seek to limit First Amendment protections for Republican candidates, and seek improper remedies. If, as Plaintiffs insist, Section 11(b) and 42 U.S.C. § 1985(3) proscribe Defendants' conduct, then the statutes would be overbroad and unenforceable. In addition, Plaintiffs Maureen Taylor, Nicole L. Hill, and Teasha K. Jones are residents of Michigan and do not have standing to obtain relief on behalf of voters in other states.

1

Therefore, the Trump Defendants respectfully request this Court dismiss Plaintiffs' Second Amended Complaint in its entirety.

## BACKGROUND

Plaintiffs Michigan Welfare Rights Organization, Maureen Taylor, Nicole L. Hill, Teasha K. Jones, and the NAACP filed their Second Amended Complaint ("Complaint") seeking declaratory and injunctive relief as well as monetary damages under Section 11(b) of the Voting Rights Act and 42 U.S.C. § 1985(3) and naming as Defendants (1) President Donald J. Trump; (2) his presidential campaign, Donald J. Trump for President, Inc. (the "Campaign"); and (3) the Republican National Committee (the "RNC"). Dkt. No. 60, ¶¶ 7-17.

According to their Complaint, Plaintiff Michigan Welfare Rights Organization is a group whose membership includes "Black members who reside in Detroit, Michigan, voted in the November 2020 Election, and cast a ballot for President." *Id.* at ¶7. The Complaint alleges that the three individual Plaintiffs Taylor, Hill, and Jones are Black residents of Detroit, Michigan, over the age of eighteen years old, who voted in the November 2020 election, and cast a ballot for President. *Id.* at ¶ 8-10. The Complaint further alleges that the NAACP is a "civil rights grassroots organization" with state and local chapters representing 48 states with "members across the country who voted in the 2020 election and who plan to vote in future elections, including in Michigan, Wisconsin, Pennsylvania, Georgia, Arizona, and Nevada." *Id.* at ¶ 12.

2

Donald J. Trump is the Forty-Fifth President of the United States. In November 2020, he was a candidate for reelection to that office. Dkt. No. 60, ¶ 13. He is domiciled in Florida, as he was when the events alleged in the Complaint occurred. Donald J. Trump for President, Inc. is a Virginia corporation with a principal place of business in New York and an office in Virginia. The RNC is a national political party that generally coordinates and promotes Republican candidates for elected office. *Id.* at ¶ 15.

Confronting voting irregularities so extensive that even Plaintiffs had to acknowledge such an instance in their Complaint,[1] President Trump and his Campaign worked tirelessly to ensure a safe and secure election and to ensure all future elections would be more transparent and secure. From the beginning, President Trump pursued this investigation with one goal in mind: protecting the franchise of every American by ensuring that every legal vote is counted.

President Trump undertook this effort on behalf of all Americans. In an attempt to obstruct him and to derail the ongoing struggle for ballot integrity, Plaintiffs filed their Complaint alleging President Trump, his Campaign, and the RNC "engaged in a conspiracy, executed through a coordinated effort, to disenfranchise voters by disrupting vote counting efforts, lodging groundless challenges during recounts, and attempting to block certification of election results

---

[1] *See* Dkt. No. 60, ¶ 45 (dismissing "minor discrepancies" between the number of voters who signed into poll books and the number of ballots cast).

through intimidation and coercion of election officials and volunteers," all in violation of Section 11(b) of the Voting Rights Act and 42 U.S.C. § 1985(3). Dkt. No. 60, ¶ 20. Factually, these allegations are wrong and wildly offensive.

President Trump vigorously rejects the assertion that he sought to disenfranchise any American or prevent a single legal vote from being counted. President Trump intended to protect the American electoral system from manipulation by bad actors seeking to subvert the People's will. The election challenges that Plaintiffs blithely dismiss were grounded in the affidavits of hundreds of everyday Americans who put their reputations, their livelihoods, and their personal safety on the line to speak out—under penalty of perjury—about the election fraud they observed. These individuals whose affidavits supported President Trump's claims testified at great personal expense, not in pursuit of any gain but in an effort to protect the voting rights of all Americans.

