**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MICHIGAN WELFARE RIGHTS
ORGANIZATION, *et al.*,

       *Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*,

       *Defendants.*

Case No. 1:20-cv-03388-EGS

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorities ............................................................................................................ ii

Background ......................................................................................................................... 1

   I.    Conduct at Issue. ...................................................................................................... 2

   II.   Allegations Supporting an Inference of Conspiracy Among Defendants. ................ 5

   III.  Additional Evidence Has Emerged Since Plaintiffs Filed the SAC. ......................... 7

Argument ............................................................................................................................ 8

   I.    The First Amendment Does Not Protect Defendants' Conduct. ............................... 8

     A.    The First Amendment Does Not Protect Defendants' Alleged Threats. ..................... 9

     B.    The First Amendment Does Not Protect Defendants' Speech Because That Speech Was Meant to—and Did—Incite Imminent Lawlessness. ...................................................... 12

     C.    Plaintiffs' Requested Injunctive Relief Does Not Constitute an Impermissible Prior Restraint. .................................................................................................................... 15

   II.   Plaintiffs State a Claim Under VRA § 11(b). ....................................................... 16

     A.    VRA § 11(b)'s Implied Private Right of Action Is Well Established. ...................... 17

     B.    Plaintiffs Have Standing to Seek Injunctive Relief. ................................................ 21

     C.    The SAC's Allegations of Intimidation, Threats and Coercion Are Well Pleaded. .... 24

     D.    Plaintiffs Have Adequately Pleaded That Trump Campaign Volunteers, RNC Volunteers, and State Republican Parties Who Engaged in Relevant Conduct Were Defendants' Agents. .................................................................................................. 30

   III.  Plaintiffs State a Claim Under KKK Act § 1985(3). ............................................ 32

     A.    Plaintiffs Have Alleged Facts Showing a Civil Conspiracy. ................................... 33

     B.    Plaintiffs Have Stated a Claim Under the Support or Advocacy Clause. .................. 35

     C.    Plaintiffs Have Stated Claims Under the Deprivation and Hindrance Clauses. ......... 39

     D.    Plaintiffs Have Alleged That Defendants' Violations of § 1985(3) Harmed Them... 41

   IV.  This Case Does Not Involve a Political Question. .................................................. 41

   V.   The VRA and KKK Act Apply to Former President Trump. ................................. 43

Conclusion ......................................................................................................................... 44

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Agostini v. Felton*,
   521 U.S. 203 (1997)...........................................................................................................20

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)...........................................................................................................20

*\* Allen v. State Board of Elections*,
   393 U.S. 544 (1969)............................................................................................17, 18, 25

*Arizona Democratic Party v. Arizona Republican Party*,
   Civ. No. 16-3752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016)............................................29

*Atherton v. D.C. Off. of Mayor*,
   567 F.3d 672 (D.C. Cir. 2009) ..........................................................................................37

*Autor v. Pritzker*,
   740 F.3d 176 (D.C. Cir. 2014) ...........................................................................................1

*Azzam v. Rightway Dev. Inc.*,
   789 F. Supp. 2d 110 (D.D.C. 2011) ...................................................................................32

*Baker v. Carr*,
   369 U.S. 186 (1962)...........................................................................................................43

*Barbour v. Merrill*,
   48 F.3d 1270 (D.C. Cir. 1995) ..........................................................................................37

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................................40

*Beul v. ASSE Int'l, Inc.*,
   233 F.3d 441 (7th Cir. 2000) .............................................................................................31

*Blessing v. Cable News Network, Inc.*,
   No. 2:20-cv-0015, 2020 WL 7647530 (E.D. Ky. Dec. 23, 2020)............................................13

*Bowie v. Maddox*,
   642 F.3d 1122 (D.C. Cir. 2011) ........................................................................................38

---

[*] Authorities upon which Plaintiffs chiefly rely are marked with an asterisk.

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969) ................................................................................................12

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ................................................................................................37

*Burson v. Freeman*,
   504 U.S. 191 (1992) (plurality opinion) ................................................................16

*Casanova v. Marathon Corp.*,
   477 F. Supp. 2d 98 (D.D.C. 2007) ........................................................................32

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
   436 F. Supp. 3d 354 (D.D.C. 2020) .......................................................................31

*Citizens for Resp. & Ethics in Washington v. Off. of Admin.*,
   566 F.3d 219 (D.C. Cir. 2009) ...............................................................................43

*Cort v. Ash*,
   422 U.S. 66 (1975) ...........................................................................................19, 20

*Council on Am.-Islamic Rel'ns Minn. v. Atlas Aegis, LLC*,
   497 F. Supp. 3d 371 (D. Minn. Oct. 29, 2020) .....................................................17

*Daschle v. Thune*,
   slip op., No. CIV 04-4177 (D.S.D. Nov. 2, 2004), ECF No. 6................................27

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   No. 2:81-cv-3876, 2016 WL 6584915 (D.N.J. Nov. 5, 2016) .................................32

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   No. 81-3876 (D.N.J. Jul. 27, 1987)........................................................................16

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) ................................................................................................11

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................................................43

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) ..................................................................................................37

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ............................................................................5, 15

*Hobson v. Wilson*,
   737 F.2d 1 (D.C. Cir. 1984) ..........................................................................34, 36, 39

*Johnson v. Interstate Mgmt. Co.*,
    849 F.3d 1093 (D.C. Cir. 2017) ......................................................................20

*United States ex rel. Joseph v. Cannon*,
    642 F.2d 1373 (D.C. Cir. 1981) ......................................................................42

*United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*,
    250 F. Supp. 330 (E.D. La. 1965) ..............................................................25, 27

*Keating v. Carey*,
    706 F.2d 377 (2d Cir. 1983) .......................................................................40, 41

*LaRouche v. Fowler*,
    152 F.3d 974 (D.C. Cir. 1998) ......................................................................37

* *League of United Latin Am. Citizens v. Pub. Interest Legal Found.*,
    No. 18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ................... *passim*

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) .....................................................................................25

*Levy v. Currier*,
    587 A.2d 205 (D.C. 1991) ...........................................................................31

*McCord v. Bailey*,
    636 F.2d 606 (D.C. Cir. 1980) ......................................................................37

* *Morse v. Republican Party of Virginia*,
    517 U.S. 186 (1996) ...........................................................................17, 18, 20

* *Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) ............................................................ *passim*

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    512 F. Supp. 3d 500 (S.D.N.Y. 2021) ...................................................33, 34, 35

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................................11

*Nixon v. Herndon*,
    273 U.S. 536 (1937) ..................................................................................43

*Nwanguma v. Trump*,
    903 F.3d 604 (6th Cir. 2018) ........................................................................12

*Pa. Democratic Party v. Republican Party of Pa.*,
    Civ. No. 16-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) .............................29

*Paynes v. Lee*,
  377 F.2d 61 (5th Cir. 1967) ...............................................................36, 38

*Reynolds v. Sims*,
  377 U.S. 533 (1964)....................................................................................35

*Rhodes v. Siver*,
  No. 19 Civ. 12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021)............17

*In re Rodriguez*,
  No. 05-5130, 2005 WL 3843612 (D.C. Cir. Oct. 14, 2005) (per curiam) ............37

*New York ex rel. Spitzer v. Operation Rescue Nat'l*,
  273 F.3d 184 (2d Cir. 2001)........................................................................16

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)....................................................................................21

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)...............................................................................11, 12

*Thompson v. Trump*,
  590 F. Supp. 3d 46 (D.D.C. 2022) ..........................................................42, 43

*United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v.
  Scott*,
  463 U.S. 825 (1983)....................................................................................37

*United States v. Bruce*,
  353 F.2d 474 (5th Cir. 1965) .....................................................................26

*United States v. Clark*,
  249 F. Supp. 720 (S.D. Ala. 1965)..........................................................28, 30

*United States v. May*,
  555 F. Supp. 1008 (E.D. Mich. 1983)........................................................16

*United States v. McLeod*,
  385 F.2d 734 (5th Cir. 1967) .....................................................................26

*United States v. Turner*,
  720 F.3d 411 (2d Cir. 2013)........................................................................10

*United States v. White*,
  769 F.2d 511 (8th Cir. 1985) .....................................................................15

*In re Vitamins Antitrust Litig.*,
  No. MISC 99-197, 2000 WL 1475705 (D.D.C. May 9, 2000)...............34

*Warth v. Seldin*,
    422 U.S. 490 (1975).....................................................................................24

*Watts v. United States*,
    394 U.S. 705 (1969) (per curiam) ..............................................................9

*Willingham v. Cnty. of Albany*,
    593 F. Supp. 2d 446 (N.D.N.Y. 2006)........................................................29

*Wilson v. DNC Servs. Corp.*,
    417 F. Supp. 3d 86 (D.D.C. 2019)..............................................................37

*Wilson v. DNC Servs. Corp.*,
    831 F. App'x 513 (D.C. Cir. 2020) (per curiam)........................................37

*Youming Jin v. Ministry of State Sec.*,
    335 F. Supp. 2d 72 (D.D.C. 2004).........................................................33, 34

*Zhang Jingrong v. Chinese Anti-Cult World All.*,
    287 F. Supp. 3d 290 (E.D.N.Y. 2018) ........................................................39

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017)................................................................................20

**Statutes**

* 42 U.S.C. § 1985(3) ....................................................................... *passim*

52 U.S.C. § 10101(b) ...................................................................................25

* 52 U.S.C. § 10307(b) ...................................................................... *passim*

52 U.S.C. § 10310(c)(1)........................................................................24, 28, 30

**Other Authorities**

Clara Hendrickson, Detroit Free Press, *Kristina Karamo seeks court order that
    could impact thousands of Detroit voters*, Oct. 28, 2022,
    https://www.freep.com/story/news/politics/elections/ 2022/10/28/kristina-
    karamo-lawsuit-detroit-votes/69598090007 ...........................................23

Cong. Globe, 42d Cong., 1st Sess. 565, 567, col. 2 (1871) .........................41

H.R. Rep. No. 89-439 (1965)........................................................................26

Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965)....................28

Jack Nissen, Fox 2 Detroit, *Detroit judge dismisses Karamo lawsuit, calls it 'false flag of election law violations and corruption'*, Nov. 7, 2022, https://www.fox2detroit.com/news/detroit-judge-dismisses-karamo-lawsuit-calls-it-false-flag-of-election-law-violations-and-corruption ...................................................23

Kristen Holmes, CNN, *Trump calls for the termination of the Constitution in Truth Social post*, Dec. 4, 2022, https://www.cnn.com/2022/12/03/politics/trump-constitution-truth-social/index.html ........................................................................................................8

*Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol* (Dec. 22, 2022) ......................................................................7

Restatement (Third) of Agency § 7.07(3)(b) (2006) .................................................31

Through their motions to dismiss, Defendants the Republican National Committee ("RNC"), Donald J. Trump for President, Inc. ("Trump Campaign"), and former President Donald J. Trump ("former President Trump")[1] seek to validate their persistent effort to disenfranchise voters. Defendants contend that coercive actions to block vote counting in tightly contested states, threatening state and local election officials to prevent certifying election results, and baselessly challenging the validity of legally cast ballots is ordinary political speech protected by the First Amendment. That dangerous contention should be rejected. Read as a whole and with inferences in Plaintiffs' favor, Plaintiffs' Second Amended Complaint (Dkt. 60) ("SAC") alleges coercion and intimidation, which the First Amendment plainly does not protect and which is proscribed by Section 11(b) of the Voting Rights Act ("VRA"), 52 U.S.C. § 10307(b), and the Ku Klux Klan Act ("KKK Act"), 42 U.S.C. § 1985(3). By describing an organized campaign to undermine the election carried out by numerous actors over a period of months, the SAC also adequately alleges the agency and conspiratorial relationships between the various Defendants to establish claims under both the VRA and the KKK Act.