Notably, in seeking to expose the voter fraud that riddled the 2020 election, President Trump sought to accomplish the very aims that motivated Congress' enactment of the Voting Rights Act as indicated by its legislative history. As noted by the Seventh Circuit:

> [Section 11(b)] originated as a section of the comprehensive Voting Rights Act of 1965. That act was designed "primarily to enforce the 15th amendment to the Constitution of the United States and [was] also designed to enforce the 14th amendment and article I, section 4 [of the Constitution]." H.R.Rep. No. 439, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2437. The House Judiciary Committee noted that "[t]he public record is replete with endless instances of vote frauds, including stuffing the ballot box, tombstone voting, multiple casting of votes by one individual in several precincts or districts, threats and coercion of voters, destruction or alteration of

ballots, willful miscounting of votes, and buying votes." *Id.* at 2471. To meet the congressional purposes the members of the House Judiciary Committee deemed it imperative that the Act include methods for enforcing clean elections. "It is a cruel deception to give any man the elective franchise and then allow destruction of the effect of his vote through a multitude of corrupt practices [W]e are obligated to protect the integrity of the vote cast by any citizen."

*United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994).

The very purpose of Section 11(b) is to fight voter disenfranchisement, specifically from fraud. Indeed, as the enactors of the Voting Rights Act undoubtedly understood, every time a fraudulent vote is cast and counted, the choice of a legitimate voter is erased. President Trump's efforts to ensure the integrity of our voting system are consistent with both the letter and the spirit of this law. This lawsuit is premised on constitutionally untenable interpretations of Section 11(b) and § 1985(3)—that is, that any political pressure President Trump and his Campaign generated by exercising their First Amendment rights amounted to a violation of the Voting Rights Act and a conspiracy undertaken "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *See* 42 U.S.C. § 1985(3).

This is simply a transparent attempt to quell political dissent and chill political speech. The thrust of this lawsuit is clear—do not challenge the establishment's political machine or the media's chosen narrative. Those who do will pay dearly. Their motives will be impugned, and they will be labeled racists.

In this vein, a cause of action under 42 U.S.C. § 1985(3) expressly requires proof, among other things, that "some racial, or perhaps otherwise class-based,

invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993). In an apparent attempt to meet this burden, Plaintiffs generally allege that Defendants recount efforts focused on metropolitan areas with large Black populations. Dkt. No. 60, ¶¶ 1, 20, 123. Specifically, Plaintiffs assert that, in Wisconsin, the Trump Campaign limited recount efforts to two counties in Wisconsin with the largest percentage of Black voters and that "[t]he Trump Campaign did not identify any neutral justification for targeting its recount request at only those two counties." Dkt. No. 60, ¶ 27. Plaintiffs make a similar assertion about Defendants' motivations in seeking a recount in Wayne County, where Detroit is located. Yet, they are silent about the long and embarrassing history of voter fraud in that city.[2]

The factual allegations Plaintiffs raise are of two kinds. First, Plaintiffs make various specific allegations involving purely political speech, which fall squarely under the protection of the First Amendment:

> (1)    A press conference at which Trump Campaign lawyers reported the findings of the Campaign's voter fraud investigation. Dkt. No. 60, ¶¶ 41-43, 94.

---

[2] *See* Craig Mauger, *Michigan election officials call Detroit's primary voting problems 'appalling,' 'alarming'*, THE DETROIT NEWS (Aug. 21, 2020), https://www.detroitnews.com/story/news/politics/2020/08/21/michigan-election-officials-call-detroit-primary-voting-problems-alarming-appalling/3410790001/.; Joel Kurth and Jonathan Oosting, *Records: Too many votes in 37% of Detroit's precincts*, THE DETROIT NEWS (Dec. 12, 2016), https://www.detroitnews.com/story/news/politics/2016/12/12/records-many-votes-detroits-precincts/95363314/.

(2)     Several tweets posted by President Trump, including a tweet asserting that "Voter Fraud in Detroit is rampant, and has been for many years!" and another reporting on the results of a vote of the Wayne County Board of Canvassers stating, "'Wow! Michigan refused to certify the election results! Having courage is a beautiful thing!'" Dkt. No. 60, ¶ 47; *see also* ¶¶ 23, 47, 53, 58, 63, 65, 108.