Finally, the Court should reject former President Trump's conclusory arguments that this case involves a political question, that the VRA and KKK Act do not apply to him, and that Plaintiffs lack standing.

## BACKGROUND[2]

Defendants conspired to prevent the counting of legally cast ballots, including targeting cities with large numbers of Black voters. (SAC ¶¶ 20, 121-30.) The objective of Defendants'

---

[1] The RNC's combined motion to dismiss and supporting memorandum (Dkt. 71) is denominated "RNC Mem." The Trump Defendants' memorandum in support of their motion to dismiss (Dkt. 72-1) is denominated "Trump Mem."

[2] The Court must accept as true all of the factual allegations contained in the SAC and draw all inferences in favor of Plaintiffs. *See Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014).

conspiracy was to intimidate election officials, disenfranchise and overturn the will of voters, and ensure that then-President Trump stayed in power despite losing the 2020 presidential election. (*See, e.g.*, *id.* ¶¶ 38-40.) In furtherance of their conspiracy, Defendants engaged in private coercion of election officials; public intimidation of, and incitement of lawless action against, election officials; and, through their agents, physical violence, obstruction, and other intimidation— conduct far beyond the limits of any legitimate campaign activity and unprotected by the First Amendment.

Defendants' actions were also carried out by agents under Defendants' control, including Trump Campaign and RNC volunteers and state Republican parties. (*Id.* ¶¶ 2, 22, 66, 83-88.) Defendants and their agents "recruit[ed] volunteers for election-related activities," and, once the volunteers had "enlisted," Defendants required them "to participate in a training before engaging in certain election-related activities." (*Id.* ¶¶ 84-85.) The trainings, which Defendants prepared and provided to volunteers, were designed to prime volunteers to engage in inappropriate behavior, including intimidation and coercion, at polling places and recount sites. (*Id.* ¶ 88.)

## I.   Conduct at Issue.

Defendants' conduct falls into three main categories: (i) private coercion and intimidation of election officials (by the Trump Defendants); (ii) public intimidation targeting election officials, including through false accusations and implications of criminality and incitement of illegal activity by others (by all Defendants, including in conspiracy with one another); and (iii) physical violence and/or obstruction of counting lawful votes by agents (by all Defendants, including in conspiracy with one another). Allegations of each include:

*Private Coercion and Intimidation of Election Officials*: (i) former President Trump made personal phone calls to two Republican canvassers in Wayne County, Michigan who agreed to certify Wayne County's election results, but who reversed course after receiving those calls and

furnished affidavits to the Trump Campaign stating their opposition to certification (*id.* ¶¶ 50-51); (ii) former President Trump made phone calls to the Governor of Georgia, the Chair of the Maricopa County, Arizona Board of Supervisors, and the speaker of the Pennsylvania House of Representatives pressuring them to overturn election results (*id.* ¶¶ 55, 58, 60-61); (iii) former President Trump summoned the leaders of the Michigan State Senate and State House to the White House, where they participated in a meeting that included lawyers involved in former President Trump's efforts to overturn the election results (*id.* ¶ 52); (iv) Trump Campaign representatives "spent weeks" pressuring the Governor of Arizona "to echo President Trump's false claims about election fraud and cast doubt upon the State's results" (*id.* ¶ 63); and (v) former President Trump made calls to the Georgia Secretary of State, Brad Raffensperger and threatened him with a "criminal offense" if he declined to illegally "find 11,780 votes" (*id.* ¶ 59).

*Public Intimidation Causing Others to Target Election Officials*: (i) the RNC hosted a press conference at its Washington, D.C. headquarters, where former President Trump's personal lawyer, Rudolph Giuliani, falsely asserted that Wayne County's election results should not be certified due to "illegitimate ballots," and Trump Campaign lawyer Sidney Powell stated that the 2020 election had involved "the most unpatriotic acts I can even imagine," and that "American patriots are fed up with the corruption from the local level, to the highest level of our government" (an event that the RNC subsequently amplified by retweeting a portion of Powell's remarks using its official Twitter account) (*id.* ¶¶ 41-43, 93-94); (ii) former President Trump publicly attacked Philadelphia City Commissioner Al Schmidt, falsely asserting that the Election in Philadelphia was characterized by "a mountain of corruption and dishonesty" (*id.* ¶ 24); (iii) former President Trump publicly branded Georgia's Secretary of State as "an enemy of the people," suggested the Georgia Secretary of State and Governor were implicated in "massive voter fraud in Georgia," and

3

amplified a tweet from a supporter saying that they "will soon be going to jail" (*id.* ¶ 58); (iv) the RNC routinely used its official Twitter account (@GOP) to tweet links to the Trump Campaign's hotline for reporting purported election fraud and to repeat the false claim that "THE DEMOCRATS WILL TRY TO STEAL THIS ELECTION" (*id.* ¶ 93); (v) the Arizona Republican Party's official Twitter account issued multiple tweets encouraging supporters to "give [their] life for this fight" and "die for something" (*id.* ¶¶ 65, 82); (vi) the Chairperson of the Arizona Republican Party issued a tweet endorsing military intervention to "stop this coup" and overturn the election for former President Trump (*id.* ¶ 82); (vii) Defendants engaged in highly-militaristic marketing and recruitment efforts, including their designation of Trump Campaign volunteers as an "Army for Trump," who would need to "enlist" and "fight" to overturn the election (*id.* ¶¶ 83-84, 88, 92). These allegations show that Defendants intimidated public election officials by: (a) falsely accusing them of corruption, and (b) inciting their supporters to engage in lawless activities. And the latter indeed came to pass—among other things, Defendants' supporters directed grave intimidation, including rape and death threats, at officials and judges connected to the election in various states (*id.* ¶¶ 33-37), surrounded and attempted to force their way into the homes of election workers (*id.* ¶ 56), and finally stormed the U.S. Capitol on January 6, 2021 during Congress's certification of Electoral College votes, causing violent clashes and multiple deaths (*id.* ¶¶ 95-108).

*Baseless Challenges, Physical Violence, Obstruction, and Other Intimidation by Agents*: (i) "Trump Campaign observers encroached on physical spaces of vote tabulators to observe the count and made verbal comments pressuring vote tabulators" and "broke observation rules by frequently interrupting vote counters, sometimes with harassing comments and questions" (*id.* ¶ 29); (ii) "Trump Campaign observers also baselessly challenged" the validity of ballots for

various reasons, "even though such challenges are clearly improper under Wisconsin law" (*id.* ¶ 30); and (iii) "[s]ome Trump Campaign observers went even further . . . by becoming physically aggressive with election volunteers," including "one Trump Campaign observer [who] had to be escorted from the [Milwaukee] recount site after pushing an election official" (*id.* ¶ 31). The SAC further shows that there is a plausible inference that, in undertaking these intimidating and obstructionist tactics, observers were acting as agents of the Trump Campaign and the RNC (which were closely coordinated throughout the 2020 election as described below). As the chairperson of the Republican Party of Fond du Lac County, Wisconsin acknowledged, the "GOP strategy" in Wisconsin post-election was "to disenfranchise people." (*Id.* ¶ 32.) Former President Trump also arranged for "alternate slates of electors" to send false election certificates to Congress with the intent of having the fake Trump votes counted instead of legitimate votes for President Biden in order to change the result of the election. (*Id.* ¶¶ 68-78.)

## II.   Allegations Supporting an Inference of Conspiracy Among Defendants.

Furthermore, Plaintiffs' allegations give rise to a fair inference that Defendants' actions were part of a conspiracy among them, such that conduct directly attributable to specific Defendants is nonetheless attributable to all Defendants. *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983). Evidence that Defendants supported and carried out their illegal activities through joint efforts include allegations that:

- "After the 2016 Election, President Trump, the Trump Campaign, and the RNC merged their field and fundraising efforts together under the 'Trump Victory' banner, which resulted in a shared operational overhead, including office space and staff." (SAC ¶ 89.)[3]

- Defendants engaged in joint recruitment and training of election volunteers. (*Id.* ¶ 91.)

---

[3] Of course, Plaintiffs do not contend that all of Defendants' fundraising or field activity is improper. The evidence of coordination is significant because it supports an inference that Defendants were also involved in coordinating the illegal activity described in the SAC, including through oversight and direction of their joint volunteers/agents.

- Defendants shared Trump Victory fundraising proceeds, with the majority going directly to the RNC and state Republican parties. (*Id.* ¶ 90.)

- Through the Trump Victory enterprise, the RNC used training videos in multiple battleground states calculated to lead Trump supporters to interfere with the electoral process, *e.g.*, by encouraging volunteer poll watchers to wear "Official 'Poll Watcher'" badges, giving the false impression of being official state actors, whereby they engaged in intimidation and coercion at polls and recount sites. (*Id.* ¶¶ 85-88.)

- Defendants engaged in other joint conduct calculated to intimidate election officials and interfere with the electoral process, *e.g.*, by the RNC's hosting of a press conference at its Washington, D.C. headquarters in November 2020 at which former President Trump's personal lawyer and a Trump Campaign lawyer repeated baseless allegations of voter fraud and suggested that election officials were complicit in fraud and unpatriotic acts to steal the election. (*Id.* ¶¶ 41-43, 93.)

- The RNC routinely endorsed false claims by the Trump Defendants suggesting elected officials were complicit in illegal conduct, *e.g.*, by using its official Twitter account (@GOP) to retweet material from the Trump Campaign's official account (@TeamTrump), including multiple links to the Trump Campaign's hotline for reporting purported election fraud when none was occurring; to issue original tweets repeating the claim that "THE DEMOCRATS WILL TRY TO STEAL THE ELECTION" (*id.* ¶ 93); and to retweet the Trump Campaign's remarks at the RNC's November 2020 press conference. (*Id.* ¶¶ 41-43, 93.)

- The RNC publicly amplified the Trump Defendants' false narrative that voters had engaged in widespread fraudulent (and criminal) conduct, and that election officials who certified results would be complicit in that conduct. After the Wayne County Board of Canvassers initially deadlocked on certification, then-Michigan Republican Party Chairwoman Laura Cox made clear that the RNC and Trump Campaign were working together to promote that false narrative, stating: "I am proud that, due to the efforts of the Michigan Republican Party, the Republican National Committee and the Trump Campaign, enough evidence of irregularities and potential voter fraud was uncovered resulting in the Wayne County Board of Canvassers refusing to certify their election results." (*Id.* ¶ 47.) After county canvassers ultimately certified the results, Ms. Cox and RNC Chair Ronna McDaniel sent a letter to the State Board seeking to delay certification (premised on minor discrepancies that the Michigan Secretary of State confirmed "are common in Michigan and across the nation" and not indicative of fraud, such as "a voter being checked in at the right polling place but the wrong precinct, or a voter checking in but leaving with their ballot if the line was long"). (*Id.* ¶¶ 45, 53.)