(3)     A statement from the Michigan Republican Party Chairwoman saying: "I am proud that, due to the efforts of the Michigan Republican Party, the Republican National Committee and the Trump Campaign, enough evidence of irregularities and potential voter fraud was uncovered resulting in the Wayne County Board of Canvassers refusing to certify their election results." Dkt. No. 60, ¶ 47.

(4)     President Trump's telephone call with two Republican members of the Wayne County Board of Canvassers after they succumbed to liberal pressure to certify the county's election results. Dkt. No. 60, ¶ 50.

(5)     President Trump's meeting at the White House with two Republican state legislators from Michigan. Dkt. No. 60, ¶ 52.

(6)     President Trump's alleged telephone calls with various political officials "pressuring [them] to somehow overturn the election result." Dkt. No. 60, ¶ 1; *see also* ¶¶ 58, 63.

Undoubtedly aware of the constitutional problems raised by their reliance on purely political speech, Plaintiffs attempt to put some meat on the bones of this meritless lawsuit by raising several new and very vague factual allegations in their Complaint involving asserted conduct committed by "Trump Campaign observers":

(1)     "Trump Campaign observers encroached on the physical spaces of vote tabulators to observe the count and made verbal comments pressuring vote tabulators." Dkt. No. 60, ¶ 29.

(2)     "Some Trump Campaign observers engaged in other deliberate actions to delay the recount by separately challenging every single ballot at a particular recount table" and challenging "absentee ballots that tabulators folded in order to put them in envelopes" and "mail-in ballots where the official sticker had become unstuck." Dkt. No. 60, ¶ 30.

7

> (3)     Some Trump Campaign observers allegedly became physically aggressive with election volunteers, with one observer having to be escorted from the recount site after pushing an election official. Dkt. No. 60, ¶ 31.

Similarly, Plaintiffs' Complaint also contains several allegations involving unidentified, desultory "Trump supporters." Dkt. No. 60, ¶¶ 34, 56. Plaintiffs do not plead any facts that could give rise to any inference that an agency relationship existed between these unnamed individuals and President Trump and/or the Campaign.

On November 20, 2020, Plaintiffs filed their Complaint. Dkt. No. 1. Plaintiffs then filed an Amended Complaint on December 21, 2020. Dkt. No. 8. Defendants subsequently moved to dismiss all of Plaintiffs' claims. On April 1, 2022, the Court dismissed Plaintiffs' claim under the Voting Rights Act and held in abeyance a decision on Plaintiffs' 42 U.S.C. § 1985(3) claim. Dkt. No. 49. Plaintiffs then moved for leave to file a second amended complaint. Dkt. No. 59. This Court granted that motion on November 28, 2022, and in doing so, decided that "President Trump is not immune from monetary damages in this suit." Dkt. No. 59.

President Trump timely appealed the Court's decision on absolute immunity and moved for a stay of all proceedings before this Court. Dkt. No. 61; Dkt. No. 66. As this Court has not yet acted upon the motion to stay all proceedings, President Trump and Donald J. Trump for President, Inc., timely file this motion to dismiss Plaintiffs' Second Amended Complaint in its entirety.

## ARGUMENT

### I.   Plaintiffs' claims are precluded by constitutional principles.[3]

#### a.  The First Amendment bars Plaintiffs' claims.

For the Court to find that Plaintiffs' Second Amended Complaint states a claim, it would have to adopt extraordinarily broad interpretations of Section 11(b) and § 1985(3) such that any effort by any person to exert political pressure on state and local election officials would constitute violations of these provisions. *Cf.* U.S. Const. amend. I ("Congress shall make no law…abridging…the right of the people…to petition the Government for redress of grievances."). Such a broad definition would necessarily prohibit or chill garden-variety campaign activity and lobbying efforts. Plaintiffs, however, have cited no authority to support such a boundless interpretation of the act.

The factual allegations Plaintiffs have raised against President Trump and his Campaign involve conduct that is squarely protected by the First Amendment of the United States Constitution. The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." *Id.* The hallmark of the protection of free speech is to allow "free trade in ideas"—even ideas that the overwhelming majority of people might find distasteful or discomforting. *Virginia v. Black*, 538 U.S.