- Further suggesting coordination between them, most of Defendants' conduct took place in close temporal proximity and was directed at ballot counting processes across the United States, including Washington, D.C. (*id.* ¶ 25, 41), Wisconsin (*id.* ¶¶ 27-32), Arizona (*id.* ¶¶ 34, 63-65, 82, 90), Georgia (*id.* ¶¶ 33, 58, 85, 91), Pennsylvania (*id.* ¶¶ 56, 61), Nevada (*id.* ¶¶ 34, 56, 90), and Michigan (¶¶ 47-54).

**III.    Additional Evidence Has Emerged Since Plaintiffs Filed the SAC.**

Since Plaintiffs filed the SAC in June 2022, further evidence of Defendants' coordinated effort to disenfranchise voters in violation of the VRA and KKK Act has been made public. In December 2022, the Select Committee to Investigate the January 6th Attack on the United States Capitol published its final report, which includes the Committee's detailed findings of Defendants' attempts to prevent the lawful counting of votes after the 2020 election, including details of the RNC's involvement in former President Trump's efforts to organize fake slates of electoral college votes in seven states that former President Trump lost.[4] Former President Trump's "carefully planned scheme" to submit false slates of electors "was aided at key points by Chairwoman of the Republican National Committee Ronna McDaniel."[5] To involve McDaniel in the scheme, former President Trump personally called McDaniel in December 2020 to enlist the RNC's assistance. McDaniel agreed to provide that assistance.[6] McDaniel then emailed former President Trump's executive assistant an update on the electors that had voted for him in six states that he had not won.[7] The Committee also concluded that former President Trump was "personally and substantially involved in multiple efforts to pressure State election officials and State legislatures to alter official lawful election results."[8]

---

[4] House of Representatives, *Final Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol* (Dec. 22, 2022) ("Select Committee Report") at 341-354.
[5] *Id.* at 341.
[6] *Id.* at 41.
[7] *Id.* at 354.
[8] *Id.* at 43.

Recent developments have also shown Defendants' continuing efforts to overturn valid election results. On December 3, 2022, former President Trump made a social media post seeking to throw out the results of the 2020 election and terminate the Constitution.[9]

All of this evidence further supports Plaintiffs' claims. While these additional facts are not necessary to Plaintiffs' claims, they lend further support to the claims asserted in the SAC and show that Defendants' motions lack merit and are only an attempt to delay an injunction that would prevent Defendants from their attempts to interfere in the 2024 presidential election.

## ARGUMENT

### I.   The First Amendment Does Not Protect Defendants' Conduct.

Defendants incorrectly argue that the actions challenged in this lawsuit are protected by the First Amendment because they are garden variety political speech. (RNC Mem. at 2-8; Trump Mem. at 9-13.) Plaintiffs have no interest in challenging protected speech. But they do have a profound interest in redressing and preventing any recurrence of Defendants' intimidation, threats, coercion, and incitement to lawlessness, including the obstructionist and sometimes violent conduct by Defendants' agents at vote counting sites. The First Amendment does not prevent Plaintiffs from doing so.

As an initial matter, not all of Defendants' relevant conduct is speech. The RNC is wrong to claim that "all the allegations against the RNC rest on the RNC's speech." (RNC Mem. at 3.) The SAC also alleges that all Defendants worked together to organize illegal "alternate slates of electors" (SAC ¶¶ 72, 77), and, through their agents, engaged in obstruction, intimidation, and outright violence at recount sites in violation of VRA § 11(b) and KKK Act § 1985(3) with the

---

[9] Kristen Holmes, CNN, *Trump calls for the termination of the Constitution in Truth Social post*, Dec. 4, 2022, https://www.cnn.com/2022/12/03/politics/trump-constitution-truth-social/index.html.

objective of slowing and stopping counting efforts. Trump Campaign observers violated rules governing their behavior as observers, harassed and crowded vote tabulators, and became physically aggressive with election volunteers. (*Id.* ¶¶ 28-30.) These actions are clearly not protected by the First Amendment.

As to the speech alleged in the SAC, it falls outside the scope of the First Amendment because it consists of threats, intimidation, and coercion—the conduct prohibited by both the VRA § 11(b) and KKK Act § 1985(3).[10] Defendants are wrong to suggest that the First Amendment protects all intimidation, threats, and incitements to lawlessness unless they are made with an intent to commit an unlawful act of violence. (RNC Mem. at 4-5; Trump Mem. at 9-13.) As shown below, that contention is inconsistent with case law, which makes clear that nonviolent threats are not protected speech. Further, much of Defendants' conduct is also outside the scope of the First Amendment because their speech incited unlawful action, all of which was imminent, much of which actually occurred. Finally, the Trump Defendants' attempt to avail themselves of First Amendment protection by arguing that Plaintiffs' requested injunctive relief is an impermissible prior restraint fails because the conduct to be prevented is not protected speech, and the requested relief is narrowly tailored to protect the government's interest in securing the right to vote.

A.     **The First Amendment Does Not Protect Defendants' Alleged Threats.**

Defendants argue that their actions are protected by the First Amendment because they do not constitute "true threats," which the Supreme Court has held fall outside of First Amendment protection. *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). Whether speech

---

[10] The Trump Defendants also argue that Plaintiffs' interpretations of the VRA and the KKK Act offend the canon of constitutional avoidance by demanding an overbroad reading of those statutes. (Trump Mem. at 11-13.) This is false—as demonstrated in this Opposition, Plaintiffs have pleaded a complaint that alleges true threats and speech that incites imminent lawless action, neither of which, as applied to the VRA and the KKK Act, offends the Constitution.

constitutes a true threat depends on "whether an ordinary, reasonable recipient who is familiar with the context of the [speech] would interpret it as a threat of injury." *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013). Although Defendants contend that the true threats doctrine applies only to threats of violence, recent authority makes clear that true threats include threats of nonphysical and nonviolent harm. *Nat'l Coal. on Black Civic Participation v. Wohl* ("*NCBCP I*"), 498 F. Supp. 3d 457, 480 (S.D.N.Y. 2020) (history omitted). Actions that inspire fear of economic harm, legal repercussions, privacy violations, derogatory remarks, and even surveillance can constitute threats for purposes of a true threat inquiry. *Id.* at 477, 482 (citations omitted). In *NCBCP I*, the court looked, in part, to the Supreme Court's decision in *Virginia v. Black*, noting that although the Supreme Court held that true threats "*encompass* . . . expression[s] of an intent to commit an act of unlawful violence to a particular individual or group of individuals," the Supreme Court did not indicate that *only* threats of unlawful violence constitute true threats. *Id.* at 479 (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)) (emphasis added). In *NCBCP I*, the court also recognized that "[t]he threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence," entirely consistent with the Supreme Court's rationale for holding that "true threats" fall outside the protection of the First Amendment. *Id.* (citing *Black*, 538 U.S. at 360). In *NCBCP I*, the threatened nonbodily harms arose from false but intimidating statements that voting by mail would result in creditors and/or government agencies acquiring voters' personal information to use when collecting debts, identifying voters for mandatory vaccination, and enforcing outstanding warrants. *Id.* at 482. Those threats created a climate of fear that made voters hesitate to vote by mail, *id.* at 483, much as Defendants' efforts here made officials fear the consequences of fulfilling their lawful duty to count votes in the 2020 election.

As detailed above, the SAC alleges conduct by Defendants that fits squarely into the types

of threats considered by *NCBCP I*. The SAC alleges, in part, that former President Trump engaged in private intimidation of election officials to pressure them against certifying President-Elect Biden's victory. (SAC ¶¶ 50, 52, 55, 58-60, 63.) The SAC also alleges that Defendants intimidated and threatened election officials by implicating them in criminal conduct, including, for example, by retweeting a message saying that Georgia's Secretary of State and Governor "will soon be going to jail." (*Id.* ¶ 58.) Former President Trump also threatened Georgia's Secretary of State with a "criminal offense" if he declined to illegally "find 11,780 votes." (*Id.* ¶ 59.) This call to action was intended to produce imminent lawless action—namely the baseless reversal of election results— and was likely to produce such action.

Defendants' false statements of rampant voter fraud fall outside the scope of the protections of the First Amendment for the additional reason that they were made with reckless disregard for their truth—particularly when used to coerce local officials to overturn the results of the election.

Deliberate or recklessly false statements are presumed to be unprotected by the First Amendment. *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (holding that false statements are unprotected by First Amendment when published with malice).[11] This is especially true where the speech causes harm. For example, falsely accusing someone of criminal activity or making false statements that relate to the person's professional conduct are unprotected speech. *See, e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755 (1985) (recovery for defamatory falsehoods, even when related to public concern, is permitted where a party proves

---

[11] The RNC relies on *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964), for the proposition that courts "have consistently refused to recognize an exception for any test of truth." (*See* RNC Mem. at 6.) But in that case, the Court was considering only "erroneous statements honestly made," 376 U.S. at 278, and made clear that the First Amendment does not protect someone who makes a statement "with knowledge that it was false or with reckless disregard of whether it was false or not," *id.* at 280.

actual malice); *St. Amant*, 390 U.S. at 728, 731 (malice established when speech made with doubt as to truth or reckless disregard for truth). Here, the false accusations of fraud directed at election officials are unprotected because they were made with reckless disregard for the truth and sought to affirmatively harm those individuals. Even Defendants' more general statements of fraud are unprotected for the additional reason that they were made with reckless disregard for the truth and were intended to undermine the outcome of the 2020 election by invalidating millions of lawfully cast ballots.

Defendants further intimidated and threatened election officials seeking to fulfill their legal obligations by repeated false accusations of fraud, including accusations directed at Wayne County officials and others who certified the election results (*id.* ¶¶ 41-43, 94), and attacks on elections, like Philadelphia's, that former President Trump labeled "a mountain of corruption and dishonesty" (*id.* ¶ 24). These officials responsible for counting and certifying votes were thereby threatened with legal repercussions and harassment, which constitute true threats under *NCBCP I*, 498 F. Supp. 3d at 477. As a result of the threats directed at election officials following the 2020 presidential election, election officials have quit or retired early or plan to do so before the 2024 elections. (SAC ¶¶ 35-36.)

**B.    The First Amendment Does Not Protect Defendants' Speech Because That Speech Was Meant to—and Did—Incite Imminent Lawlessness.**

The First Amendment does not protect Defendants' violations of VRA § 11(b) and KKK Act § 1985(3) for the independent reason that their speech was directed to inciting or producing imminent lawless action and did in fact incite such action. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also Nwanguma v. Trump*, 903 F.3d 604, 609-10 (6th Cir. 2018) (citing *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 246 (6th Cir. 2015)) (noting that speech is not protected where it implicitly or explicitly encouraged the use of lawless action, the speaker intends that his

speech will result in lawless action, and lawless action is the likely result of the speech). When evaluating inciting speech, courts will look to its "content, form, and context" to assess "the circumstances of the speech, including what was said, where it was said, and how it was said." *Blessing v. Cable News Network, Inc.*, No. 2:20-cv-0015, 2020 WL 7647530, at *12 (E.D. Ky. Dec. 23, 2020) (quoting *Snyder v. Phelps*, 562 U.S. 443, 454 (2011)), *appeal dismissed*, No. 21-5082 (6th Cir. Mar. 25, 2021). Context is especially important here, where the conspiracy relied not only on obvious threats, intimidation, and coercion but also on insidious forms of those transgressions that succeeded in combination with the obvious forms.