---

[3] President Trump maintains that he is immune from these claims; this issue is currently on appeal before the D.C. Circuit.

343, 358 (2003). Thus, the First Amendment "ordinarily" denies "the power to prohibit dissemination of social, economic and political doctrine" even when politically unpopular. *Id.*

Indeed, the First Amendment generally prevents the government from proscribing speech or even expressive conduct because of disapproval of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 382 (1992). Content-based regulations are presumptively invalid. *Id.* Further, "political speech is entitled to the fullest possible measure of constitutional protection." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984). "[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps,* 562 U.S. 443, 451–52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985)).

The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder,* 562 U.S. at 452. That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.*

Given that Donald J. Trump was the President of the United States and, at all relevant times, a candidate for reelection to that office, it is difficult to imagine speech cloaked with more constitutional protection than the alleged expressive conduct—the tweets, press conference and public statements, and meetings with state officials—

that Plaintiffs seem to assert violates Section 11(b) and § 1985(3). Turning district courts into the arbiters of campaign speech would be a particularly troubling precedent.

Moreover, the very election challenge Plaintiffs wish this Court to enjoin is independently authorized by other provisions of the Constitution, including the First Amendment right to petition the government for a redress of grievances and Article II, § 1, cl. 2, which places the selection of presidential electors squarely in the hands of the state legislatures. *See* U.S. Const. amend. I ("Congress shall make no law…abridging…the right of the people…to petition the Government for redress of grievances."); U.S. Const. art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors….").

Indeed, Plaintiffs are inviting this Court to make such a broad and boundless interpretation of these statutes that would require them to be struck down for running afoul of the vagueness and overbreadth doctrines. *See Hastings v. Judicial Conference of U.S.*, 829 F.2d 91, 105 (D.C. Cir. 1987) ("The overbreadth and vagueness doctrines are related but distinct. A vague law denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions; in contrast, a law that is overbroad may be perfectly clear but impermissibly purport to penalize protected First Amendment activity."). Simply put: Plaintiffs' broad reading of these historic statutes puts their enforceability and constitutionality at risk. The Court need not take the bait.

Indeed, the canon of constitutional avoidance counsels against interpreting a statute in such a way that would raise constitutional questions when there is some other ground upon which to dispose of the case. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (recognizing the "well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case"); *Delegates to Republican Nat. Convention v. Republican Nat. Comm.*, No. SACV 12-00927 DOC, 2012 WL 3239903, at *11-12 (C.D. Cal. Aug. 7, 2012); *see also Simmons v. Galvin*, 575 F.3d 24, 42 (9th Cir. 2009) (acknowledging and applying "the principle that courts, particularly in [Voting Rights Act] cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue").

In this case, there are myriad ways to interpret these statutes that would not offend constitutional principles. *See, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 774 (1994) ("Absent evidence that the protesters' speech is independently proscribable (i.e., 'fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, this provision [banning all 'images observable' outside of an abortion clinic] cannot stand."); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992) (acknowledging that "threats of violence are outside the First Amendment"); *Virginia v. Black*, 538 U.S. 343, 359 (2003) ("[T]he First Amendment also permits a State to ban a 'true threat.' 'True threats' encompass those statements where the speaker means to communicate a serious expression of an

12

intent to commit an act of unlawful violence to a particular individual or group of individuals…. Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.") (internal citations omitted).

Ultimately, the Voting Rights Act and § 1985(3) cannot punish that which the Constitution protects. Plaintiffs do not allege any acts that would be proscribable under a constitutionally permissible interpretation of these statutes. Accordingly, they have failed to state a claim, and this Court should dismiss their Amended Complaint.

### b.  Plaintiffs' claims require this court to consider a political question.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n. v. Am. Cetacean Soc.,* 478 U.S. 221, 230 (1986). There are several instances where the doctrine makes a case nonjusticiable, including when there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department" and when it is impossible to decide an issue without making "an initial policy determination of a kind clearly for nonjudicial discretion." *Bancoult v. McNamara*, 455 F.3d 427, 432 (D.C. Cir. 2006) (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Here, Plaintiffs seek declarations and damages against the Trump Defendants based on actions taken while President Trump was acting in his capacity as President of the United States, as well as against his campaign for actions taken in furtherance of its political pursuit to re-elect President Trump. Adjudication of such a claim based upon the words or actions of the President would improperly regulate the executive department. Moreover, adjudication of Plaintiffs' claims would require the Court to make a value determination about what is or is not proper for the President to say during a political speech when advocating for governmental action or advocating that the laws be faithfully executed.