Defendants' speech falls outside the scope of First Amendment protection because it publicly incited their supporters[12] to threaten, intimidate, coerce, or commit violence against public officials to prevent local officials from certifying election results. Many supporters engaged in these actions as a direct result of Defendants' inciting speech. Defendants' aggressive campaign, particularly messaging that baselessly suggested there was rampant election fraud (SAC ¶¶ 21-26) and that election officials (who followed the law rather than obeying Defendants' demands) were complicit in that fraud (*e.g.*, *id.* ¶ 58), was intended to produce threats, intimidation, and coercion targeting such officials. In response to that incitement, Trump supporters paraded past the Georgia Secretary of State's home, with some directing sexually explicit threats at the Georgia Secretary of State's wife (*id.* ¶ 33), threatened a Georgia election technician with a noose (*id.*), threatened a Wisconsin Supreme Court Justice who ruled against former President Trump in an election-related case (*id.*), directed threats to the Arizona and Nevada Secretaries of State as well as a Michigan

---

[12] Defendants wrongly suggest that they can only be responsible for their own acts or their agents' acts. (RNC Mem. at 16; Trump Mem. at 20-21.) But the incitement described in this section is addressing Defendants' own acts. Their inciting speech that is proscribed by VRA § 11(b) and KKK Act § 1985(3) caused others, regardless of agency, to commit unlawful acts to prevent or attempt to prevent election officials from performing their duties.

official's family member (*id.* ¶ 34), and, armed with weapons, assembled outside of the Michigan Secretary of State's home at night (*id.*). In light of this incitement and the resulting threats, public officials, concerned that former President Trump's supporters would injure someone, called on former President Trump to condemn violence and rein in his supporters. (*Id.* ¶ 58.) Former President Trump directly responded in a tweet where he linked to a video of the request from officials by continuing his aggressive—but baseless—campaign against purported voter fraud and asking what those officials were "afraid of." (*Id.*)

Most significantly, on January 6, 2021, former President Trump gave a speech stating that "we're going to the Capitol" and urging his followers to "fight like hell," inciting a mob that he knew possessed weapons to overcome police and break into the Capitol building. (*Id.* ¶¶ 95-106.)[13] The mob acted because they believed former President Trump's false claim that former Vice President Pence could decide the election himself.[14]

The RNC's argument that it is absolved from liability because none of the Trump Defendants' threats or incitement are attributable to it fails as well. (RNC Mem. at 15-16.) As an initial matter, the RNC engaged in speech that targeted election officials, suggesting they were complicit in voter fraud and speech in ways designed to incite imminent lawlessness. For example, the RNC hosted a press conference, and later retweeted remarks from the conference, at which a Trump Campaign representative declared that the 2020 election had involved one of "the most unpatriotic acts I can imagine." (SAC ¶¶ 41-43.) The RNC also publicly supported the false narrative that voters engaged in widespread fraudulent (and criminal) conduct in Wayne County. (*Id.* ¶¶ 47-48.) After Wayne County agreed to certify the results, the RNC communicated with the

---

[13] *See* Select Committee Report at 429, 540, 585.
[14] *See* Select Committee Report at 647.

State Board looking to delay certification based on the false premise that minor discrepancies were evidence of widespread fraud. (*Id.* ¶¶ 45, 53.) Further, the RNC routinely used its Twitter account (@GOP) to reinforce the Trump Defendants' false claim that the election was stolen. (*Id.* ¶ 93.) The RNC, through the Arizona Republican Party, put pressure on Arizona officials not to certify election results (*id.* ¶¶ 55, 60) and issued multiple tweets encouraging supporters to "give [their] life for this fight" and "die for something" (*id.* ¶¶ 65, 82), which contributed to former President Trump's supporters threatening the Arizona Secretary of State with violence (*id.* ¶ 34). All of the RNC's statements were knowingly false, as "RNC leadership knew that President Trump was lying to the American people."[15]

Finally, as demonstrated below, Plaintiffs have alleged facts showing that the Trump Defendants and the RNC formed a conspiracy to deprive voters of the franchise in violation of VRA § 11(b) and KKK Act § 1985(3). Accordingly, the RNC is liable for the injuries the Trump Defendants caused, in addition to the injuries it caused by its own incitement. "[O]nce [a] conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy." *Halberstam*, 705 F.2d at 481.

### C.   Plaintiffs' Requested Injunctive Relief Does Not Constitute an Impermissible Prior Restraint.

The Trump Defendants argue that injunctive relief would be an impermissible prior restraint. (Trump Mem. at 15-16.) This argument is not a basis for dismissing the complaint, as the content of any injunctive relief will not be decided until a later stage of the case, when the Court would ensure it satisfied all constitutional requirements. In any event, the injunction Plaintiffs seek would not be a prior restraint because the conduct prohibited by the injunction would not be constitutionally protected speech. *See, e.g.*, *United States v. White*, 769 F.2d 511, 516-17 (8th Cir.

---

[15] Select Committee Report at 780.

1985) (injunction not impermissible prior restraint where commercial speech had been shown to be false or fraudulent and was likely to promote illegal activity and because speech was not protected by the First Amendment); *United States v. May*, 555 F. Supp. 1008, 1010 (E.D. Mich. 1983) (injunction valid, in part, because of adequate procedural safeguards). Moreover, Plaintiffs' request for injunctive relief prohibiting violations of the KKK Act and VRA will be subject to hearing and review by this Court, *May*, 555 F. Supp. at 1010, and the Court will ensure it is narrowly tailored to protect the government's significant interest in securing the right to vote. *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 210-11 (2d Cir. 2001) (portions of injunction not impermissible prior restraints where narrowly tailored to protect government interest); *see also Burson v. Freeman,* 504 U.S. 191, 199 (1992) (plurality opinion) (The "right to vote freely for the candidate of one's choice is of the essence of a democratic society.") (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). In fact, the injunctive Plaintiffs seek is similar to a prior injunction against the RNC that remained in place for over thirty years, requiring that the RNC, *inter alia,* not engage in any ballot security program unless the court determined that the program complied with the law. *Democratic Nat'l Comm. v. Republican Nat'l Comm.,* No. 81-3876 (D.N.J. Jul. 27, 1987).

## II.   Plaintiffs State a Claim Under VRA § 11(b).

VRA § 11(b) provides: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52. U.S.C. § 10307(b). As one court has put it, "Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote, regardless of race." *NCBCP I*, 498 F. Supp. 3d

at 476. The well-pleaded allegations in Plaintiffs' Second Amended Complaint, taken as true as they must be on a motion to dismiss, show that Defendants engaged in a series of threatening, intimidating, and coercive conduct designed to disenfranchise Plaintiffs and their members. That is precisely the type of conduct prohibited by Section 11(b).

### A.     VRA § 11(b)'s Implied Private Right of Action Is Well Established.

The RNC's contention that VRA § 11(b) is without a private right of action is meritless. (*See* RNC Mem. at 8-10.) "Consistent with Section 11(b)'s broad reach . . . private parties may sue to enforce Section 11(b)." *NCBCP I*, 498 F. Supp. 3d at 476; *see also*, *e.g.*, *Rhodes v. Siver*, No. 19 Civ. 12550, 2021 WL 912393, at *1-2 (E.D. Mich. Mar. 10, 2021) ("Defendants contend that Section 11(b) affords no private right of action. That is incorrect.") (citation omitted); *Council on Am.-Islamic Rel'ns Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 378-79 (D. Minn. Oct. 29, 2020) (assuming private right of action); *League of United Latin Am. Citizens v. Pub. Interest Legal Found.* ("*LULAC*"), No. 18-cv-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (same). Indeed, as the RNC acknowledges, this Court has already rejected its argument in this case, holding "that precedent and direction from the Court of Appeals for the District of Columbia Circuit ('D.C. Circuit') and the Supreme Court support a finding of a private right of action." (Dkt. 49 at 31; *see id.* at 32-37.)

These cases follow from *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), and *Allen v. State Board of Elections*, 393 U.S. 544 (1969), in which the Supreme Court found private rights of action under other provisions of the VRA. *See Morse*, 517 U.S. at 231-32 (plurality opinion by Justice Stevens; majority of Justices holding that Section 10 provides an implied private right of action and acknowledging an implied private right of action in Section

2); *Allen*, 393 U.S. 544, 555-57 (1969) (holding that Section 5 provides an implied private right of action).

Both *Allen* and *Morse* confirm that Section 12 of the VRA, which the RNC relies upon (*see* RNC Mem. at 8), does not preclude enforcement by private litigants. In *Allen*, the Supreme Court found an implied private right of action to enforce Section 5 of the VRA, which, like VRA § 11(b), is silent about a private right of action and can be enforced by the Attorney General under Section 12. *Allen*, 393 U.S. at 555-56. In so holding, the Court explained that to interpret Section 12 as limiting the ability of private individuals to bring suit under the VRA would contradict Congress's intent to "make the guarantees of the Fifteenth Amendment finally a reality for all citizens." *Id.* at 556. The Court explained: "[t]he achievement of the [VRA's] laudable goal could be severely hampered [] if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. . .  It is consistent with the broad purpose of the [VRA] to allow the individual citizen standing." *Id.* at 556-57.

Likewise, in *Morse*, the Supreme Court found an implied private right of action under Section 10 of the VRA. *See Morse*, 517 U.S. at 232. There, the Court explained that its finding of a private right of action in *Allen* was reinforced by subsequent amendments to the VRA, in which Congress amended Section 3 to allow suits under any section of the VRA not just by the Attorney General but also "'*an aggrieved person*'" and added Section 14(e) to provide for attorneys' fees to prevailing parties "'*other than the United States*.'" *Id.* at 233-34 (quoting 52 U.S.C. §§ 10302(a), 10310(e) (emphasis added)). Also acknowledging a private right of action under Section 2, the Court observed that "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language." *Id*. at 232. Rather than apply the holding of the majority of the

Court in *Morse*, the RNC relies on Justice Thomas's dissenting opinion in that case in support of its argument that there should be no private right of action here. (*See* RNC Mem. at 9.) But this Court is bound by the views of the majority of the Justices, not the dissent, in *Morse*.

Implicitly recognizing as much, the RNC also emphasizes that *Morse* was decided before *Alexander v. Sandoval*, in which, according to the RNC, the Supreme Court abandoned its prior approach to recognizing implied causes of action absent evidence of congressional intent. (*See id.* at 10.) But, as this Court already explained, *Sandoval* itself recognized that the Court had abandoned that approach over two decades before *Morse* in *Cort v. Ash*, 422 U.S. 66 (1975). (*See* Dkt. 49 at 32-33.) And, as this Court further explained, in *Morse*, "the Supreme Court addressed precisely th[e] question" asked by *Cort* and *Sandoval*, i.e., did Congress intend to create a private right of action. (Dkt. 49 at 35.) *Morse* answered this question in the affirmative, finding that "Congress' intent in enacting the VRA, displayed in the statutory text, was to create a private right of action." (*Id.*)

The Supreme Court in *Morse* so held based on Congress's 1975 amendment to Section 3 of the VRA, which applies to any proceeding to enforce the right to vote, to cover actions "'by the Attorney General *or an aggrieved person*.'" (*Id.* (quoting *Morse*, 517 U.S. at 233).) As this Court further explained:

> since § 11(b), like § 10, "by its terms, [is] a statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments," *Morse*, 517 U.S. at 234; it meets the *Sandoval* test for an intent to create a private remedy. This intent is further evidenced in Congress' addition of § 14(e) to provide for attorneys' fees to prevailing parties "other than the United States."