As previously discussed, such value determinations of the content of speech are not appropriate for the judiciary. The courts are not the branch constitutionally tasked with making "policy choices and value determinations," and they cannot serve to second-guess the President's judgments. *Japan Whaling*, 478 U.S. at 230.

In addition, the judiciary is ill-suited to determining whether the actions at issue are proper political campaign actions. Plaintiffs claim that there was improper discrimination, despite there being a perfectly legitimate non-discriminatory basis for Defendants' alleged actions: that the areas with a history of voting irregularities and the largest percentage of votes for democratic candidates are based in the urban areas, which also contain higher percentages of minority voters. As a result, it is plainly likely that such areas would be the focus of Republican political campaigns' scrutiny. Yet, Plaintiffs blatantly seek to politicize this issue by attacking only Republican operations and ignoring irregularities or actions taken by democratic

14

organizations, which also focus on these areas. The courts are not a proper avenue for settling such political disputes, especially when there is a legitimate non-discriminatory purpose.[4]

### c.  Plaintiffs seek an impermissible remedy.

Plaintiffs blatantly seek a prior restraint by asking that this Court approve future political actions and commentary by Defendants before they happen. *See* Dkt. No. 60 at 48 (requiring Defendants [s]ecure approval from this Court prior to engaging in any activities related to recounts, certifications, or similar post-election activities.). Prior restraints "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Court orders that proscriptively forbid speech activities are classic examples of prior restraints. *Alexander v. United States*, 509 U.S. 544, 550 (1993).

Prior restraints are presumed to be constitutionally invalid, and the government's burden of justifying such a restraint is heavy. *New York Times v. United States*, 403 U.S. 713, 714 (1971). Indeed, any prior restraint on expression comes to this Court with a "heavy presumption" against its constitutional validity. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). Content-based laws—those that target speech based on its communicative content—are presumptively

---

[4] *See* Section II(b) *infra,* regarding Plaintiffs' failure to state a claim upon which relief may be granted.

unconstitutional and may only be justified if the government proves that they are narrowly tailored to serve compelling governmental interests. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also Edwards v. District of Columbia*, 765 F. Supp. 2d 3, 14 (D.D.C. 2011).

No conceivable issue of public concern could justify the issuance of a prior restraint against a candidate for any public office, and certainly not when the office being sought is that of President of the United States; Plaintiffs have certainly not pled one here. If a prior restraint was not appropriate to stop the dissemination of classified information found in the Pentagon Papers, it is certainly not appropriate here. The request for any prospective relief must be dismissed, with prejudice.

## II.     Plaintiffs have failed to state a claim for which relief may be granted.

To survive a motion to dismiss, Plaintiffs must make factual allegations sufficient to show that they are entitled to relief. The pleading standard Federal Rule of Civil Procedure Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard is not akin to a "probability requirement," but it asks for

more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Although for the purposes of a motion to dismiss the court must take all the factual allegations in the complaint as true, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Iqbal,* 556 U.S. at 679.

A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Iqbal,* 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

### a. Plaintiffs failed to state a claim under Section 11(b) because they do not plausibly plead allegations of "intimidation, threats, or coercion."

The Complaint does not even approach the plausibility standard that the *Twombly* Court deemed insufficient for a claim to survive a motion to dismiss. The statute prohibits "intimidation, threats, or coercion" directed at "any person for voting or attempting to vote" or at "any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 1307(b) (emphasis added). Yet, Plaintiffs provide no facts about President Trump or the Campaign's intimidation of any person; they make no allegations about threats of any kind; they provide no facts about coercion. Instead, Plaintiffs offer labels, conclusions, and naked assertions devoid of "further factual enhancement." *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

Certainly, Plaintiffs' Second Amended Complaint is peppered with the terms "intimidation," "threats," and "coercion." But the sum of Plaintiffs' allegations against the Trump Defendants amount to tweets, a news conference, meetings between the President of the United States and other public officials, and alleged telephone calls. The substance of the tweets is public record. The news conference was televised. Plaintiffs make minimal or no factual allegations about the contents of these alleged telephone calls or the substance of the White House meeting. Ultimately, Plaintiffs allege nothing more than a formulaic recitation of the elements of Section 11(b). Under *Twombly*, this "will not do." *Twombly,* 550 U.S. at 555.