(Dkt. 49 at 35-36 (quoting *Morse*, 517 U.S. at 233-34) (additional citation and internal quotation marks omitted).) The RNC has no answer to this Court's persuasive analysis on this issue, and it does not even attempt to argue that § 11(b) differs from § 10 in any of these respects.

Similarly, the RNC cites a single case from the D.C. Circuit—*Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017)—to stand for the vague proposition that "the Supreme Court has been 'very hostile to implied causes of action'." (RNC Mem. at 9.) However, in *Johnson*, this Court clarified that, even after *Cort v. Ash*, 422 U.S. 66 (1975) and later cases declining to find implied rights of action, *Morse* "recognize[d] an implied cause of action under Section 10 of the Voting Rights Act." 849 F.3d at 1097.

In sum, controlling precedent, including *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) and *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855-56 (2017), recognizes that statutory intent remains the guiding principle in the implied right of action analysis.[16] *See Sandoval*, 532 U.S. at 286, 290 (explaining in Title VI context that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create" a private cause of action); *Ziglar*, 137 S. Ct. at 1855 (explaining in Section 1983 context that "[t]he 'determinative' question is one of statutory intent"). And in *Morse*, the Court held that Congress's intent in enacting the VRA was to create a private right of action—rejecting the argument that the lack of "express authorizing language" forecloses private litigants from enforcing their rights thereunder. *Morse*, 517 U.S. at 231-32.

No case has "overrule[d]" the private rights of action identified in *Allen* and *Morse*. (*Contra* RNC Mem. at 11.) The Supreme Court repeatedly has instructed that even "if a precedent of this Court . . . appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (citation omitted). As

---

[16] *Sandoval* itself acknowledges an implied private right of action for claims brought under Section 601 of Title VI. 532 U.S. at 279, 289.

indicated above, in the two decades since *Sandoval* and *Ziglar*, a multitude of lower courts have continued to find a private right of action under VRA § 11(b) and other sections of the VRA. The RNC's theory is inconsistent with Supreme Court precedent and should again be rejected by this Court.

### B.       Plaintiffs Have Standing to Seek Injunctive Relief.

Article III standing requires that "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Where, as here, a case is at the pleading stage," a plaintiff need only "clearly allege facts demonstrating each element." *Id.* When, as here, a plaintiff seeks injunctive relief, the injury-in-fact prong asks whether Plaintiffs are facing imminent harm, which, under Supreme Court and D.C. Circuit precedent, is "satisfied where there is a 'substantial risk' of future harm." (Dkt. 59 at 13 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013), and *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)).) In other words, as this Court stressed in holding the Second Amended Complaint adequately alleges standing to seek injunctive relief, "'substantial risk' is the touchstone for analyzing imminence." (*Id.* (citing *Richardson v. Trump*, 496 F. Supp. 3d 165, 178 (D.D.C. 2020)).)

Here, unlike the election cases that the RNC cites—where the requested relief was tied to a past election—the 2020 and 2022 elections' "'passage into history'" does not obviate Plaintiffs' need for injunctive relief. (RNC Mem. at 13 (quoting *Virginians Against a Corrupt Congress v. Moran*, No. 92-5498, 1993 WL 260710 (D.C. Cir. June 29, 1993) (other citations omitted)).) As this Court has already recognized in rejecting Defendants' argument that

amendment would be futile, Plaintiffs are seeking injunctive relief to address the substantial risk that they will be harmed by Defendants' conduct in upcoming elections. (Dkt. 59 at 18, 21.)

The RNC argues that, since the allegations in the SAC concern past events, Plaintiffs do not have standing to seek injunctive relief. (RNC Mem. at 10-14.) However, this Court pointed out the error in the RNC's logic in its Order granting Plaintiffs Motion, noting that "for something to count as a valid allegation or piece of evidence, *it must already have happened*." (Dkt. 59 at 22.) Here, the Court correctly concluded that Defendants' alleged past conduct demonstrates the substantial risk of future harm Plaintiffs face in having their fundamental right to vote denied. (*See id.* at 18-22.) As this Court put it with respect to the RNC specifically, "[a]s to a 'substantial risk' of future harm, Plaintiffs' allegations more than suffice." (*Id.* at 21.) It does not matter that the 2022 elections have now passed. The allegations in the Plaintiffs' amended complaint concerning efforts by Republican officials to train poll workers to target voters of color, and to coerce and intimidate elections officials and voters, did not cease simply because that election has passed. Indeed, Plaintiffs specifically referred to a news report discussing those plans for both the 2022 and 2024 elections. (*See* SAC ¶ 118 nn. 173, 176). Plaintiffs' allegations of Defendants' continued efforts to prevent the orderly functioning of the electoral system by baselessly undermining legitimate elections as recently as 2022 identifies a substantial risk that Defendants' conduct is ongoing and designed to impact the 2024 elections as well.

Moreover, contrary to the RNC's assertion, the successful certification of the 2022 elections in all of Michigan's counties does not undermine Plaintiffs' allegations or suggest they can be treated as unduly speculative on a motion to dismiss. The successful certification of an election does not show a lack of attempts to coerce voters or election officials, and Plaintiffs did

not allege only that Defendants' conduct risked the certification process. Plaintiffs alleged interference and intimidation directed toward voters and officials involved with election results, including facilitating ballot challenges. (SAC ¶ 117.) Notably, on October 28, 2022, the *Detroit Free Press* reported that a lawsuit had been filed by Kristina Karamo, Michigan's Republican secretary of state candidate backed by Former President Trump, against Detroit City Clerk Janice Winfrey less than two weeks before the midterm elections, alleging election law violations targeting Detroit.[17] On November 7, 2022, a local judge dismissed the lawsuit as a "false flag of election law violations and corruption."[18] These are the very kinds of false claims challenging the legitimacy of election results, and seeking to disenfranchise voters, that Plaintiffs allege Defendants continue to amplify.

The SAC alleges facts showing that there is significant likelihood of recurrence of Defendants' election-related misconduct. Not only is the RNC involved "in most elections for key offices," it also was only recently released from a 35-year consent decree prohibiting it from engaging in election intimidation behavior. (SAC ¶ 110.) Likewise, the Trump Defendants stress that former President Trump is now, once again, a "*current* presidential candidate" (Trump Mem. at 1), and he has already raised "at least $207.5 million since the election, a significant amount of which has been directed to former President Trump's new political action committee, Save America PAC" (SAC ¶ 115). Indeed, the RNC does not even contend that the wrongful behavior will not be repeated but instead, incorrectly, defends it as

---

[17] Clara Hendrickson, Detroit Free Press, *Kristina Karamo seeks court order that could impact thousands of Detroit voters*, Oct. 28, 2022, https://www.freep.com/story/news/politics/elections/2022/10/28/kristina-karamo-lawsuit-detroit-votes/69598090007/.

[18] Jack Nissen, Fox 2 Detroit, *Detroit judge dismisses Karamo lawsuit, calls it 'false flag of election law violations and corruption'*, Nov. 7, 2022, https://www.fox2detroit.com/news/detroit-judge-dismisses-karamo-lawsuit-calls-it-false-flag-of-election-law-violations-and-corruption.

permissible under VRA § 11(b). (*See, e.g.*, RNC Mem. at 17-19.) All of this creates a risk of future harms to Plaintiffs of the same sort that give them standing in the first place: future harms to their voting rights, future harms to their members' voting rights, and/or future drains on their resources.

Finally, contrary to the Trump Defendants' cursory assertion that MWRO and NAACP lack standing to bring their VRA § 11(b) claim because they "cannot meet their burden of proving injury in fact" (Trump Mem. at 26), the SAC establishes injury, as well as the other prongs of organizational standing and representational standing. The Trump Defendants ignore that Plaintiff NAACP is a national organization, with members in 48 states.  (SAC ¶ 12.) The NAACP has associational standing to bring Section 11(b) claims on behalf of its members, and therefore the Plaintiffs may litigate the substantial risk of future harm faced by Plaintiffs not only in Michigan but in other states where similar conduct is likely to recur. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) (establishing that, even when not injured itself, "an association may have standing solely as the representative of its members").

### C.     The SAC's Allegations of Intimidation, Threats and Coercion Are Well Pleaded.

Defendants do not argue that pressuring state and local election officials to disregard lawfully cast ballots, as alleged here (*see* SAC ¶¶ 21-37), is beyond the reach of VRA § 11(b). (*See* Trump Mem. at 21-24; RNC Mem. at 21-24.) Nor could they: as set forth above, VRA § 11(b) proscribes intimidation against anyone who is "voting," "attempting to vote," or "urging or aiding any person to vote or attempt to vote," 52 U.S.C. § 10307(b)—and the VRA expressly defines "voting" as including "having such ballot counted properly *and* included in the appropriate totals of votes cast," 52 U.S.C. § 10310(c)(1) (emphasis added).

24

Defendants contend only that the SAC fails to allege conduct that constitutes "intimidat[ion], threat[s], or coerc[ion]" under the statute. (*See* Trump Mem at 17-23; RNC Mem. at 6, 15-19.) This argument has no merit. The words "intimidate," "threaten," and "coerce" have broad meaning, particularly in the VRA, which Congress intended to be given "the broadest possible scope." *Allen*, 393 U.S. at 567.[19] The SAC amply alleges that Defendants have deployed overt and indirect tactics to intimidate, threaten, or coerce state and local officials.

Although Plaintiffs have alleged physical aggression obstruction by Defendant Trump Campaign's agents (*see* SAC ¶¶ 28-34), VRA § 11(b)'s reach is not limited to such conduct. As the Southern District of New York recently explained upon examining VRA § 11(b)'s history and application, other forms of conduct that "reasonably arouse fear in recipients" may be "subtler, but no less potent, forms of intimidation" in violation of this statute. *NCBCP I*, 498 F. Supp. 3d at 485; *see also United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 353 (E.D. La. 1965) (stating that VRA § 11(b)'s predecessor statute Section 131(b) "may be extended against interference with any activity having a rational relationship with the federal political process").[20]

---

[19] The ordinary meanings of "intimidate," "threaten," and "coerce" are expansive. *See Leocal v. Ashcroft*, 543 U.S. 1, 2 (2004) ("When interpreting a statute, words must be given their ordinary or natural meaning.") (cleaned up). As the court in *NCBCP I* explained:

> To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." To "threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)."

498 F. Supp. 3d at 477 (quoting Webster's Third New Int'l Dictionary (1966)).

[20] *Katzenbach* and certain other cases cited herein were brought under the Civil Rights Act of 1957, 52 U.S.C. § 10101(b) ("Section 131(b)")), which is VRA § 11(b)'s predecessor statute. Like VRA § 11(b), Section 131(b) prohibits "intimidat[ion]," "threat[s]," and "coerc[ion]" in connection with voting. 52 U.S.C. § 10101(b). VRA § 11(b) was enacted with the intent of expanding Section

Accordingly, VRA § 11(b) also proscribes threats of baseless prosecutions, false claims of voter fraud and criminality, and other coercive tactics. *See United States v. McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967) (applying Section 131(b), 11(b)'s predecessor statute, to "baseless arrests and prosecutions" at a voter registration drive); *United States v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965) (economic pressure actionable voter intimidation under 131(b)); *LULAC*, 2018 WL 3848404, at *4 (denying motion to dismiss VRA § 11(b) claim for report falsely identifying individuals as being fraudulently registered to vote).