Even assuming all the allegations are true, President Trump and his Campaign engaged in simple and straightforward political speech during an important political dispute. At most, these allegations are merely consistent with Defendants potential liability. This is insufficient as a matter of law to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678; *Twombly,* 550 U.S. at 557. Viewing all the facts in the light most favorable to Plaintiffs, this Complaint does not show that Plaintiffs are entitled to relief based on any allegation they raise against President Trump or the Trump Campaign. *See* Fed. R. Civ. P. 8(a)(2). Accordingly, Plaintiffs' Section 11(b) claim against the Trump Defendants should be dismissed.

### b.  Plaintiffs do not state an actionable § 1985(3) conspiracy claim because they fail to adequately allege discriminatory purpose.

To plausibly allege a cause of action under § 1985(3), a plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of laws;
(3) an act in furtherance of the conspiracy; and (4) whereby a person is either injured
in his person or property or deprived of any right or privilege of a citizen of the United
States. 42 U.S.C. § 1985(3); *Pope v. Bond*, 641 F. Supp. 489, 498 (D.D.C. 1986). A
plaintiff must show, inter alia, "some racial, or perhaps otherwise class based,
invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v.
Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993). Discriminatory
purpose implies more than intent as volition or intent as awareness of consequences.
*Id.* at 271. It implies that the decisionmaker selected or reaffirmed a particular course
of action at least in part "because of," not merely "in spite of," its adverse effects upon
an identifiable group. *Id.* at 271-72 (quoting *Personnel Administrator of Mass. v.
Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)) (emphasis
added).

    Here, Plaintiffs' claims of discrimination amount to assertions that the
counties in which Defendants sought to conduct a recount or focused some of their
election day efforts were counties with large Black populations. If true, this allegation
does not show that Defendants conspired against Plaintiffs because of—rather than
in spite of—their status as Black Americans. As discussed above, there are multiple
legitimate non-discriminatory purposes for the alleged focus on the areas claimed by
Plaintiffs, including but not limited to the political makeup of those areas, the history
of voting irregularities in those areas, and the concentration of population in those
areas.

The allegation that the alleged actions constitute a violation of 42 U.S.C. § 1985(3) is a bald assertion that does not meet the Twombly plausibility standard. *See In re Rodriguez*, No. 05-5130, 2005 WL 3843612, at *4 (D.C. Cir. Oct. 14, 2005). Indeed, it is a factual contention that is, at best, "merely consistent with" Defendant's liability. *Iqbal*, 556 U.S. at 678; *Twombly,* 550 U.S. at 557. As such, it "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. Thus, Plaintiffs' § 1985(3) claim against the Trump Defendants should be dismissed.

### c. With respect to both claims, Plaintiffs fail to adequately allege an agency relationship between Trump supporters/volunteers and the Trump Defendants.

To the extent that Plaintiffs seek to impose liability on President Trump and his Campaign for the alleged conduct of "Trump Campaign observers" and "Trump supporters," Plaintiffs have failed to allege facts that, if true, would show an agency relationship between these unnamed individuals and either of the Trump Defendants. Although the Court accepts as true the well-pled allegations in Plaintiffs' Complaint, *Ndoromo v. Barr*, No. CV 19-3781 (CKK), 2020 WL 5107546, at *1 (D.D.C. Aug. 31, 2020), pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions." *Twombly,* 550 U.S. at 555. In the instant case, Plaintiffs label these unidentified Trump Campaign volunteers and supporters as "agents," *see* Dkt. No. 60, ¶ 17, but they have failed to raise a plausible inference that an agency relationship existed between the Trump Campaign and these unnamed individuals.