As detailed above, the SAC contains multiple allegations of conduct by Defendants that is violative of VRA § 11(b). For example, the SAC alleges numerous calls by former President Trump to the officials in various battleground states and even a meeting at the White House with Michigan's legislative leaders which raises an inference of coercion against certification of President-Elect Biden's victory. (SAC ¶¶ 50, 52, 55, 58, 61-63.) Former President Trump even called Georgia's Secretary of State and pressured him to "find 11,780 votes," threatening him with a "criminal offense" if he declined to do so. (*Id.* ¶ 59.) The SAC also alleges numerous examples of former President Trump's public coercion and intimidation of election officials, including by falsely implicating them in criminal conduct, *e.g.*, by former President Trump suggesting that Georgia's Secretary of State and Governor were implicated in "massive voter fraud" and amplifying a tweet saying that they "will soon be going to jail." (*Id.* ¶ 58.) The SAC also includes allegations of incitement of lawless behavior against those involved in election certification, incitement which resulted in threatened and actual violence, including armed rioters storming the Capitol to violently disrupt the certification of the

---

131(b). *See* H.R. Rep. No. 89-439, at 30 (1965). Thus, VRA § 11(b) is interpreted *in pari materia* with Section 131(b), but more broadly.

presidential election on January 6, 2021. (*Id.* ¶¶ 33-34, 37.) The SAC also includes allegations of President Trump pressuring state and federal legislators, as recently as 2022, to illegally rescind or nullify the 2020 election results. (*Id.* ¶¶ 112-114.) And, as noted above, the SAC alleges that the Trump Campaign's agents engaged in obstruction, including physical aggression, at tabulation sites in an effort to disenfranchise voters. (*Id.* ¶¶ 29-31, 101-108.)

With respect to the RNC, the SAC alleges that the RNC and its constituent state organizations have undertaken large-scale "election integrity" efforts to disrupt elections through numerous methods, including recruiting people who falsely believe the 2020 election was stolen to work as election officials, promoting false claims of fraud in the 2020 election, and organizing militaristic poll watcher trainings designed to intimidate voters and result in voter challenges. (*Id.* ¶¶ 117-119.)

Finally, the SAC alleges—and describes in detail—how the Defendants worked together took to identify individuals to serve as "alternate electors" as part of a scheme to disenfranchise tens of millions of voters (including Plaintiffs and their members) by declaring that their states' electoral votes should go to former President Trump even though the majority of their voters had elected President Biden. (*Id.* ¶¶ 68-72.)

The conduct described above—which is "interference with . . . activity" at the heart of "the federal political process," *Katzenbach*, 250 F. Supp. at 353—is actionable under VRA § 11(b), *see, e.g.*, *NCBCP I*, 498 F. Supp. 3d at 480 ("Conduct that puts others 'in fear of harassment and interference with their right to vote' naturally includes egregious conduct, such as acts of violence.") (quoting *LULAC*, 2018 WL 3848404, at *4); *Daschle v. Thune*, slip op., No. CIV 04-4177 (D.S.D. Nov. 2, 2004), ECF No. 6 (granting temporary restraining order under VRA § 11(b) against campaign members who followed Native Americans to polling

places, stood closely behind them, and made harassing comments about Native Americans being prosecuted for voting illegally).

The RNC argues that the SAC fails to allege that the RNC intimidated, threatened, or coerced voters. (*See* RNC Mem. at 15.) This assertion is not accurate. Taken together, the allegations in the SAC present an extreme climate of pressure by Defendants, including the RNC, on state and local officials involved in certifying election results, for the purpose of disenfranchising voters. This includes alleged conduct by agents of the Trump Campaign and the RNC to disenfranchise voters through baseless challenges and other obstructionist conduct. *See* pages 4-6, 8, *supra*. The alleged conduct even included direct efforts to organize alternate states of electors, who would disregard the will of voters and hand the electoral votes of states where voters had chosen President Biden over former President Trump. *See* pages 5, 8, *supra*. These are all forms of "coercion" against voters, as coercion includes "nullifying individual will or desire." *See* n.18, *supra*. Moreover, section 11(b) protects both voters and elections officials. As noted above, the statute protects not only voters, but also anyone "urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b), and another provision of the VRA broadly defines "voting" as including "having such ballot counted properly *and* included in the appropriate totals of votes cast," 52 U.S.C. § 10310(c)(1) (emphasis added).

In sum, the detailed allegations in the SAC support more than a plausible inference that Defendants intended the natural consequences of their actions when they engaged in conduct having the "inevitable effect of . . . discourag[ing], intimidat[ing], threaten[ing], and coerc[ing]" citizens seeking to vote, which violates VRA § 11(b). *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965); *see* Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) (testimony of Attorney General Nicholas

Katzenbach that under VRA § 11(b), "defendants would be deemed to intend the natural consequences of their acts"). That is all that is required to overcome a motion to dismiss.

Notwithstanding the scope of these allegations and VRA § 11(b)'s reach, the RNC urges that the SAC should be dismissed because "statements about the illegality of voter fraud and warnings against illegal voting . . . do not violate § 11(b)." (RNC Mem. at 24.) The Trump Defendants similarly argue that the SAC should be dismissed, claiming that the SAC only allege "simple and straightforward political speech during an important political dispute." (Trump Mem at 18.) But, as discussed above, the allegations in the SAC are not limited to such statements, and, in any event, false statements about purported voter fraud that risk intimidating or coercing voters have been found actionable under VRA § 11(b). *See, e.g.*, *LULAC*, 2018 WL 3848404, at *4 (denying motion to dismiss VRA § 11(b) claim for report falsely identifying individuals as being fraudulently registered to vote).[21] The key is whether a

---

[21] Nor do any of the RNC's cited cases immunize false claims of voter fraud from scrutiny under 11(b) as the RNC suggests. Instead, the VRA § 11(b) cases cited by the RNC all involved case-specific determinations. (*See* RNC Mem. at 17-18 (citing *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (denying preliminary injunction, finding that plaintiffs had not demonstrated that Virginia statute requiring voters to sign statement of "Republican party affiliation" in order to vote for a Republican candidate in primary constituted intimidation)); *Pa. Democratic Party v. Republican Party of Pa.*, Civ. No. 16-5664, 2016 WL 6582659, at *7, *8 (E.D. Pa. Nov. 7, 2016) (denying preliminary injunction where, *inter alia*, "Plaintiff [had] not shown that any Defendant has engaged or will engage in voter intimidation in this District" but noting that "had Plaintiff made any credible showing, . . . I would not hesitate to take immediate action"); *Arizona Democratic Party v. Arizona Republican Party*, Civ. No. 16-3752, 2016 WL 8669978, at *7, *10 (D. Ariz. Nov. 4, 2016) (denying preliminary injunction where "Plaintiff produced no evidence that [defendant's] actions will result in voter intimidation," contrasting case with another where "the court had before it concrete examples of voter intimidation by the defendants' supporters that had actually occurred," thereby "removing any air of speculation about likelihood of harm" and justifying an injunction); *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 463-64 (N.D.N.Y. 2006) (granting summary judgment on VRA § 11(b) claim in case not involving any statements concerning purported election fraud, ruling that defendants' actions in visiting plaintiffs at their homes and completing absentee ballots for them implicated conduct that "would fairly support a finding that [defendants] misinformed, defrauded, tricked, or deceived these individuals," but that

statement would have the "inevitable effect" of intimidating a voter or a state official responsible for counting or certifying votes. *Clark*, 249 F. Supp. at 728. As explained, the statements and other actions by the RNC described in the SAC, which include false suggestions that elected officials were complicit in criminal activity, raise more than a plausible inference of such inevitable effect. The RNC also strains to contend that "no statement was directed at voting." (RNC Mem. at 26.) This contention again is false, given the numerous statements concerning voting that are attributable to the RNC described above. *See* pages 3-4, *supra*. The RNC also ignores that the VRA expressly defines voting as including "having such ballot counted properly and included in the appropriate totals of votes cast," 52 U.S.C. § 10310(c)(1), and the SAC alleges numerous actions targeting this process, and the participants in that process (*see, e.g.*, SAC ¶¶ 53, 65, 82, 93).

For these reasons, as this Court has already recognized, the SAC more than adequately states a claim under VRA § 11(b) and Defendants' motions to dismiss this claim should be denied.

**D.** **Plaintiffs Have Adequately Pleaded That Trump Campaign Volunteers, RNC Volunteers, and State Republican Parties Who Engaged in Relevant Conduct Were Defendants' Agents.**

The Trump Campaign tries to escape responsibility for its volunteers' actions by arguing that the SAC is "completely devoid of any suggestion that the Trump Campaign had control over its diffuse and myriad volunteers" (Trump Mem. at 21), and the RNC similarly insists that it is not liable for the actions of members of state parties (RNC Mem. at 16-18).[22] Defendants

---

plaintiffs had presented "no sufficient basis" of "compulsion as required to prove intimidation, threats, or coercion" under VRA § 11(b))).

[22] Plaintiffs have separately alleged facts showing that any unlawful threats or violence committed by individuals who might not have been Defendants' agents were nonetheless committed as the result of Defendants' incitement. (*See, e.g.*, SAC ¶¶ 33-34.)

are wrong. Plaintiffs have alleged facts supporting an inference that Defendants recruited, trained, and instructed Trump volunteers on poll monitoring, including vote counting, and that the RNC controls the state parties involved in those efforts; those allegations establish that the volunteers were Defendants' agents.[23]

As set forth in the Facts section, the SAC alleges that Defendants and their agents recruited and trained volunteers who engaged in election-related activities. (SAC ¶¶ 84-85.) Defendants' highly militaristic recruitment efforts for their "Army for Trump" called for volunteers to "enlist" to "fight" for Trump. (*Id.* ¶¶ 83-84, 92.) The trainings prepared and provided by Defendants encouraged volunteers to think that they were called upon to prevent "deliberate attacks that could sway the overall results of the election." (*Id.* ¶¶ 84-85, 87.) These allegations create a plausible inference that the Trump Campaign observers who engaged in obstruction and physically intimidating conduct were acting under the direction and control of Defendants. *See, e.g.*, *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354, 357 (D.D.C. 2020) ("[A] court must . . . grant plaintiff the benefit of all inferences that can be derived from the facts alleged.") (citation omitted).

Further, as the RNC concedes, it is "responsible for statements or actions by members of state parties" if "they were acting under the direction, and as agents, of the RNC." (RNC Mem. at 16.) The SAC pleads such a relationship: alleging, *inter alia*, that the RNC "oversees" the state Republican parties (SAC ¶¶ 2, 66), and that pursuant to the RNC's organizational

---

[23] The fact that the volunteers may be unpaid does not prevent them from being agents. *Levy v. Currier*, 587 A.2d 205, 210 (D.C. 1991) (citing Restatement (Second) of Agency § 225 & cmt. A ("Consideration is not necessary to create the relation of principal and agent.")); *see also* Restatement (Third) of Agency § 7.07(3)(b) (2006) ("[T]he fact that work is performed gratuitously does not relieve a principal of liability."); *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 444 (7th Cir. 2000) (nonprofit corporation could be held liable for negligence of a volunteer).

structure, its members include the heads of each state's Republican Party (*id.* ¶ 53 (citing "The Rules of the Republican Party")). And, while the RNC relies on *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 2:81-cv-3876, 2016 WL 6584915 (D.N.J. Nov. 5, 2016), that case—an out-of-district case interpreting specific language and representations in a consent decree—stands for the proposition that it is a "factual inquiry" whether state party chairs are "acting in their capacity as RNC members" when determining whether their conduct is attributable to the RNC. *Id.* at *16. That "factual inquiry" must be determined after trial, not on a motion to dismiss.