In the District of Columbia, the determination of whether an agency relationship exists turns on several factors, including: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 110 (D.D.C. 2010). Of these factors, the "'determinative factor' is usually the ... right to control an employee in the performance of a task and in its result." *Id.*; *see also Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C.1985) (stating that the "determination of the existence of [an agency] relationship basically turns upon one of these factors: control."). Indeed, "[i]t is a fundamental principle of hornbook agency law that an agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'" *Acosta Orellana*, 711 F. Supp. 2d. at 110; *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 122 (D.D.C.2008) (quoting Restatement (Second) of Agency § 14 (1958)); *see also* Restatement (Third) of Agency § 1.01 (2006) (stating that an agency relationship is the "fiduciary relationship that arises when [a principal] manifests assent to [an agent] that the agent shall act on the principal's behalf and subject to the principal's control").

Plaintiffs' factual allegations are utterly devoid of any suggestion that the Trump Campaign had control over its diffuse and myriad volunteers, much less the over seventy-four million Trump supporters in America. Because Plaintiffs fail to "plead[ ] factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged," they have failed to state a claim for relief that can survive a motion to dismiss. *Iqbal*, 556 U.S. at 678; *Cumis Ins. Soc., Inc. v. Peters*, 983 F. Supp. 787, 796 (N.D. Ill. 1997) ("While the existence and extent of the agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss.").

### d. Plaintiffs have failed to adequately allege that the VRA or 42 U.S.C. § 1985(3) apply to the President of the United States.

The statutes at issue in this case apply generally to persons. *See* 42 U.S.C. § 1985(3) ("If two or more persons in any state or territory conspire … ."); 52 U.S.C. § 10307(b) ("No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce … ."). Generally worded statutes have been held to not reach the President or his office in several contexts. As an example, the Administrative Procedure Act ("APA") has been found not to apply to the President without the explicit authorization of Congress.

In *Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992), the Court determined that the President was not subject to the APA because "textual silence is not enough to subject the President to the provisions of the APA." The Court premised this ruling upon the important separation of powers at issue, as well as the "unique" constitutional position of the president. *Id.* Further, the Court held it would be improper to subject the President's action to the abuse of discretion review required by the APA without an explicit authorization by Congress. *Id.*

It is notable that the Court cited to *Nixon v. Fitzgerald* in creating this statutory exemption of the President, where the Court pointed out that the President is not subject to damages actions without specific authorization from Congress. *Id.*

This general principle that the President must be specifically called out by Congress in order to be subject to statutes has endured and cropped up in other areas of law as well. Namely, in FOIA cases, the President and his close advisors are not subject to the same requirement that apply to other persons or agencies. "FOIA does not extend to 'the President's immediate personal staff or units in the Executive Office [of the President] whose sole function is to advise and assist the President[.]'" *Citizens for Resp. & Ethics in Washington v. Off. of Admin.,* 566 F.3d 219, 222 (D.C. Cir. 2009) (citing *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 156 (1980). It is especially noteworthy that the FOIA statutes do not explicitly name the President or his close staff as being within or without the FOIA provisions. The Court read this textual silence to mean that the statute does not apply to the President.

As the president occupies a unique position within the constitutional structure of our government, it is appropriate that generally worded statutes do not always reach the President or his office. *Fitzgerald,* 457 U.S. at 749-750; *Franklin*, 505 U.S. 801. Such a finding is especially appropriate in these circumstances, where the statutes and cases revolve around the proper enforcement of the laws of the United States and seeking to ensure they are properly executed. The statutes at issue in this case draw a parallel to the considerations in *Franklin,* where the Supreme Court

23

decided that a statute that is textually silent about the President is not enough to subject the President to damages actions or the APA because of the danger to the separation of powers.

Here, Plaintiffs' allegations include claims that President Trump and his Campaign for President exerted political pressure on local officials to ensure that their elections were properly conducted and certified. Plaintiffs further claim that President Trump and his Campaign improperly focused on certain areas in these efforts. These actions not only fall within the duties of the presidency as discussed above, but they also are constitutionally and statutorily invested in the President, making him a unique individual in the statutory and constitutional framework of our legal system. Finding that statutes of general import apply to the President would allow the Congress to infringe upon the President's inherent discretion in carrying out his duties. This is an impermissible invasion of the separation of powers between the legislative and executive branches.