The SAC further alleges that Defendants controlled their volunteers' efforts to undermine and then challenge the election results. (SAC at. ¶ 22.) Volunteers and state parties were carrying out a plan based on Defendants' direction. (*Id.*) This is sufficient to support a plausible inference that the volunteers were agents "acting under [Defendants'] direction or control." *Azzam v. Rightway Dev. Inc.*, 789 F. Supp. 2d 110, 115 (D.D.C. 2011) (holding that the complaint adequately alleged principal "directed" its agent to perform tortious conduct). Any protestation to the contrary by Defendants involves issues of fact not appropriately addressed at the pleading stage. *See Casanova v. Marathon Corp.*, 477 F. Supp. 2d 98, 103 (D.D.C. 2007) (issues of material fact precluded determination level of control, if any, between parties even at summary judgment stage). Indeed, this Court has already recognized as much. (*See* Dkt. 59 at 20-21 ("To the extent that the RNC contests these allegations [concerning the attribution of the conduct of RNC officials to the RNC], it is premature for the Court to consider the RNC's arguments now, given that the Plaintiffs' plead that the conduct at issue was conducted by RNC officials.").)

### III.   Plaintiffs State a Claim Under KKK Act § 1985(3).

KKK Act § 1985(3) prohibits conspiring for any one of three reasons: (1) "for the purpose

of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" (the "Deprivation Clause"); (2) "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws" (the "*Hindrance Clause*"); *or* (3) "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy" (the "*Support or Advocacy Clause*"). 42 U.S.C. § 1985(3). Defendants appear to address only a claim under the Deprivation Clause. (*See* RNC Mem. at 23-24; Trump Mem. at 18-20.)

Here, the SAC adequately alleges both a conspiracy and all three types of prohibited underlying conduct. Indeed, given that the violations of all three clauses involve the right to vote, alleging a conspiracy to violate § 1985(3) also constitutes alleging a conspiracy to violate VRA § 11(b). *See Nat'l Coal. on Black Civic Participation v. Wohl* ("*NCBCP II*"), 512 F. Supp. 3d 500, 512 (S.D.N.Y. 2021) (noting that conduct constituting intimidation under VRA § 11(b) also constitutes intimidation under § 1985(3)).

### A.    Plaintiffs Have Alleged Facts Showing a Civil Conspiracy.

Plaintiffs allege facts showing a civil conspiracy: (i) an agreement between two or more persons; (ii) to participate in an unlawful act or in a lawful act in an unlawful manner; and (iii) an injury caused by an unlawful overt act performed by one of the parties to the agreement (iv) pursuant to, and in furtherance of, the common scheme. *Youming Jin v. Ministry of State Sec*.,

335 F. Supp. 2d 72, 78 n.2 (D.D.C. 2004).[24] In particular, the SAC satisfies the first two elements

by alleging, in addition to joint recruitment, fundraising, and training efforts (SAC ¶¶ 84-87), close

operational            and            messaging            ties            among            Defendants

(*e.g.*, *id.*, ¶¶ 43, 87, 89-91, 93), including multiple instances in which Defendants, directly and

through their agents, acted in concert to threaten, intimidate, or coerce election officials with the

shared goal of disenfranchising Plaintiffs (*e.g.*, *id.*, ¶¶ 20, 22-38, 41-43, 85-88, 93). Many of those

concerted disenfranchisement efforts took place all over the nation but in a compressed time

period, illustrating the close coordination among Defendants. (*Id.* ¶¶ 27-34, 41, 47-53, 58-65, 82,

85, 90-91.)[25] Thus, the Court should swiftly reject the RNC's contention that even if the SAC

adequately alleges a conspiracy, it does not allege a conspiracy to deprive anyone of a right. (RNC

Mem. at 23-24.)

The Court should also reject the RNC's argument that Plaintiffs fail to allege the remaining

two elements—an injury caused by Defendant's conspiratorial acts—because "Defendants'

actions thus far have been unsuccessful." (*Id.* at 24 (quoting SAC ¶ 1).) *First*, neither statute

requires that Defendants achieved their ultimate goal. *NCBCP II*, 2021 WL 480818, at *10 ("the

[VRA and KK Act] do not proscribe only threatening and intimidating language that successfully

prevents a person from voting"). *Second*, although Defendants did not overturn the result of the

---

[24] "[A]s the D.C. Circuit has recognized, 'in most cases the court will have to infer a conspiracy from indirect evidence'" that suggests the conspirators are pursuing the same goal and are in contact with one another in that pursuit. *Youming Jin*, 335 F. Supp. 2d at 82 (quoting *Halberstam*, 705 F.2d at 481). Thus, a plaintiff may adequately allege conspiracy based "primarily on inference, press reports, and circumstantial evidence." *In re Vitamins Antitrust Litig.*, No. MISC 99-197, 2000 WL 1475705, at *10 (D.D.C. May 9, 2000).

[25] "An express agreement among all conspirators is not necessary." *Hobson v. Wilson,* 737 F.2d 1, 51 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord'n Unit*, 507 U.S. 163 (1993). Provided that conspirators share "the general conspiratorial objective . . . they need not know all the details of the plan . . . or possess the same motives." *Id.*

2020 presidential election, they did injure Plaintiffs while trying to do so. NAACP had to expend resources trying to counteract the harms inflicted on its members by Defendants' actions. (SAC ¶ 128.) Moreover, Plaintiffs have also alleged facts showing that Defendants intimidated, threatened, and coerced state officials in an effort to prevent Plaintiffs' (and their members') votes from being properly counted and that this effort undermined those individuals' voting rights. (*Id.* ¶ 125.) Such harms, including the dignitary harm to Black voters who were targeted for disenfranchisement and the false narrative of voter fraud, are profound injuries. "[I]t is 'as equally unquestionable that the right to have one's vote counted is as open to protection [. . .] as the right to put a ballot in a box.'" *Reynolds*, 377 U.S. at 554-55 (citation omitted). Creating "fear of harassment and interference" among voters or those counting and certifying their votes causes a cognizable harm under both VRA § 11(b) and KKK Act § 1985(3), even where the votes are ultimately cast and counted. *LULAC*, 2018 WL 3848404, at *1; *NCBCP II*, 2021 WL 480818, at *5, *10.

### B.     Plaintiffs Have Stated a Claim Under the Support or Advocacy Clause.

The same intimidation, threats, and coercion of election officials that violated VRA § 11(b) also violated the Support or Advocacy Clause of § 1985(3) by aiming "to prevent by force, intimidation, or threat" Plaintiffs from giving their "support or advocacy in a legal manner" in a federal election. 42 U.S.C. § 1985(3).

Defendants argue that Plaintiffs' § 1985(3) claim should be dismissed entirely because (1) the SAC does not adequately allege any "discriminatory purpose" (Trump Mem. at 18-20; *see* RNC Mem. at 21-23), and (2) § 1985(3) does not create substantive rights and Plaintiffs have not alleged that Defendants violated some separate right (RNC Mem. at 21-23). Those arguments are incorrect. *First,* as shown below in Plaintiffs' arguments regarding the Deprivation and Hindrance Clauses, Plaintiffs *do* allege both discriminatory purpose and violations of separate rights,

including their rights under VRA § 11(b) and the Equal Protection Clause. *Second*, Plaintiffs do not need to allege discriminatory purpose or identify a separate right in order to state a claim under § 1985(3). The Support or Advocacy Clause does not require race- or class-based discrimination and creates its own freestanding cause of action. *LULAC*, 2018 WL 3848404, at *5-*6; *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967); *NCBCP I*, 498 F. Supp. 3d at 486-87 & n.30.

Defendants disregard § 1985(3)'s plain language and structure, both of which sharply differentiate among the three clauses. On one hand, the Deprivation and Hindrance Clauses explicitly invoke "the equal protection of the laws." 42 U.S.C. § 1985(3). On the other hand, the Support or Advocacy Clause does not. That distinction is reinforced by the two separate forms of conspiracy set out by the statute: one in which "two or more persons . . . conspire or go in disguise on the highway or on the premises of another" (Deprivation and Hindrance Clauses) and another in which "two or more persons conspire to prevent by force, intimidation, or threat" any citizen's support or advocacy in connection with a federal election (Support or Advocacy Clause). *Id.* Although some decisions addressing § 1985(3), including some D.C. Circuit decisions, have been misread as stating that equal protection analysis applies to the Support or Advocacy Clause, that is because those decisions either address claims that are "focus[ed] on the clauses related to equal protection" or simply "do not explicitly distinguish between different portions of Section 1985(3)." *LULAC*, 2018 WL 3848404, at *5.[26]

---

[26] In *Hobson*, the D.C. Circuit said that "the statute" requires that a plaintiff prove that the defendants conspired to deprive someone of the equal protection of the laws or of equal privileges and immunities, that "the rights protected by section 1985(3) exist independently of the section and only to the extent that the Constitution creates them," and that there must be class-based animus. 737 F.2d at 14-16. However, the Court did so *only* in terms of the Deprivation Clause, without addressing the Hindrance and Support or Advocacy Clauses in its recitation of the relevant statutory text. *Id.* at 14. Thus, the court's analysis applies—and was intended to apply—only to the Deprivation Clause. The same is true for other cases in which the Court focused on equal

Those key distinctions between the Support or Advocacy Clause and the other two clauses of § 1985(3) lead to the conclusion that the court reached in *LULAC*: the Support or Advocacy Clause, "unlike the equal protection part of Section 1985(3)[,] does not require allegations of a race or class-based, invidiously discriminatory animus or violation of a separate substantive right." *LULAC*, 2018 WL 3848404, at *6. Supreme Court decisions regarding § 1985(3) support that conclusion. As the court noted in *LULAC*, the Supreme Court generally has been careful to mark the limits of its analysis regarding the requirements of invidious discrimination and the violation of a separate statute or constitutional right and has not applied those requirements to the Support or Advocacy Clause.[27] The *LULAC* court observed that the Supreme Court's analysis in *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971), which announced the animus requirement, involved only equal protection analysis under the Deprivation Clause and thus did not apply to the Support or Advocacy Clause. 2018 WL 3848404, at *5; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993) (stating that *Griffin*'s analysis applies to "the first clause of § 1985(3)").

---

protection claims, and cited this general language from *Hobson*, *Griffin*, or *Bray*, all of which analyzed only the Deprivation Clause. *See, e.g.*, *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009); *In re Rodriguez*, No. 05-5130, 2005 WL 3843612, at *4 (D.C. Cir. Oct. 14, 2005) (per curiam); *LaRouche v. Fowler*, 152 F.3d 974, 987 n.14 (D.C. Cir. 1998); *Barbour v. Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995); *McCord v. Bailey*, 636 F.2d 606, 613 (D.C. Cir. 1980). But Plaintiffs have found no case in which the D.C. Circuit applied the equal protection standard to a Support or Advocacy Clause claim. Indeed, in a recent decision regarding a claim involving the Support or Advocacy Clause, although the district court recited the equal protection standard, *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 96 (D.D.C. 2019), the D.C. Circuit did not and disposed of the case on other grounds, *Wilson v. DNC Servs. Corp.*, 831 F. App'x 513, 515-16 (D.C. Cir. 2020) (per curiam).