Here, Plaintiffs have made no allegations, nor have they presented any evidence, that either of the statutes they rely upon reach the President or his office. As a matter of statutory interpretation, it would be appropriate for this Court to find that these statutes were intended to apply to the President or his office and thereby reduce the President's discretion in carrying out his duties.

### III.    Plaintiffs do not have standing to assert a third-party claim on behalf of voters in states other than Michigan.

Plaintiffs seek an injunction from this Court requiring Defendants, among other things, to "[s]ecure approval from this Court prior to engaging in any activities related to recounts, certifications, or similar post-election activities" and to train volunteers using only training materials approved by this Court. Dkt. No. 60 at 48-49. Plaintiffs do not have standing to assert a third-party Voting Rights Act claim on behalf of voters in a state other than Michigan.

### a.  Plaintiffs Michigan Welfare Rights Organization and the NAACP do not have standing.

The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Where the plaintiff's standing is challenged, the court "must assume that [the plaintiff] states a valid legal claim." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 37 (D.D.C. 2018). In such cases, the plaintiff bears the burden of "show[ing] a substantial probability that [he or she has] been injured, that the defendant caused [his or her] injury, and that the court could redress that injury." *Id.*

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. *Arpaio*, 797 F.3d at 19 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). While the court accepts well-pleaded factual allegations as true and draws all reasonable inferences

from those allegations in the plaintiff's favor, threadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice. *Id.* The court does not assume the truth of legal conclusions, nor does it "accept inferences that are unsupported by the facts set out in the complaint." *Id.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face. *Id.*

Here, both Michigan Welfare Rights Organization and the NAACP cannot meet their burden of proving injury in fact. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) ("Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114, 71 L.Ed.2d 214 (1982), an organization may establish Article III standing if it can show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests.") (internal quotation marks omitted).

### b. Individual Plaintiffs do not have standing to assert a third-party claim on behalf of voters in other states.

Generally, a party must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Although the United States Supreme Court has recognized that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another, it has limited this exception by requiring that a party seeking third-party standing make two additional showings.

26

*Id.* at 129-30. A party that satisfies the requirements of Article III standing may seek to enforce the legal rights of a third party where: (1) the party has a "close" relationship with the possessor of the right; and (2) there is a "hindrance" to the possessor's ability to protect its own interests. *Kumar v. Frisco Indep. Sch. Dist.*, 443 F. Supp. 3d 771, 781 (E.D. Tex. 2020) (citing *Kowalski*, 543 U.S. at 130).

Here, the individual Plaintiffs have not demonstrated a "close relationship" with voters in other states. Indeed, under Article II of the U.S. Constitution, the President is elected by Presidential Electors from each state who are appointed "in such Manner as the Legislature thereof may direct." U.S. Const. art. II, § 1, cl. 2. A voter in Michigan has no relationship whatsoever to a voter in another state because the right to vote for Presidential Electors in each state is prescribed by each state's respective legislatures, who are free to select Presidential Electors in any manner— including direct election of the Electors by the members of the state legislature—that does not violate the provisions the Constitution.

Moreover, there exists no hindrance to the ability of voters in other states to protect their own interests. Consequently, Plaintiffs do not have standing to seek relief on behalf of voters "in any other state."

## CONCLUSION

Plaintiffs' claims are precluded by important constitutional interests including the First Amendment, absolute immunity, and the political question doctrine. Even if they were not, Plaintiffs have failed to state a claim upon which relief may be

granted sufficient to avoid their claims being dismissed as they already once were. Moreover, this Court has no power to grant the injunctive remedy that Plaintiffs request. Finally, Plaintiffs do not have standing to seek relief on behalf of voters "in any other state." For these reasons, and the reasons raised by the Republican National Committee in its motion and brief, the Trump Defendants respectfully request that this Court dismiss Plaintiffs' Second Amended Complaint in its entirety.

Dated: January 2, 2023

Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
Email: jesse@binnall.com

*Attorney for Donald J. Trump and*
*Donald J. Trump for President, Inc.*

## CERTIFICATE OF SERVICE

I certify that on January 2, 2023, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Jesse R. Binnall
Jesse R. Binnall

*Attorney for Donald J. Trump and Donald J. Trump for President, Inc.*