[27] Authorities that Defendants rely upon recognize those limitations. *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 827 (1983), explicitly restricts its analysis to the Deprivation Clause: "This case concerns the scope of the cause of action made available by 42 U.S.C. § 1985(3) (Supp. 1981) to those injured by conspiracies formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" (*See* RNC Mem. at 20 (quoting *Carpenters*).)

The court in *LULAC* further noted that the Supreme Court declined to extend *Griffin*'s reasoning beyond the first clause of § 1985(3) because "there is no suggestion" that reasoning should apply to "any other portion of § 1985." *LULAC*, 2018 WL 3848404, at *5 (quoting *Kush v. Rutledge*, 460 U.S. 719, 726 (1983)); *see also Bowie v. Maddox*, 642 F.3d 1122, 1129 & n.3 (D.C. Cir. 2011) (reversing dismissal of claim under first clause of § 1985(2) for "[l]ack of invidious motive" because "that clause 'contain[s] no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws.'" (quoting *Kush*, 460 U.S. at 725)).

Based on the correct legal standard, the court in *LULAC* held that the defendants' alleged conduct, which implied that the individual plaintiffs and the organizational plaintiff's members were voting illegally and also included personally identifying information regarding the individual plaintiffs, violated both VRA § 11(b) and the Support or Advocacy Clause and that the plaintiffs' alleged injuries satisfied those statutes' requirements. *LULAC*, 2018 WL 3848404, at *1, *4, *6. The plaintiffs' cognizable injuries included "the detrimental impact [on the individual plaintiffs] of adverse publicity, intimidation, embarrassment, and fear of harassment associated with their participation in the electoral process" and, for the organizational plaintiff, having to divert "time and resources to combat the false narrative that Latinos who vote are doing so illegally" rather than being able to devote those resources to its ordinary activities. *Id.* at *4, *6.

Similarly, here, Plaintiffs have alleged facts showing that Defendants used intimidation and incitement in an effort to prevent them from supporting a political candidate and to otherwise disenfranchise them. Plaintiffs have further alleged that Defendants' conduct harmed them, whether in the form of injury to their property (NAACP) or in the form of debasing their right to have their votes counted in an environment free from force, intimidation, or threat (all Plaintiffs or their members). *Paynes*, 377 F.2d at 63.

For the foregoing reasons, a violation of the Support or Advocacy Clause does not require either a showing of class-based discrimination or violation of a separate right, and Plaintiffs have pleaded facts that establish a violation thereof.

### C.   Plaintiffs Have Stated Claims Under the Deprivation and Hindrance Clauses.

Plaintiffs also state claims under both the Deprivation Clause and the Hindrance Clause. Claims under the Deprivation Clause require showing: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Hobson v. Wilson,* 737 F.2d 1, 14 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord'n Unit*, 507 U.S. 163 (1993). For the purposes of this Opposition only, Plaintiffs assume that the same standard applies to the Hindrance Clause.[28]

As established above, Plaintiffs allege facts showing that Defendants conspired for the purpose of directly and indirectly depriving them of their right to vote (Deprivation Clause) and "for the purpose of preventing or hindering the constituted authorities of [multiple states] from giving or securing" them their right to vote (Hindrance Clause) and that Defendants acted in furtherance of that conspiracy. 42 U.S.C. § 1985(3). Specifically, Plaintiffs have alleged facts showing the existence of a conspiracy to use intimidation, threats, and coercion to obstruct the counting and certification of votes by state and local election officials. Finally, Plaintiffs have alleged facts showing that they were injured in their property, by the debasement of their rights, or both. As also shown above, Defendants' arguments to the contrary fail. Their remaining arguments

---

[28] "Although the Supreme Court has interpreted [ ] the 'Deprivation Clause[ ]' of § 1985(3), it has never construed the Hindrance Clause[.]" *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 300 (E.D.N.Y. 2018) (citation omitted) (first two alterations in original).

are equally unavailing.

    *1.  Plaintiffs Have Alleged Class-Based Discrimination.*

Defendants argue that Plaintiffs have failed to allege that there is "some racial, or perhaps otherwise class-based invidiously discriminatory animus" underlying the conspiracy. (Trump Mem. at 19 (citing *Bray*, 506 U.S. at 268); RNC Mem. at 20.) Not so. Plaintiffs have alleged facts indicating that Defendants targeted their efforts at heavily Black areas without a plausible, non-discriminatory reason for doing so and consistent with long-standing discriminatory myths that votes from heavily Black communities are more likely to be fraudulent. (SAC ¶¶ 3-4, 17, 20, 27, 46, 109-11, 123, 128.) Plaintiffs have provided specific examples of the targeted areas, including Detroit, Philadelphia, Atlanta, Milwaukee, and Madison. (*E.g.*, *id.* ¶¶ 3, 20, 27, 46, 123.) Plaintiffs have further identified instances in which Defendants challenged the vote in heavily Black areas but not in any other areas. (*Id.* ¶¶ 27, 45. ) That includes noting that Defendants targeted Detroit (*e.g.*, *id.* ¶¶ 24, 41-42), even though a judge had found their claims "not credible" (*id.* ¶ 41), and even though at least one majority-white city in the same county as Detroit had inconsistencies more significant than the minor, routine inconsistencies in Detroit (*id.* ¶¶ 45-46). On a motion to dismiss, this Court may not credit Defendants' assertions that they were trying to protect ballot integrity or election integrity. (Trump Mem. at 3-5; RNC Mem. at 21-22.) Plaintiffs have more than met their burden to allege facts that push their claims over the dividing line "between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Separately, Plaintiffs have alleged invidious discrimination on the grounds that Defendants targeted areas that went against former President Trump in the 2020 election. Political affiliation can be a protected class under § 1985(3). *Keating v. Carey*, 706 F.2d 377, 386-88 (2d Cir. 1983). The plain language of the KKK Act does not specify a need for invidious racial motive. Nor does the KKK Act's history support such a requirement. "The Congress of 1871 . . . did not view the

Klan solely as a racist organization to oppress blacks but as a political organization intent on establishing Democratic hegemony in the South.'" *Id.* at 387. The KKK Act's Senate floor sponsor made that broader scope clear when he explained to the Senate that the Act would apply to "a conspiracy formed against [a] man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter[.]" Cong. Globe, 42d Cong., 1st Sess. 565, 567, col. 2 (1871).

### D. Plaintiffs Have Alleged That Defendants' Violations of § 1985(3) Harmed Them.

The RNC also argues that Defendants' violations of § 1985(3) did not proximately cause Plaintiffs any injury. (RNC Mem. at 23-24.) As a threshold matter, it is far from clear whether proximate causation analysis is the right analysis for § 1985(3), particularly given that the Deprivation Clause expressly proscribes "indirect[]" as well as "direct[]" means of depriving plaintiffs of their rights, privileges, and immunities. More importantly, the RNC's purported proximate causation argument is not about causation. Instead, it is an assertion that Plaintiffs suffered no injury cognizable under § 1985(3). (*See* RNC Mem. at 24 (arguing that "Plaintiffs fail to allege deprivation").) As already established, the fact that Defendants' efforts to overturn the 2020 presidential election were unsuccessful simply does not mean that those efforts left Plaintiffs unharmed.

Plaintiffs have sufficiently alleged facts showing that Defendants violated all three clauses of § 1985(3), so this Court should deny their motions to dismiss.

### IV.   This Case Does Not Involve a Political Question.

The Trump Defendants make the conclusory assertion that adjudicating this lawsuit would "improperly regulate the executive department" and "require the Court to make a value determination about what is or is not proper for the President to say during a political speech when advocating for governmental action or advocating that the laws be faithfully executed." (Trump

Mem. at 14.) Former President Trump raised this precise argument before another judge in this District, and the court rejected it. *Thompson v. Trump*, 590 F. Supp. 3d 46, 85-86 (D.D.C. 2022). This Court should reject it too.

The political question doctrine bars jurisdiction "only when the Constitution textually commits the issue to be adjudicated in the case to a coordinate political department or when there is a lack of judicially discoverable and manageable standards for resolving it." *Id.* at 85 (citing *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015)) (internal quotation marks omitted). The characteristics of a political question are:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government.

*United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

This Court has already held that the SAC's allegations about former President Trump's conduct do "not constitute executive action in defense of the Constitution." (Dkt. 59 at 13.) Because "the court already has held that the President's actions . . . were not undertaken in his official capacity . . . th[is] case[] implicate[s] no policy choice or value determination committed to the Executive Branch. That holding alone takes this case outside of the political question doctrine." *Thompson*, 590 F. Supp. 3d at 85.

The mere fact that the Trump Defendants face allegations including and relating to the former President's actions and campaign does not "morph" this case into presenting a political question, *id.*, nor does the fact that the conduct giving rise to these allegations arose in a political

context. "A suit against the President often has political overtones, but 'courts cannot avoid their responsibility merely because the issues have political implications.'" *Id.* at 86 (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)). *See also Nixon v. Herndon,* 273 U.S. 536, 539 (1937) ("The objection that the subject-matter of the suit is political is little more than a play upon words. Of course, the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in suit at law hardly has been doubted for over two hundred years…"); *Baker v. Carr*, 369 U.S. at 217 ("[t]he doctrine…is one of 'political questions,' not 'political cases.'").

## V.   The VRA and KKK Act Apply to Former President Trump.

Former President Trump next argues that he is above the VRA and KKK Act, citing to cases about the applicability of the APA and FOIA. (Trump Mem. at 22-24.) Those statutes are not analogous here, nor is the reasoning in those cases.

In *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992), the Court concluded that the president is not subject to APA review because the president is not an "agency." Neither the VRA nor KKK Act limit their applicability to "agencies." They apply—as the Trump Defendants acknowledge—to "persons." (Trump Mem. at 22.) Here, former President Trump is being sued in his individual capacity as a person.

The Trump Defendants next cite to a case excluding "the President's immediate personal staff or units in the Executive Office of the President" from FOIA. *Citizens for Resp. & Ethics in Washington v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009). Plaintiffs do not seek to apply the VRA or KKK Act to the President's personal staff, but to former President Trump himself in his capacity as a private citizen.

In any event, these cases address applicability of laws to the *office* of the Presidency. But Plaintiffs bring suit against former President Trump for actions he took in his *personal* capacity,

which is why this Court has held that the allegations about former President Trump's conduct do "not constitute executive action in defense of the Constitution." (Dkt. 59 at 13.) Because the conduct at issue in this lawsuit does not relate to official executive action, former President Trump's arguments that the statutes at issue do not apply to him fail.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss.

Dated: January 17, 2023

Respectfully submitted,

/s/ *Jason M. Bradford*
Jason M. Bradford (D.D.C Bar No. IL0073)

Samuel Spital (D.D.C Bar No. NY0248)
Janai S. Nelson (*pro hac vice*)

NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
(212) 965-2200

Anuja D. Thatte (D.D.C. Bar No. 1742276)
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300

Jason M. Bradford (D.D.C Bar No. IL0073)
Jonathan A. Enfield (D.D.C Bar No. IL0074)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350

Stephen L. Ascher (*pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

*Counsel for Plaintiffs*

44

**CERTIFICATE OF SERVICE**

I certify that on January 17, 2023, I electronically filed the foregoing Plaintiffs' Response in Opposition to Defendants' Motions to Dismiss and the accompanying proposed order with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record.


Dated: January 17, 2023                           /s/ *Jason M. Bradford*
                                                  Jason M. Bradford
                                                  Attorney for Plaintiffs